**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| PHILLIP HALL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 50116 |
| | ) | |
| v. | ) | Hon. Judge Reinhard |
| | ) | |
| STERLING PARK DISTRICT and | ) | Hon. Magistrate Judge Mahoney |
| STERLING PARK DISTRICT BOARD | ) | |
| OF COMMISSIONERS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF STERLING PARK DISTRICT'S MOTION TO
DISMISS COUNT IV OF PLAINTIFF'S COMPLAINT UNDER RULE 12(b)(6) AND
STERLING PARK DISTRICT BOARD OF COMMISSIONERS' MOTION TO DISMISS
PLAINTIFF'S COMPLAINT UNDER RULE 12(b)(6)**

## I.    <u>INTRODUCTION</u>

Plaintiff Phillip Hall's ("Plaintiff") claim for overtime pay under the Illinois Wage

Payment and Collection Act ("IWPCA") fails as a matter of law, because the IWPCA does not

create an entitlement to overtime compensation.  Instead, the IWPCA requires that a claim be

based on a contract or agreement, and the provision of the Sterling Park District's Personnel

Policy Manual ("Manual") relied upon by Plaintiff does not create a contract because the District

classified him as exempt and because the Manual contains a disclaimer.  Case law supports the

dismissal of Plaintiff's IWPCA claim in Count IV against Defendant, Sterling Park District

("District"), where no agreement or contract exists, and Plaintiff is merely using the IWPCA to

extend the statute of limitations for an overtime claim.

Dismissal of Plaintiff's claims against Defendant, Sterling Park District Board of

Commissioners ("Board"), is required here under Rule 12(b)(6), because Illinois law does not

permit Plaintiff to sue the Board as a separate legal entity on a collective basis.  The District is

the corporate entity which can sue or be sued under applicable law creating the District; the Board acts on the District's behalf.  Therefore, the Complaint fails to state a claim.  In addition, Count IV also fails to state a claim under Rule 12(b)(6) for the reasons stated above.

## II.     SUMMARY OF ALLEGATIONS IN PLAINTIFF'S COMPLAINT

The following allegations are taken from Plaintiff's Complaint, which the Court must accept as true for the purposes of ruling on this Motion to Dismiss:

The District employed Plaintiff as the Director of Golf Operations at Emerald Hill Golf and Learning Center until his termination on or about April 30, 2006.  (Compl., ¶¶2, 8, 9, the Complaint is attached to the Motion to Dismiss as Exhibit A.)  Plaintiff alleges that, as the Director of Golf Operations earning nearly $70,000 annually, he primarily performed non-exempt manual labor and was required to and regularly worked in excess of 40 hours per week (Compl., ¶¶8, 9, 11, 15.)  Further, Plaintiff claims that the Manual provides that non-exempt employees who work beyond 40 hours in a work week will receive overtime compensation or be eligible for compensatory time off.  (Compl. ¶¶12-13.)  (Plaintiff does not attach the provisions in question or the entire Manual as exhibits to the Complaint.)  According to Plaintiff, he did not receive any overtime compensation or compensatory time off for the hours he worked in excess of 40 per work week (Compl., ¶14.)

Plaintiff raises claims for alleged: (1) failure to pay overtime in violation of the Fair Labor Standards Act ("FLSA") against Defendants (Count I); (2) willful failure to pay overtime in violation of the FLSA against Defendants (Count II); (3) violation of the Illinois Minimum Wage Law ("IMWL") against Defendants (Count III); and (4) violation of the IWPCA against Defendants (Count IV).

III.    **STANDARD**

A court should grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)

if a plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

Holman v. Indiana, 211 F.3d 399, 402 (7th Cir. 2000), cert. denied, 531 U.S. 880 (2000).

IV.    **COUNT IV SHOULD BE DISMISSED AGAINST THE DISTRICT UNDER RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM**

The IWPCA mandates that an employer pays its employees agreed-upon wages and

benefits within certain time periods.  Mathias v. Addison Fire Protection District No. 1, 43

F.Supp. 2d 916, 925 (N.D. Ill. 1999).  The IWPCA does not address the rate at which an

employer must pay its employees, either during regular or overtime hours.  Id.  Put another way,

the IWPCA does not create a plaintiff's entitlement to overtime wages.  Lopez v. Smurfit-Stone

Container Corp., 2003 WL 297533, *3 (N.D. Ill. Feb. 10, 2003) (attached to this Memorandum

as Exhibit A).

The IWPCA requires that a plaintiff prove a right to compensation pursuant to an

agreement or contract.  Stark v. PPM America, Inc., 354 F.3d 666, 671 (7th Cir. 2004).  However,

courts have held that an employee handbook does not constitute a contract within the meaning of

the IWPCA where the handbook contains an express disclaimer.  Skelton v. American

Intercontinental University Online, 382 F.Supp. 2d 1068, 1075 (N.D. Ill. 2005).  The disclaimer

negates a finding of contract formation.  Id.

For example, in Pautlitz v. City of Naperville, 1991 WL 33658, *3 (N.D. Ill. Mar. 8,

1991) (attached to this Memorandum as Exhibit B), the court dismissed a claim under the

IWPCA for overtime compensation where the plaintiffs relied on the employee handbook

policies defining overtime eligibility and overtime.  The plaintiffs only attached a page of the

handbook, and the defendant submitted the entire handbook in support of its motion to dismiss.

Id. Although the court recognized that it generally does not take notice of matters outside of the pleading on a motion to dismiss, it found that, when a plaintiff relies on the provisions of a document as the basis of its claim, the court requires the entire document in support instead of selected positions offered in a vacuum. Id. The defendant's submission of the entire handbook addressed a deficiency in the pleading. Id. The express disclaimer in the handbook foreclosed the plaintiff's IWPCA claim, and the court dismissed the claim. Id.

Here, Plaintiff relies on policies of the Manual to argue that an agreement existed to pay overtime compensation or compensatory time off for hours worked in excess of 40 per week. (Compl., ¶¶12-14.) However, Plaintiff failed to plead the existence of the disclaimer in the Manual which negates any claim of the formation of an agreement or contract. Policy 101:1 of the Manual states, "Nothing contained in these policies or any written or oral statement interpreting, explaining or clarifying these policies is intended to create an employment contract, either express or implied, between the Park District and an employee." (The Manual in its entirety is attached to this Memorandum as Exhibit C.) Consequently, the requisite agreement does not exist, and Count IV does not state a claim upon which relief may be granted. The District respectfully requests the Court dismiss Count IV against the District with prejudice pursuant to Rule 12(b)(6).

Further, Count IV fails to state a claim because Plaintiff cannot use the IWPCA to extend the statute of limitations for any claims under the FLSA or IMWL which are time-barred. See e.g., Palmer v. Great Dane Trailers, 2005 WL 1528255, *3 (N.D. Ill. June 28, 2005) (attached to this Memorandum as Exhibit D). In Palmer, the court recognized that no agreement existed which required the employer to pay overtime and which the employer breached and that the correct route to obtain potential overtime pay was through timely FLSA and IMWL claims. Id.

at *4.  Similarly, there is no agreement to pay overtime or compensatory time off by virtue of the disclaimer in the Manual, the District did not breach an obligation to pay overtime or compensatory time off and no IWPCA claim exists.  Plaintiff cannot plead an IWPCA claim to extend the statute of limitations to five years.  The Court should dismiss Count IV with prejudice against the District for failure to state a claim under Rule 12(b)(6) on this added basis.

## V.    COUNTS I-IV SHOULD BE DISMISSED AGAINST THE BOARD FOR FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6)

"A party to a litigation must have a legal existence, either natural or artificial, to sue or be sued."  Jackson v. Village of Rosemont, 180 Ill. App. 3d 932, 937-38 (1st Dist. 1988).  Illinois law is clear that a board of a corporation or municipal corporation is not a separate legal entity which can be sued.  Richardson v. County of Cook, 250 Ill. App. 3d 544, 547 (1st Dist. 1993); Davis v. City of Chicago, 53 F.3d 801, 803 (7th Cir. 1995).  See also Federal Rule of Civil Procedure 17(b)(3) (capacity to sue or be sued for all other parties besides individuals and corporations is determined by the law of the state where the court is located).

For example, in Willmschen v. Trinity Lakes Improvement Ass'n, 362 Ill. App. 3d 546, 551-52 (2nd Dist. 2005), the court affirmed the dismissal of a claim against the board of directors of an association.  The court reasoned that the plaintiffs failed "to explain how the board of directors of a corporation, as distinct from the corporation itself, may be held collectively liable. Plaintiffs cite no Illinois authority to support their claim, nor do we know of any."  Id. at 551. The court concluded that Illinois law does not permit a plaintiff to sue a corporation's board of directors as a distinct and separate legal entity.  Id. at 552.

In this case, Illinois law provides in the Park District Code, 70 ILCS 1205/1-1 et seq., which governs the formations of park districts outside of Chicago, and case law makes it clear, that the park district is the entity which sues or is sued, and the governing board of the park

district is the entity which has authority to act on behalf of the park district. Specifically, the Park District Code establishes a park district as a "body corporate and politic" which "shall have and exercise the following powers: (a) to adopt a corporate seal and alter the same at pleasure; <u>to sue and be sued</u>; and to contract in furtherance of any of its corporate powers." 70 ILCS 1205/8-1(a) (Emphasis added.) <u>See</u> <u>also</u> 70 ILCS 1205/2-8 ("[a]ll courts in this State shall take judicial notice of all park districts"). The Park District Code allows for the formation of a governing board, which constitutes the "corporate authority for such district." 70 ILCS 1205/4-1. <u>See</u> <u>also</u> <u>Hartman v. Lisle Park District</u>, 158 F.Supp. 2d 869, 874 (N.D. Ill. 2001) ("[t]he Illinois statutes concerning the establishment and governance of local park districts make it clear that a park district's board exercises the final authority on behalf of the district"). Therefore, the Board's powers are "co-extensive" with the District. <u>Richardson</u>, 250 Ill. App. 3d at 547.

As in <u>Jackson</u>, Plaintiff here may not hold the Board collectively liable under Illinois law because it is not a separate legal entity. Consequently, Counts I-IV should be dismissed with prejudice against the Board for the failure to state a claim pursuant to Rule 12(b)(6). Count IV also fails to state a claim for the reasons discussed above in Section IV and should be dismissed with prejudice against the Board pursuant to Rule 12(b)(6) on this added basis.

## VI.   <u>CONCLUSION</u>

For the reasons set forth in the Motion to Dismiss and the instant Memorandum of Law, Defendant, Sterling Park District, respectfully requests that the Court dismiss Count IV with prejudice against the District, for failure to state a claim pursuant to Rule 12(b)(6).  Defendant, Sterling Park District Board of Commissioners, also respectfully requests that the Court dismiss Plaintiff's Complaint in its entirety with prejudice against the Board for failure to state a claim pursuant to Rule 12(b)(6).

Dated:  August 8, 2008                                Respectfully submitted,


                                              /s Joshua A. Dombrow
                                              Gregory R. James, Jr.
                                              Jennifer A. Naber
                                              Joshua A. Dombrow
                                              Laner Muchin Dombrow Becker Levin and
                                              Tominberg, Ltd.
                                              515 North State Street, Suite 2800
                                              Chicago, Illinois 60654
                                              (312) 467-9800
                                              (312) 467-9479 (fax)
                                              Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

Joshua Dombrow, an attorney, hereby certifies that he caused the **Motion to Dismiss and Memorandum In Support of Sterling Park District's Motion To Dismiss Count IV of Plaintiff's Complaint Under Rule 12(b)(6) and Sterling Park District Board of Commissioners' Motion to Dismiss Plaintiff's Complaint Under Rule 12(b)(6)** in the above-captioned matter to be served upon the attorneys for the Plaintiff electronically, by operation of the Court's electronic filing system, by filing the document electronically with the Clerk of this Court:

Robin B. Potter, Esq.
Denise M. Kelleher, Esq.
ROBIN POTTER & ASSOCIATES, P.C.
111 East Wacker Drive, Suite 2600
Chicago, IL 60601

_____
/s Joshua Dombrow

Westlaw.

Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2003 WL 297533 (N.D.Ill.), 171 L.R.R.M. (BNA) 3170, 148
Lab.Cas. P 10,208
**2003 WL 297533 (N.D.Ill.)**

▷Lopez v. Smurfit-Stone Container Corp.
N.D.Ill.,2003.

United States District Court,N.D. Illinois,
Eastern Division.
Noelia LOPEZ, et al., Plaintiffs,
v.
SMURFIT-STONE CONTAINER
CORPORATION and Jefferson Smurfit
Corporation, Defendants.
**No. 02 C 7347.**

Feb. 10, 2003.

Unionized employees filed state court action
against employer and its parent corporation,
alleging they had not been paid overtime
wages in violation of Illinois Wage Payment
and Collection Act (IWPCA). Defendants
removed action to federal court on basis of
complete preemption under § 301 of Labor
Management Relations Act (LMRA), then
moved to dismiss for failure to state a claim.
The District Court, <u>Kennelly</u>, J., held that:
(1) § 301 of LMRA preempted IWPCA
claim, and (2) employees had failed to
exhaust administrative remedies provided in
collective bargaining agreement (CBA) and
therefore could not maintain § 301 cause of
action.

Motion granted.

West Headnotes

**[1]  Federal Civil Procedure  170A**
**☜1829**

<u>170A</u> Federal Civil Procedure
    <u>170AXI</u> Dismissal

<u>170AXI(B)</u> Involuntary Dismissal
    <u>170AXI(B)5</u> Proceedings
        <u>170Ak1827</u> Determination
            <u>170Ak1829</u> k. Construction
of Pleadings. <u>Most Cited Cases</u>

**Federal Civil Procedure  170A ☜1835**

<u>170A</u> Federal Civil Procedure
    <u>170AXI</u> Dismissal
        <u>170AXI(B)</u> Involuntary Dismissal
            <u>170AXI(B)5</u> Proceedings
                <u>170Ak1827</u> Determination
                    <u>170Ak1835</u> k. Matters
Deemed Admitted. <u>Most Cited Cases</u>
When considering motion to dismiss, court
accepts plaintiffs' allegations as true and
construes any ambiguities in complaint in
plaintiffs' favor. <u>Fed.Rules Civ.Proc. Rule</u>
<u>12(b), 28 U.S.C.A.</u>

**[2]  Labor  and  Employment  231H**
**☜1967**

<u>231H</u> Labor and Employment
    <u>231HXII</u> Labor Relations
        <u>231HXII(K)</u> Civil Liabilities
            <u>231Hk1967</u> k. Preemption. <u>Most</u>
<u>Cited Cases</u>
    (Formerly  232Ak773.1,  232Ak758.1
Labor Relations)

**States  360 ☜18.46**

<u>360</u> States
    <u>360I</u> Political Status and Relations
        <u>360I(B)</u>  Federal  Supremacy;
Preemption
            <u>360k18.45</u> Labor and Employment
                <u>360k18.46</u> k. In General. <u>Most</u>

Not Reported in F.Supp.2d                                    Page 2

Not Reported in F.Supp.2d, 2003 WL 297533 (N.D.Ill.), 171 L.R.R.M. (BNA) 3170, 148 Lab.Cas. P 10,208

**2003 WL 297533 (N.D.Ill.)**

Cited Cases

Whether section 301 of LMRA operates to preempt a particular state law claim is a matter for case-by-case factual analysis. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

**[3]  Labor and Employment 231H 1967**

231H Labor and Employment
     231HXII Labor Relations
          231HXII(K) Civil Liabilities
          231Hk1967 k. Preemption. Most Cited Cases
     (Formerly 232Ak773.1, 232Ak758.1 Labor Relations)

**States 360 18.46**

360 States
     360I Political Status and Relations
          360I(B)  Federal  Supremacy; Preemption
          360k18.45 Labor and Employment
               360k18.46 k. In General. Most Cited Cases

Not every dispute that tangentially involves a provision of a collective bargaining agreement (CBA) is preempted by LMRA, and preemption will not occur if a dispute merely requires reference to or consultation of CBA; however, preemption is triggered when claim is founded directly on rights created by CBA and when resolution of state law claim depends on meaning of, or requires interpretation of, CBA. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

**[4]  Labor and Employment 231H 2222**

231H Labor and Employment
     231HXIII Wages and Hours
          231HXIII(B) Minimum Wages and Overtime Pay
               231HXIII(B)1 In General
               231Hk2222 k. Preemption. Most Cited Cases
          (Formerly 232Ak1471 Labor Relations)

**States 360 18.46**

360 States
     360I Political Status and Relations
          360I(B)  Federal  Supremacy; Preemption
          360k18.45 Labor and Employment
               360k18.46 k. In General. Most Cited Cases

Section 301 of LMRA preempted unionized employees' claim under Illinois Wage Payment and Collection Act (IWPCA) for delinquent overtime; claim was founded on rights created directly by collective bargaining agreement (CBA), not by IWPCA, and resolution of dispute required interpretation of CBA, insofar as employees claimed they had been "forced off" their regular shifts whereas company claimed that CBA section neither guaranteed specific number of hours nor prohibited it from changing hours, and that they had performed work "outside" their "regular shift" within meaning of another CBA provision. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185; S.H.A. 820 ILCS 115/1 et seq.

**[5]  Labor and Employment 231H 1219(2)**

231H Labor and Employment
     231HXII Labor Relations
          231HXII(D)          Bargaining

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2003 WL 297533 (N.D.Ill.), 171 L.R.R.M. (BNA) 3170, 148
Lab.Cas. P 10,208
**2003 WL 297533 (N.D.Ill.)**

Representatives
        231Hk1207    Duty    to    Act
Impartially   and   Without   Discrimination;
Fair Representation
        231Hk1219    Actions    for
Breach of Duty
        231Hk1219(2)    k.
Exhaustion of Internal Remedies. Most
Cited Cases
        (Formerly 232Ak773.1 Labor Relations)

**Labor    and    Employment    231H**
**☞1320(1)**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(E) Labor Contracts
            231Hk1318 Actions for Breach
                231Hk1320    Exhaustion    of
Internal Remedies
                231Hk1320(1)    k.    In
General. Most Cited Cases
        (Formerly 232Ak773.1 Labor Relations)
Exhaustion of administrative remedies is a
procedural prerequisite to maintaining action
under   section   301   of   LMRA.   Labor
Management Relations Act, 1947, § 301, 29
U.S.C.A. § 185.

**[6]    Labor    and    Employment    231H**
**☞1320(8)**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(E) Labor Contracts
            231Hk1318 Actions for Breach
                231Hk1320    Exhaustion    of
Internal Remedies
                231Hk1320(8)    k.    Wages
and Bonuses. Most Cited Cases
        (Formerly 232Ak777.1 Labor Relations)
Employees failed to exhaust all required
administrative remedies as required before

bringing LMRA claim against employer for
delinquent   payment   of   overtime   wages;
employees'   grievances   were   currently
pending   at   step   4   with   opportunity   to
arbitrate   available   should   resolution   not
occur, parties had not expressly agreed that
arbitration   was   not   the   exclusive   remedy,
and there was no allegation of breach of
union's   duty   of   fair   representation   (DFR).
Labor Management Relations Act, 1947, §
301, 29 U.S.C.A. § 185.

*MEMORANDUM OPINION AND ORDER*

KENNELLY, J.
*1  Plaintiffs  Noelia  Lopez  and  sixty-three
others   similarly   situated   filed   suit   in   the
Circuit   County   of   Cook   County   against   their
employer,   Jefferson   Smurfit   Corporation,
and   its   parent,   Smurfit-Stone   Container
Corporation.   Plaintiffs   claim   that   defendants
have   not   paid   them   overtime   wages   in   a
timely   manner,   in   violation   of   Illinois   law.
Defendants   removed   the   case   to   federal
court,   contending   that   plaintiffs'   claims   are
completely   preempted   by   section   301   of   the
Labor   Management   Relations   Act   of   1947
(LMRA),   29 U.S.C. § 185.   Defendants   now
move for dismissal pursuant to Federal Rule
of Civil Procedure 12(b)(6). For the reasons
stated   below,   the   Court   grants   defendants'
motion.

BACKGROUND

Plaintiffs   are   members   of   the   Graphic
Communications   Union   Local   415-S   and   are
or   were   employed   on   an   hourly   basis   by
Jefferson   Smurfit   Corporation.   The   terms   of
their   employment   are   subject   to   two
successive   collective   bargaining   agreements
between   Jefferson   Smurfit   and   the   Local.
The first covers the period of June 1, 1996 to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 4
Not Reported in F.Supp.2d, 2003 WL 297533 (N.D.Ill.), 171 L.R.R.M. (BNA) 3170, 148
Lab.Cas. P 10,208
**2003 WL 297533 (N.D.Ill.)**

June 1, 2002, and the second covers the period of June 1, 2001 to June 1, 2006. Article 4, Section 2 of both agreements provides:

Overtime of half time, in addition to regular straight time hourly earnings, will be paid for hours worked over eight (8) hours per day and for any work performed outside a worker's regular shift.

Compl., Exs. 1C, 2B, 2C. Section 2 of the second agreement further provides:
This section does not guarantee any specific amount of hours. This does not prohibit the Company from changing the hours, if business conditions warrant a change.

Compl., Ex. 2C. Plaintiffs allege that they have performed work "outside a worker's regular shift" and are thus entitled to overtime compensation pursuant to this provision.

The Illinois Wage Payment and Collection Act (IWPCA), 820 ILCS 115/1-115/15, dictates the timely payment of earned wages:

All wages earned by any employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned.

820 ILCS 115/4. Plaintiffs allege that thirteen days have elapsed since the end of the pay period in which their overtime wages were earned and that defendants have not yet tendered the additional compensation to which they are entitled. Plaintiffs claim that defendants are therefore liable under the IWPCA for the past due overtime wages

plus prejudgment interest and attorney's fees.

The collective bargaining agreement also provides for a grievance procedure. Plaintiffs allege that on or about May 17, 2002, they filed a grievance with Jefferson Smurfit and demanded payment of the delinquent overtime wages. In addition to portions of both collective bargaining agreements, plaintiffs attached the following documents to their complaint: 1) a copy of their grievance filing; 2) a letter from Smurfit-Stone's employee relations manager in response to the first step of the grievance procedure; and 3) a memo relaying the company's response to the second step of the grievance procedure.

**\*2** After removing the case to federal court, defendants filed the present motion to dismiss. They argue two bases for their motion: plaintiffs' state law claim is preempted by section 301, and plaintiffs have not alleged that they have exhausted available administrative remedies.

### DISCUSSION

[1] When considering a motion to dismiss, we accept the plaintiffs' allegations as true, *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), and construe any ambiguities in the complaint in plaintiffs' favor. *Thompson v. Ill. Dep't of Prof'l Regulation,* 300 F.3d 750, 753 (7th Cir.2002). The Court reads the complaint liberally, granting the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2003 WL 297533 (N.D.Ill.), 171 L.R.R.M. (BNA) 3170, 148
Lab.Cas. P 10,208
**2003 WL 297533 (N.D.Ill.)**

A. Section 301 Preemption

Defendants contend that dismissal of plaintiffs' complaint is required because their ILWPCA claim is completely preempted by section 301 of the LMRA. Section 301 provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). This section confers federal court jurisdiction over disputes that arise out of collective bargaining agreements and also "authorizes federal courts to fashion a body of federal law for the enforcement of these agreements."*Loewen Group Int'l, Inc. v. Haberichter,* 65 F.3d 1417, 1421 (7th Cir.1995) (citing *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 403, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988)). To ensure the uniform interpretation of collective bargaining agreements, section 301 preempts state law claims that touch on its subject matter: "issues raised in suits of a kind covered by § 301[are] to be decided according to the precepts of federal labor policy."*Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 209, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) (quoting *Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 104, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962)) (alteration in original) (internal quotation marks omitted).

[2][3] Whether section 301 operates to

preempt a particular state law claim is a matter for "case-by-case factual analysis." *In re Bentz Metal Prods. Co.,* 253 F.3d 283, 285 (7th Cir.2001). Not every dispute that tangentially involves a provision of a collective bargaining agreement is preempted. *Allis-Chalmers,* 471 U.S. at 211. Preemption will not occur if a dispute merely requires reference to, or consultation of, an agreement.*Livadas v. Bradshaw,* 512 U.S. 107, 124, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994); *In re Bentz,* 253 F.3d at 285. Preemption is triggered, however, when a claim is "founded directly on rights created by collectivebargaining agreements,"*Caterpillar, Inc. v. Williams,* 482 U.S. 386, 394, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987), and when the resolution of a state law claim "depends on the meaning of, or requires the interpretation of, a collective bargaining agreement."*Loewen,* 65 F.3d at 1421 (citing *Lingle,* 486 U.S. at 405-06). Stated otherwise, a claim is preempted if it is "substantially dependent on an analysis of the terms of the collective bargaining agreement."*Atchley v. Heritage Cable Vision Assocs.,* 101 F.3d 495, 499 (7th Cir.1996). Therefore, if the meaning of a contract term is at the heart of the dispute, section 301 will have preemptive effect. *Livadas,* 512 U.S. at 124;*Caterpillar,* 482 U.S. at 394.

*3 [4] The Court finds that plaintiffs' state law claim is preempted by section 301 because 1) it is "founded directly on rights created by" the collective bargaining agreement, *Caterpillar,* 482 U.S. at 394, and 2) resolution of the dispute requires interpretation of the agreement.

*1. Rights Are Created by the Collective Bargaining Agreement*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                  Page 6
Not Reported in F.Supp.2d, 2003 WL 297533 (N.D.Ill.), 171 L.R.R.M. (BNA) 3170, 148
Lab.Cas. P 10,208
**2003 WL 297533 (N.D.Ill.)**

Plaintiffs argue that their claim merely involves the untimeliness of payment and that defendants' liability therefore arises under the IWPCA. Despite these contentions, however, there can be no real question that the predicate for plaintiffs' claim is Article 4, Section 2 of the collective bargaining agreement. The IWPCA did not create the plaintiffs' entitlement to overtime wages. In fact, the Seventh Circuit has stated that the IWPCA merely requires "that the employer honor his contract."*Nat'l Metalcrafters v. McNeil,* 784 F.2d 817, 824 (7th Cir.1986).

As defendants maintain, no state law creates the right to payment of overtime wages for work performed outside a regular shift. This entitlement exists in this case only by virtue of the collective bargaining agreement. It is the agreement that is at the heart of the dispute: plaintiffs would not have a claim were it not for Article 4, Section 2.

The instant case is similar to *National Metalcrafters v. McNeil, supra.*There, the Seventh Circuit held that section 301 preempted the employees' IWPCA claim for vacation benefits to which they claimed they were entitled pursuant to a collective bargaining agreement. Because there was no independent statutory right to receive vacation benefits, the Seventh Circuit concluded that "[t]he only basis of the state-law claim in this case is that the company broke its contract."*Id.* at 824. The Seventh Circuit stated that section 301's remedy for breach of a collective bargaining agreement is "exclusive; no action to enforce such an agreement may be based on state law."*Id.* at 823; *cf. Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust,* 463 U.S.

1, 23, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) ("[T]he pre-emptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization." ' (quoting 29 U.S.C. 185(a))). Similarly here, plaintiffs' underlying claim is that defendants' breached an obligation that arose only from the collective bargaining agreement; it is likewise preempted.

*2. Interpretation of the Collective Bargaining Agreement*

The Supreme Court has said of collective bargaining agreements that "the meaning given a contract phrase or term [must] be subject to uniform federal interpretation."*Allis-Chalmers,* 471 U.S. at 211. Public policy requires such uniformity:

Were state law allowed to determine the meaning intended by the parties in adopting a particular contract phrase or term, ... [t]he parties would be uncertain as to what they were binding themselves to when they agreed to create a right to collect benefits under certain circumstances. As a result, it would be more difficult to reach agreement, and disputes as to the nature of the agreement would proliferate.

**\*4** *Id.* If resolution of the parties' dispute requires the interpretation of the collective bargaining agreement, section 301 preempts plaintiffs' state law claim.

Defendants argue that plaintiffs' ILWPCA claim will require the interpretation of Article 4, Section 2. They maintain that plaintiffs, by fashioning their claim in the ILWPCA's terms of timing, have obfuscated the real issue demanding resolution in this

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 7
Not Reported in F.Supp.2d, 2003 WL 297533 (N.D.Ill.), 171 L.R.R.M. (BNA) 3170, 148
Lab.Cas. P 10,208
**2003 WL 297533 (N.D.Ill.)**

dispute-whether plaintiffs have performed the type of work that would entitle them to overtime wages in the first place. Defendants argue that any resolution of this issue would require interpretation of the agreement, namely interpretation of the term "regular shift."

Plaintiffs deny that any interpretation will be required because no contract terms are in dispute. They maintain that the provision requiring compensation of time and a half for work performed outside a regular shift is "clear and unambiguous." Pls.' Resp. at 4. They contend that the issue to be resolved is equally plain: "Either the defendants paid half time, in addition to straight time, for any work performed outside their regular shift, or they did not."*Id.* Plaintiffs' position is that the Court will merely have to consult the agreement to calculate the amount of overtime earned. If the agreement's meaning "is so clear that the company cannot in good faith dispute the workers' vested rights to benefits under it," then section 301 does not preempt plaintiffs' claim. *Nat'l Metalcrafters,* 784 F.2d at 828.

It is apparent from the documents attached to the complaint that the central issue to be resolved is whether plaintiffs in fact performed any work "outside" their "regular shifts." On a 12(b)(6) motion, a court considers all the pleadings, which are taken to include the complaint, any exhibits attached thereto, and supporting briefs. *Thompson,* 300 F.3d at 753;Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.")."[W]here a plaintiff attaches documents and relies upon the documents to form the basis or part of a claim, dismissal is appropriate if the

document negates the claim."*Thompson,* 300 F.3d at 754. Here, the exhibits to plaintiffs' complaint lend credence to defendants' contention that resolution of their claim will require interpretation of the collective bargaining agreement.[FN1]

> FN1. On a related note, defendants attached the affidavit of Jefferson Smurfit's Employee Relations Manager to their motion. Because the Court does not rely on this affidavit in reaching its determination, we do not need to consider whether the affidavit can be considered part of the pleadings and therefore be properly considered on this motion to dismiss.

The plaintiff's grievance form states: "Nature of Grievance: Forcing us off our regular shift and not paying us 8 hrs. at time and a half worked outside our shift. Unhealthy and unsafe."Compl., Ex. 3A. A letter from Smurfit-Stone regarding the first step of the grievance procedure states that after review of Article 4, Section 2, the company found that the provision was "administered properly." Compl., Ex. 4A. The letter also states that the article neither guarantees any specific number of hours nor prohibits the company from "changing the hours." *Id.* A memo reporting the company's response to the second step of the grievance process is also enlightening:

**\*5** The Company has not violated Section 2 of Article 4 of the current agreement. The practice of moving employees from one shift to another is not unheard of nor is it unsafe. That section of the contract clearly states that the Company does not guarantee any specific hours. The contract also states, in

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2003 WL 297533 (N.D.Ill.), 171 L.R.R.M. (BNA) 3170, 148
Lab.Cas. P 10,208
**2003 WL 297533 (N.D.Ill.)**

the same section, that the Company has the right to adjust the hours of the workweek.

Compl., Ex. 4B.

Taken together, these documents validate the defendants' position that the heart of the dispute is whether plaintiffs are entitled to overtime wages under Article 4, Section 2 in the first place. In the grievance form, plaintiffs claim they were "forced off" their regular shifts. Defendants retort that changing a worker's shift is not "unheard of" and that the company has the right under Article 4, Section 2 to alter work schedules. It is apparent that the parties have good faith, conflicting interpretations of what conditions will trigger the entitlement to overtime compensation. To resolve this conflict between the parties-a conflict whose resolution is fundamental to the adjudication of plaintiffs' claim-the collective bargaining agreement will require interpretation. As such, section 301 preempts plaintiffs IWPCA claim, and dismissal is therefore appropriate.

B.  Failure  to  Exhaust  Administrative Remedies

[5] Having concluded that plaintiffs' sole cause of action lies under section 301, we consider whether they can maintain an action under that provision. *Smith v. Colgate-Palmolive Co., 943 F.2d 764, 771 (7th Cir.1991).* The exhaustion of administrative remedies is a procedural prerequisite to maintaining a section 301 action. *Id.* at 767. Before filing suit, federal labor policy dictates that an employee is "[o]rdinarily ... required to attempt to exhaust any grievance or arbitration remedies provided in the collective

bargaining  agreement."*DelCostello  v.  Int'l Bhd. of Teamsters,* 462 U.S. 151, 163, 103 S.Ct. 2281, 76 L.Ed.2d 476 (citing *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965)); *Smith,* 943 F.2d at 771.

[6] Defendants argue that the complaint must be dismissed because plaintiffs do not allege that they have exhausted all required administrative remedies. In their brief, they report that "[p]laintiffs' grievances currently are pending at Step 4 of the grievance procedure, with the opportunity to pursue available resolution should resolution not occur."Defs.' Mem. of Law in Support of Mot. to Dismiss at 5. Defendants maintain that plaintiffs' claims must first be submitted to grievance arbitration procedures set out in the collective bargaining agreement.

The agreement's description of step four of the grievance procedure states "[i]f the parties are unable to arrive at a satisfactory settlement at this step, the Union may submit the grievance to arbitration."*Id.,* Ex. A at 20, B at 21. Although this provision is stated in permissive terms and says nothing of an individual employee's obligation to arbitrate, plaintiffs are nonetheless required to arbitrate their claims.

*6 Only under two conditions can individual employees avoid the requirement of administrative exhaustion. The first is where the parties have "expressly agreed that arbitration [is] not the exclusive remedy."*Republic Steel,* 379 U.S. at 657-58. There is no such express agreement here. *Cf. id.* at 658-59 ("Use of the permissive 'may' does not of itself reveal a clear understanding between the contracting parties that individual employees, unlike

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 297533 (N.D.Ill.), 171 L.R.R.M. (BNA) 3170, 148 Lab.Cas. P 10,208

**2003 WL 297533 (N.D.Ill.)**

Page 9

either the union or the employer, are free to avoid the contract procedure and its time limitations in favor of a judicial suit."); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 583, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)) (stating that "doubts" as to whether a collective bargaining agreement's arbitration clause covers a particular dispute "should be resolved in favor of coverage."). The second condition is where the employee has established a breach of the union's "duty of fair representation." *Smith*, 943 F.2d at 771. No such allegation has been made here. Because plaintiffs have failed to exhaust the remedies provided in the collective bargaining agreement, they cannot currently maintain a section 301 cause of action.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss [docket no. 3-1] is granted. Plaintiffs' motion seeking remand if the motion to dismiss is denied [docket no. 9-1] is denied as moot. The case is hereby dismissed.

N.D.Ill.,2003.

Lopez v. Smurfit-Stone Container Corp.

Not Reported in F.Supp.2d, 2003 WL 297533 (N.D.Ill.), 171 L.R.R.M. (BNA) 3170, 148 Lab.Cas. P 10,208

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                      Page 1
Not Reported in F.Supp., 1991 WL 33658 (N.D.Ill.), 2 Wage & Hour Cas.2d (BNA) 1178
**1991 WL 33658 (N.D.Ill.)**

◄Pautlitz v. City of Naperville
N.D.Ill.,1991.

United States District Court, N.D. Illinois,
Eastern Division.
James PAUTLITZ, et al., Plaintiffs,
v.
CITY OF NAPERVILLE, Defendant.
**No. 89 C 8855.**

March 8, 1991.

*MEMORANDUM OPINION AND ORDER*

PLUNKETT, District Judge.
**\*1** Plaintiff James Pautlitz and other
Naperville police officers have filed a three-
count amended complaint against the City of
Naperville ("Naperville"), alleging that they
are entitled to additional overtime
compensation pursuant to the Fair Labor
Standards Act, 29 U.S.C. § 216. The
plaintiffs have added two pendent state
claims pursuant to the Illinois Minimum
Wage Act, Ill.Rev.Stat. ch. 48, ch. ¶ 1002*et
seq.* (1986; Supp.1989) ("Minimum Wage
Law") and the Illinois Wage Payment and
Collection Act, Ill.Rev.Stat. ch. 48, ch. 48, ¶
39m-1 *et seq.* (1986) ("Wage Payment
Act"). This matter is before the court on
Naperville's motion to dismiss Counts II and
III, the pendent claims. For the following
reasons, we dismiss Counts II and III with
prejudice.

*Background*

The plaintiffs are police sergeants employed
by Naperville. They are apparently
compensated at their regular hourly rate for

any overtime in excess of 45 hours during
the seven-day, Monday through Sunday
work week. They state that they are not
compensated for overtime hours in excess of
40 but less than or equal to 45 hours. Count
II alleges that, pursuant to the Illinois
Minimum Wage Act, Naperville is an
employer (¶ 1003(c)), the plaintiffs are
employees (¶ 1003(d)), and that the
plaintiffs are entitled to their hourly wage
for every hour worked. (¶ 1004). The
plaintiffs request the sums due, under ¶
1012, interest at 2% per month, and fees and
costs.

Count III alleges that Naperville is an
employer and the plaintiffs are employees
under the Illinois Minimum Wage Act, ¶
39m-2. Plaintiffs also claim that they are
non-exempt employees under the Fair Labor
Standards Act, 29 U.S.C. § 201. The
plaintiffs say that they were provided with
an employee handbook and were expected to
become familiar with its contents and that
the handbook defines overtime eligibility
and overtime provisions, but that Naperville
has not honored its policies in this regard.
As non-exempt employees, the plaintiffs
claim that they must be compensated at one
and one half times the regular hourly rate for
each 15-minute increment of work in excess
of eight hours a day or forty hours a week
under Naperville's policy.

In its motion to dismiss Naperville argues,
first, that Count II must be dismissed
because the public policy behind the
enactment of the Minimum Wage Law did
not contemplate situations like this one
where the income of a police sergeant is

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2
Not Reported in F.Supp., 1991 WL 33658 (N.D.Ill.), 2 Wage & Hour Cas.2d (BNA) 1178
**1991 WL 33658 (N.D.Ill.)**

considerably in excess of the poverty line. Also, Naperville argues that ¶¶ 1004(2)(D) and (E) exempt both government bodies and executive and/or administrative employees such as the plaintiffs here. Second, Naperville maintains that Count III must be dismissed because the employee handbook that the plaintiffs rely on does not constitute a contract and that plaintiffs are in any case exempt from overtime payment by the provisions of the handbook.

*Discussion*

On a motion to dismiss, the court views the allegations of the complaint as true, along with reasonable inferences therefrom, and views these in the light most favorable to the plaintiff. *Powe v. City of Chicago,* 664 F.2d 639, 642 (7th Cir.1981). Plaintiff's complaint should not be dismissed "unless it appears beyond doubt that the plaintiff is unable to prove any set of facts which would entitle the plaintiff to relief.... Nevertheless, a plaintiff must allege sufficient facts to outline the cause of action, proof of which is essential to recovery." *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985), *cert. denied,* 475 U.S. 1047 (1986) (citations omitted).

I. *Count II: Violation of the Illinois Minimum Wage Law*

*2 Paragraph 1002 of the Minimum Wage Law outlines the legislative policy that prompted its enactment:

The General Assembly finds that the existence [in places of employment] ... of conditions detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency and general well-

being of workers, leads to labor disputes, and places burdens on the State ... to assist and supply necessary moneys and goods to workers and their families to aid them to exist on a minimum budget for their needs, and thus places an unnecessary burden on the taxpayers of this State....

It is against public policy for an employer to pay to his employees an amount less than that fixed by this Act. Payment of any amount less than herein fixed is an unreasonable and oppressive wage, and less than sufficient to meet the minimum cost of living necessary for health.

Paragraph 1004(a) states that "on or after July 1, 1985, every employer shall pay to each of his employees in every occupation wages of not less that $3.35 per hour or in the case of employees under 18 years of age wages of not less than $2.85 per hour."

Naperville protests that the plaintiffs have not stated a cause of action under the Minimum Wage Act because the Act was not promulgated to protect police sergeants who earn between $35,000.00 and $43,000.00, but rather those workers who are near the poverty line and would end up on the welfare rolls if the statutory minimum were not paid. Naperville also contends that ¶ 1004a, the overtime provision, expressly excludes governmental bodies (¶ 1004a(2)(D)) and plaintiffs who are executive or administrative employees (¶ 1004a(2)(E)). The plaintiffs protest that they rely solely on ¶ 1004, which requires simply that they be paid for every hour worked.

The plaintiffs cite only *Bernardi v. Village of North Pekin,* 135 Ill.App.3d 589, 482 N.E.2d 101 (Ill.App.3d Dist.1985), in

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1991 WL 33658 (N.D.Ill.), 2 Wage & Hour Cas.2d (BNA) 1178
**1991 WL 33658 (N.D.Ill.)**

support of the proposition that the Act has been applied to police. We note, however, that the *Bernardi* plaintiffs complained about the sum that they were being paid, arguing that it was below the sum insured by the Act. The plaintiffs cite no authority, and we find none, for the proposition that ¶ 1004 may be used in a context such as this when failure to pay for every hour worked is the issue rather than the specific sum paid. We also do note that the legislative policy expressed in ¶ 1002 makes clear that the legislature promulgated the Act to set a minimum wage standard and the plaintiffs here question failure to pay rather than the inadequacy of the sum. Consequently, we find that Count II does not state a claim under the Minimum Wage Act and we dismiss it with prejudice.

## II. *Count III: Violation of the Illinois Wage Payment and Collection Act*

The Wage Payment Act provides for the payment of "wages" owed by an employer "pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." Ch. 48 ¶ 39m-2 § 2. The plaintiffs have alleged that Naperville is an employer under ¶ 39m-1 and that they are employees under ¶ 39m-2. The thrust of the plaintiffs' allegations is that the "Employee Handbook" issued to all employees, including the plaintiffs, defines overtime eligibility and overtime, that these policies have remained in effect, that the policies were identical prior to the issuance of the handbook, and that the plaintiffs, who are non-exempt employees, have not received overtime pay in accordance with the polices. In support of Count III, the plaintiffs append

page 15 of the Employee Handbook, which outlines overtime eligibility and payments. But the plaintiffs fail to allege specifically that a "contract or agreement" exists.

***3** Naperville seeks to present extensive documentation indicating that there is no contract between the sergeants and Naperville because of express disclaimers in the handbook and that the plaintiffs are in any case exempt. We are generally disinclined to take notice of any matters outside the pleadings on a motion to dismiss, but in this instance Naperville's submission of the *entire* Employee Handbook cannot go unnoticed as it addresses a serious deficiency in the plaintiffs' pleading. When a plaintiff relies on the provisions of a document as the basis of its claim, this court requires the entire document in support, not just selected portions offered in a vacuum.

To the extent that the plaintiffs may claim overtime payment on the basis of a contract created by the Employee Handbook, the express disclaimers on pages 2 and 11 that the contents of the Handbook create an employment contract would seem to foreclose such a claim.[FN1] *See Duldulao v. St. Mary of Nazareth Hosp. Center,* 115 Ill.2d 482, 505 N.E.2d 314 (1987); *Moore v. Illinois Bell Tel. Co.,* 155 Ill.App.3d 781, 508 N.E.2d 519 (2d Dist.1987), *appeal denied,* 116 Ill.2d 562, 515 N.E.2d 112; *see also Montgomery v. Ass'n of Am.R.R.,* 741 F.Supp. 1313 (N.D.Ill.1990) (disclaimer will generally be given effect in Illinois). In *Bennett v. Evanston Hosp.,* 184 Ill.App.3d 1030, 540 N.E.2d 979, 981 (Ill.App. 1 Dist.1989), the court dismissed a complaint on very similar facts and noted that the *Duldulao* court's finding of the elements of a contract was based in part on the fact that

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1991 WL 33658 (N.D.Ill.), 2 Wage & Hour Cas.2d (BNA) 1178
**1991 WL 33658 (N.D.Ill.)**

there were no disclaimers like the ones found in the *Bennett* document.

In their response brief, the plaintiffs do not seem to dispute that there is no contract. The plaintiffs argue that even in the absence of a contract, they are entitled to the overtime claimed because of a "policy" to pay such overtime. This "policy" is allegedly gleaned in part from the Handbook, a portion of which is offered as Exhibig A and from other sources that are offered for the first time in the responsive brief. Because it appears that the plaintiffs may not state a claim for relief on a contract theory and because they have not alleged in "agreement," we dismiss Count III with prejudice. The plaintiffs have had several opportunities to amend their complaint, and we decline to give them another at this late date.

### Conclusion

For the foregoing reasons, we dismiss Counts II and III with prejudice. The case may proceed on Count I only.

> FN1. Naperville also argues that the plaintiffs are exempt from overtime payments by the express provisions of the Employee Handbook on pages 15 and 63. The plaintiffs argue that there is a policy of paying such overtime to police officers in the plaintiffs' position and that they are entitled to overtime under the Fair Labor Standards Act.

N.D.Ill.,1991.
Pautlitz v. City of Naperville
Not Reported in F.Supp., 1991 WL 33658 (N.D.Ill.), 2 Wage & Hour Cas.2d (BNA) 1178

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**STERLING PARK DISTRICT**
PO Box 958
Sterling, IL 61081

# PERSONNEL POLICY MANUAL

# PERSONNEL
# POLICY
# MANUAL

**STERLING PARK DISTRICT**



# STERLING PARK DISTRICT *strives . . .*

*for a qualified* ***S****taff*

*who is* ***P****atron oriented*

*and has sincere* ***D****edication.*

OPPOLD MARINA * DILLON MUSEUM
WESTWOOD SPORTS CENTER * KIDD
GARTNER * DOUGLAS * PROPHETER
DUIS CENTER * SCHEID * THOMAS
SANBORN * KILGOUR * EBERLEY
SINNISSIPPI * FRASOR CENTER
HOOVER * LAWRENCE PARK POOL
OPPOLD MARINA * DILLON MUSEUM
WESTWOOD SPORTS CENTER * KIDD
GARTNER * DOUGLAS * PROPHETER
DUIS CENTER * SCHEID * THOMAS
SANBORN * KILGOUR * EBERLEY
SINNISSIPPI * FRASOR CENTER
HOOVER * LAWRENCE PARK POOL
OPPOLD MARINA * DILLON MUSEUM
WESTWOOD SPORTS CENTER * KIDD

# Table of Contents

| 1 | Personnel | 100 |
| 2 | Employment | 200 |
| 3 | Pay Practices | 300 |
| 4 | Expenses | 400 |
| 5 | Benefits | 500 |
| 6 | Work Areas | 600 |
| 7 | Absence | 700 |
| 8 | Conduct | 800 |
| 9 | Miscellaneous | 900 |
| 10 | Index | 1000 |

# TABLE OF CONTENTS

**PERSONNEL RESPONSIBILITIES**

| | |
|---|---|
| Introduction | 101:1 |
| Code of Employer-Employee Relations | 102:1 |
| Employment-At-Will | 103:1 |
| Open Door Policy | 104:1 |

**EMPLOYMENT**

| | |
|---|---|
| Equal Employment Opportunity | 201:1 |
| Sexual and Other Harassment Policies | 202:1 |
| Hiring | 203:1 |
| Child Labor Laws: Employment of Minors | 203B:1 |
| Employment Agreements | 204:1 |
| Orientation and Training | 205:1 |
| Medical Procedures | 206:1 |
| Serious Diseases | 207:1 |
| Introductory Period | 208:1 |
| Transfer | 209:1 |
| Promotion | 210:1 |
| Hours of Work | 211:1 |
| Outside Employment | 212:1 |
| Dual Employment Within District | 213:1 |
| Part-Time Employees | 214:1 |
| Volunteers & Docents | 215:1 |
| Layoff and Recall | 216:1 |
| Termination of Employment | 217:1 |
| Retirement | 218:1 |
| Residency Requirements | 219:1 |

**PAY PRACTICES**

| | |
|---|---|
| Salary Administration | 301:1 |
| Performance Appraisals | 302:1 |
| Severance Pay | 303:1 |
| Job Evaluation | 304:1 |
| Pay Procedures | 305:1 |

**REIMBURSEMENT OF EMPLOYEE EXPENSES**

| | |
|---|---|
| Travel | 401:1 |
| Automobile Usage | 402:1 |

Emergency Transportation Time                                403:1
Meal Reimbursement                                          404:1
Membership in Clubs and Civic Organizations                 405:1
Participation in Trade and Professional Associations        406:1

## EMPLOYEE BENEFITS

Disclosure of Benefits                                      501:1
Vacations                                                   502:1
Holidays                                                    503:1
Pension                                                     504:1
Medical Insurance Reimbursement Increment and
    Dental Insurance                    505:1
Worker's Compensation                                       506:1
Modified Duty Program                                       506B:1
Social Security                                             507:1
Personal Days                                               508:1
Continuing Education                                        509:1
Employee Counseling                                         510:1
Relocation                                                  511:1
Use of Facilities, Programs & Equipment                     512:1
Deferred Compensation Plan                                  513:1
Sick Days                                                   514:1
Flexible Benefit Plan                                       515:1

## DISTRICT PREMISES AND WORK AREAS

Employee Safety                                             601:1
Maintenance of Work Areas                                   602:1
Personal Property                                           603:1
Selling and Solicitation                                    604:1
Parking                                                     605:1
Security                                                    606:1
Search of Lockers, Desks, and Other District Property       607:1

## ABSENCE FROM WORK

Attendance and Punctuality                                  701:1
Short-Term Absences                                         702:1
Leaves of Absence                                           703:1
Meal Breaks                                                 704:1
Family & Medical Leave Act                                  705:1

REV 11/05

## PERSONAL CONDUCT

Examples of Reasons For Disciplinary Action    801:1
Personal Appearance of Employees    802:1
Personal Finances of Employees    803:1
Patron Relations    804:1
Use of Communication Systems    805:1
Conflicts of Interest    806:1
Confidential Nature of Company Affairs    807:1
Disciplinary Procedure    808:1
Alcohol and Drug Abuse    809:1
Alcohol and Drug Procedures for CDL Employees    810:1
Use of District Computer Systems    811:1
Internet Use Policy    812:1
Tape Recording Policy    813:1
Children in the Workplace    814:1

## MISCELLANEOUS

Personnel Records    901:1
Participation in Community Affairs    902:1
Grievance Procedure    903:1
Political Activities    904:1
Meetings    905:1

REV 11/05

1

# INTRODUCTION

The Board of Park Commissioners welcomes you to the Sterling Park District. We offer our community three resources: quality facilities, parks and recreation programs. We believe that the key to a truly great park district lies in our employees who provide the service that makes our facilities, parks and programs so outstanding.

The District was organized in 1923. The District owns and leases a number of park sites. Among the recreational facilities currently operated by the District are the Duis Recreation Center, Emerald Hill Golf & Learning Center, Westwood Sports Center, Dillon Home Museum, Lawrence Park Pool and Harry Oppold Marina.

The District is governed by a five (5) member Board of Park Commissioners who are Sterling Township residents elected to serve four (4) year terms.

The Park District has prepared this Personnel Policy Manual as a reference guide for its employees. It includes the District's minimum expectations regarding your duties as an employee and describes the many benefits the District makes available to its employees. It supersedes all prior manuals, handbooks, policy statements, practices or customs. Please note, however, that these policies do not purport to be all encompassing statements of the Park District's policies, rules and benefits. The Board of Park Commissioners may, from time to time, amend, expand, revoke or suspend these policies and procedures by resolution at a regular or special meeting. Advance notice of policy changes will be given whenever possible.

Nothing contained in these policies or any written or oral statement interpreting, explaining or clarifying these policies is intended to create an employment contract, either expressed or implied, between the Park District and an employee. Employees who do not have a separate, individual written employment contract are employed at the will of the District and are subject to termination at any time, for any reason not prohibited by statute, with or without cause or notice. At the same time, such employees may terminate their employment at any time and for any reason.

Every employee should review these policies thoroughly. If an employee does not understand any provision(s) of these policies, it is his or her responsibility to make a written request for an explanation or clarification from the Executive Director (Director). If no such explanation or clarification is requested by an employee, it will be assumed that they understand the policies.

REV 5/05

102:1

CODE OF EMPLOYER-EMPLOYEE RELATIONS

Policy:

It is the policy of the District to implement fair and effective per-
sonnel policies and to require all employees to serve the organization's
best interests.

Comment:

   (1)  The District's goals for employees include the following:

      (a)  To provide equal employment opportunity and treatment
          regardless of race, religion, color, sex, age, national
          origin, handicap, or military status;

      (b)  To provide compensation and benefits commensurate with
          the work performed;

      (c)  To establish reasonable hours of work based on the Dis-
          trict's needs;

      (d)  To monitor and comply with applicable federal, state and
          local laws and regulations concerning employee safety;

      (e)  To offer training opportunities for those whose needs and
          capabilities warrant such training;

      (f)  To be receptive to constructive suggestions which relate
          to the job, working conditions, or personnel policies; and

      (g)  To establish appropriate means for employees to discuss
          matters of interest or concern with their immediate super-
          visor or the Director.

   (2)  The District expects all employees:

      (a)  To deal with patrons and suppliers in a professional man-
          ner;

      (b)  To perform assigned tasks in an efficient manner;

      (c)  To be punctual;

REV 5/95

102:2

    (d)  to demonstrate a considerate, friendly, and constructive attitude toward fellow employees; and

    (e)  To adhere to the policies adopted by the District.

(3)  The District retains the sole right to exercise all managerial functions including, but not limited to, the rights:

    (a)  To dismiss, assign, supervise, and discipline employees;

    (b)  To determine and change starting times, quitting times, shifts and meal break times;

    (c)  To transfer employees within departments or into other departments, other classifications or to other facilities;

    (d)  To determine and change the size and qualifications of the work force;

    (e)  To determine and change methods by which its operations are carried out;

    (f)  To determine and change the nature, location, and services rendered in the operation of the District; and

    (g)  To assign duties to employees in accordance with the District's needs and requirements and to carry out all ordinary administrative and management functions.

(4)  Nothing in this Manual should be considered as altering the employment-at-will relationship or as creating an express or implied contract or promise concerning the policies or practices that the District has implemented or will implement in the future.

Accordingly, the District retains the right to establish, change and abolish its policies, practices, rules and regulations at any time for any reason and as it sees fit.

REV 5/95

103:1

EMPLOYMENT-AT-WILL

Policy:

It is the policy of the District that all employees who do not have a written employment contract with the District for a specific, fixed term of employment are employed at the will of the District for an indefinite period.

Comment:

(1) Employees who do not have a separate, individual written employment contract are employed at the will of the District and are subject to termination at any time, for any reason not prohibited by state or federal law, with or without cause or notice. At the same time, such employees may terminate their employment at any time and for any reason.

(2) No District representative is authorized to modify this policy for any employee or to enter into any agreement, oral or written, contrary to this policy. Supervisory and management personnel are not authorized to make any representations to employees or applicants concerning the terms or conditions of employment with the District which are not consistent with District policies. No statements made in pre-hire interviews or discussions, or in recruiting materials of any kind, are to alter the at-will nature of employment or imply that discharge will occur only for cause.

(3) This policy may not be modified by any statements contained in this Manual or any other handbooks, employment applications, District recruiting materials, District memoranda, or any other materials provided to applicants and employees in connection with their employment. None of these documents, whether singly or combined, are to create an express or implied contract of employment for a definite period, nor an express or implied contract concerning any terms of conditions of employment. Similarly, District policies and practices with respect to any matter are not to be considered as creating any contractual obligation on the District's part or as stating in any way that termination will occur only for "just cause". Statements of specific grounds for termination set forth in this Manual or in any other District documents are examples only, not all-inclusive lists, and are not intended to restrict the District's right to terminate at-will.

(4) At the time of hiring, employees are to be required to sign a

103:2

written statement acknowledging that they are employed at the will of the District and are subject to termination at any time, for any reason not prohibited by statute, with or without notice and with or without cause.

(5) Completion of an introductory period or conferral of regular status does not change an employee's status as an employee-at-will or in any way restrict the District's right to terminate such an employee or change the terms or conditions of employment.

104:1

# OPEN DOOR POLICY

Policy:

The District promotes an atmosphere whereby employees can talk freely with members of the management staff. Employees are encouraged to openly discuss with their immediate supervisor any problems so appropriate action may be taken. If the supervisor cannot be of assistance, the department head and Director are available for consultation and guidance. The District is interested in all of our employees' success and happiness with us. We therefore welcome the opportunity to help employees whenever feasible.

**2**

201:1

**EQUAL EMPLOYMENT OPPORTUNITY**

Policy:

It is the policy of the District to be firmly committed to provide equal opportunity in employment to all employees and applicants for employment. No person will be discriminated against in employment because of race, religion, color, sex, age, national origin, ancestry, marital status, political affiliation, he/she has a disability unrelated to performing the job with reasonable accommodation, he/she is a military veteran or on the basis of pregnancy. It is also the policy of the District to comply with all applicable provisions of the American with Disabilities Act (ADA).

Comment:

(1)    This policy applies to all terms, conditions and privileges of employment including, but not limited to, hiring, introductory period, training, placement and employment development, promotion, transfer, compensation, benefits, educational assistance, layoff and recall, social and recreational programs, employee facilities, termination and retirement.

(2)    The District, if required by law, will establish a written affirmative action program to achieve prompt and full utilization of minorities, the disabled, Vietnam-era or disabled veterans, and women at all levels and in all segments of the work force.

(3)    The District prohibits and does not tolerate discrimination against anyone on the basis of pregnancy. Park District will treat all applicants and employees who are pregnant in the same manner as any other applicant or employee with regard to job-related functions, benefits, opportunities, and purposes. No person or employee, no matter his or her title or position, has the authority, whether express, actual, apparent or implied, to discriminate against a pregnant employee or applicant.

The District will not deny or remove a pregnant employee from a position because the employee is pregnant, considering pregnancy, or experiencing any pregnancy-related problems. All decisions regarding a pregnant employee's placement in or continuation in a job will be based on the same consideration

REV 5/05

201:2

that governs all employment decisions–the employee's ability to satisfactorily perform the essential duties of the job in question.

Questions, complaints, or problems related to pregnancy discrimination, should be directed to the appropriate department head or to the Director.

If questions, complaints or problems continue relating to pregnancy discrimination then contact the President of the Board of Park Commissioners. Directly confronting the person who is the source of the report, question, or complaint is not required.

(4)    It is the Park District's policy not to discriminate against any qualified employee or applicant with regard to any terms or conditions of employment because of such individual's disability or perceived disability so long as the employee can perform the essential functions of the job. Consistent with this policy of non-discrimination, the District will provide reasonable accommodations to a qualified individual with a disability, as defined by the ADA, who has made the District aware of his or her disability, provided that such accommodation does not constitute an undue hardship on the Park District.

The District will make all decisions concerning recruitment, placement, selection, training, hiring, advancement, discharge or other terms, conditions, or privileges of employment based on job-related qualifications and abilities.

Employees with a disability who believe they need a reasonable accommodation to perform the essential functions of their job should contact the appropriate department head. The District encourages individuals with disabilities to come forward and request reasonable accommodation. If an employee feels uncomfortable making an accommodation request to the department head or the employee believes the accommodation request was not properly managed, report to the Director.

201:3

On receipt of an accommodation request, the department head
and the immediate supervisor will meet to discuss and identify
the precise limitations resulting from the disability and the
potential accommodation that the District might make to help
overcome those limitations and perform the essential job
functions of the position.

The District will determine the feasibility of the requested
accommodation considering various factors, including, but not
limited to the nature and cost of the accommodation, the
District's overall financial resources, the accommodation's
impact on the operation of the department, including the ability
of other employees to perform their duties, and on the
District's ability to provide its services to the public.

What is considered a reasonable accommodation will be based
on a case-by-case analysis. The District will inform the
employee of its decision on the accommodation request or on
how to make the accommodation. If the accommodation
request is denied, employees will be advised of their right to
appeal the decision by submitting a written statement
explaining the reasons for the request. If the request on appeal
is denied, that decision is final.

The ADA does not require the District to make the *best*
possible accommodation, to reallocate essential job functions,
to create new positions, or to provide personal use items (i.e.,
eyeglasses, hearing aids, wheelchairs, etc.).

An employee or job applicant who has questions regarding this
policy or believes that he or she had been discriminated against
based on a disability should immediately notify the department
head or Director. All such inquiries or complains will be
treated as confidential to the extent permissible by law.

REV 5/05

202:1

**SEXUAL AND OTHER HARASSMENT POLICIES**

Policy:

It is the responsibility of each and every employee, official, Park Commissioner, agent, volunteer and vendor of the District, as well as anyone else using the District's facilities, to refrain from sexual or other harassment. Title VII of the Civil Rights Act prohibits discrimination or segregation in terms and conditions of employment on the basis of race, color, religion, gender or national origin.

(1)    Sexual Harassment Policy

Sexual harassment is a form of discrimination under Title VII of the US. Civil Rights Act of 1964, as amended, and the Illinois Human Rights Act. Sexual harassment is defined as any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when:

(a)    submission to such conduct is made either explicitly or implicitly as a term or condition of an individual's employment.

(b)    submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or

(c)    such conduct has the purpose or effect of substantially interfering with any individual's work performance or creates any intimidating, hostile or offensive working environment.

(d)    Some examples of conduct commonly considered to be sexual harassment include, but are not limited to:

Verbal

(1)    unwanted sexual advances

(2)    sexual innuendoes

(3)    suggestive comments, insults, humor and/or jokes about sex anatomy or gender specific traits

REV 11/05

202:2

    (4)    sexual propositions, threats or repeated requests for dates

    (5)    statements about other employees, even outside their presence, of a sexual nature

Non-Verbal

    (1)    obscene gestures

    (2)    sexually suggestive bodily gestures

Visual

    (1)    posters, photographs, art work, signs, pinups or slogans of a sexual nature

Physical

    (1)    unwelcome touching, hugging or kissing

    (2)    coerced sexual intercourse

    (3)    assault

(2)    Responsibility of Individual District Personnel

Every employee, officer, Commissioner, agent and volunteer of the District has the responsibility to refrain from sexual and other harassment in the District workplace. Any such individual who sexually or otherwise harasses District personnel and/or patrons is liable for his/her individual conduct.

All District personnel are encouraged to report incidents of sexual or other harassment, regardless of who the offender may be or whether or not he/she is the intended victim. The harassing employee will be subject to disciplinary action, as appropriate, up to and including dismissal.

(3)    Procedures For Filing a Complaint

    (a)    Clearly communicating your disapproval of the conduct to the offending employee, your supervisor and/or the Executive Director.

202:3

(b)     You should document or record each incident (what was said or done, by whom, the date, time and place, and any witnesses to the incident).

(c)     Support documentation can be strengthened by written records such as letters, notes, memos and telephone messages.

(d)     It is not necessary that the sexual or other harassment be directed at you for you to make a complaint.

You are encouraged to report complaints so that prompt response and appropriate action may be taken. No employee making a complaint will be retaliated against even if the complaint is not substantiated, provided the complaint was made in good faith. In addition, witnesses will not be retaliated against if their testimony is made in good faith. The process for making a complaint about sexual or other harassment falls into several stages. You are encouraged to follow the following procedures:

(a)     promptly report the offending employee's behavior to your immediate supervisor

(b)     if the harasser is your immediate supervisor, report the problem to the Division Director or the Executive Director

(c)     you may also issue a complaint concerning sexual harassment or other harassment to the Illinois Department of Human Rights and/or the Equal Employment Opportunity Commission

4.     False and Frivolous Complaints

A false and frivolous charge refers to a situation where the accuser is using a sexual harassment complaint to accomplish some end other than stopping sexual harassment. Complaints to your supervisor or the Executive Director concerning sexual or other harassment that are unfounded and that are not made in good faith will be considered false and frivolous. Given the seriousness of the consequences for the accused, a false and frivolous complaint is a severe offense that may result in disciplinary action up to an including dismissal.

203:1

HIRING

Policy:

It is the policy of Sterling Park District to be an equal opportunity employer and to hire individuals solely upon the basis of their qualifications and ability to do the job to be filled.  Unless otherwise provided in writing, employment with the District is considered to be at-will, so that either party may terminate the relationship at any time and for any lawful reason.

Comment:

(1)  If Division Superintendents or department heads need to fill a full-time or part-time permanent position, or need new or additional personnel, the approval of the Director must be given.  All other hiring of part-time or seasonal help is at the discretion of the Division Superintendents according to budgetary requirements and handled in accordance with procedures outlined in the District's "Operation Procedures Reference Guide".

(2)  The District will normally try to fill job openings above entry level by promoting from within if qualified applicants are known to be available internally.  In addition, the District will normally give consideration to any known qualified individuals who are on layoff status before recruiting applicants from outside the organization.

(3)  If recruitment of outside candidates is deemed necessary by the District, the District will utilize any and all methods and sources deemed appropriate to fill the openings.  When an outside candidate is considered for a job opening, the following procedures will be followed:

(a)  The candidate must fill out an employment application form.

(b)  The candidate will be given any tests required for the job.  These tests may include a proficiency, written or lifting test.

(c)  The candidate must have proof that he/she has the legal right to work in the United States and must fill out an I-9 (Employment Eligibility Verification) form.  This documentation is required by the 1986 Immigration Law.

REV 11/96

203:2

(d)    The District is required by state statute (70 ILCS 1205/8-23) to obtain criminal conviction information concerning all applicants, and shall perform a criminal background check for applicants for all positions. Pursuant to statute, any conviction of offenses enumerated in subsection (c) of said statute shall automatically disqualify the applicant from consideration for working for the District. Any other conviction(s) shall not automatically disqualify the applicant from consideration, but rather, the conviction(s) will be considered in relationship to the specific job. Applicants are not required to disclose sealed or expunged records of corrections.

Applicants may be required to submit fingerprints and/or other identification information in order to facilitate such an investigation. All information concerning the record of convictions shall be confidential and will only be transmitted to those persons who are necessary to the decision process.

(e)    The candidate, if required to drive a District vehicle or an employee owned vehicle for District business, must have a valid driver's license with the proper classification for the vehicle(s) the employee is expected to operate. Before such an employee has started work, and generally on an annual basis thereafter, the District will request a drivers license abstract review from the Illinois Secretary of State's office.

Employees who are required to have a commercial drivers license (CDL) for their position with the District will be tested in accordance with the District's Controlled Substance and Alcohol Testing Policy which is included in this Manual in Section 810:1 as Appendix B.

203B:1

# CHILD LABOR LAWS:  EMPLOYMENT OF MINORS

Policy:

The normal practice of the District is not to hire any individual 16 years of age or younger.  However, if an exception is made, the District will comply with all Federal and Illinois Child Labor Laws regarding the employment of minors.

Comment:

(1)    All minors under age 16 must have an Employment Certificate before they will be allowed to work for the District.  The Employment Certificates are issued by the Superintendent of Schools or a duly authorized agent.

(2)    For purposes of this policy, "School Day" means any day when school is in session and "School Week" means any week where one or more days are school days.

(3)    Federal and Illinois Child Labor Laws mandate that a minor cannot work the following hours:

    (a)    During school hours when school is in session;

    (b)    More than six (6) consecutive days in a calendar week;

    (c)    Over forty (40) hours in a calendar week and over eight (8) hours a day when school is out;

    (d)    Earlier than 7 am and later than 7 pm, except from June 1 to Labor Day, when the minor may work up to 9 pm;

    (e)    Over three (3) hours a day when school is in session;

    (f)    Over eight (8) hours a day combining school and work; and

    (g)    Over eighteen (18) hours in a calendar week when school is in session.

REV 11/05

203B:2

(4)    An unpaid meal period of at least thirty (30) minutes must be provided to minors no later than the fifth consecutive hour of work.

(5)    Employees under age 16 are not permitted to supervise any part of the transportation of camp, field trips, or other District sponsored program participants to or from District sponsored activities, including loading participants or materials onto a bus prior to departure, supervising the participants (or performing any other work) during the ride to and from the activity, and unloading participants or materials upon arrival at the activity or back at the point of departure. Employees under age of 16 are relieved of all duties during this time and are not to resume their duties until all participants and materials have been unloaded from the bus.

204:1

EMPLOYMENT AGREEMENTS

Policy:

It is the policy of the District that it may execute, at its sole dis-
cretion, written employment agreements with certain employees.  Employ-
ees who do not have a written employment contract containing a specified
term of employment are considered at-will employees.

Comment:

(1)  The Director is authorized to enter into a written employ-
     ment agreement not exceeding one year on behalf of the
     District with any employee.  On the recommendation from
     the Director, only the Board of Commissioners can enter
     into written employment agreements exceeding one year.

(2)  Written employment agreements, when used, will spell out
     the important terms and conditions of an individual's em-
     ployment.  Such terms and conditions should include:

     (a)  The length of time that the agreement will last and
          how, if at all, it can be renewed;

     (b)  The job title and/or job description, reserving the
          right of the District to change the employee's duties
          as the District's interests require;

     (c)  The employee's salary;

     (d)  Any other forms of compensation, such as health insur-
          ance or pension; and

     (e)  Provisions for the termination of the employment.

(3)  Written agreements covered by this policy may include, de-
     pending on individual circumstances, the following:

     (a)  Coverage of relocation expenses by the District;

     (b)  Coverage of employment agency fees;

     (c)  Coverage should specify conflicts of interest policies
          as set forth by the District;

REV 10/95

204:2

(d)  Coverage should specify any special training and educa-
     tion that will be covered by the District; and

(e)  Coverage should specify that confidential data is to be
     safeguarded.

205:1

ORIENTATION AND TRAINING

Policy:

It is the policy of the District to provide orientation programs for
new employees and to conduct or support training programs as deemed
appropriate.

Comment:

(1)  Immediate supervisors are responsible for orientation as
     it applies to introducing the new employee to the specific
     job and/or department and may select a co-worker to serve
     as a sponsor to facilitate the new employee's transition.

(2)  Immediate supervisors are responsible for recommending em-
     ployees for special training programs, for providing on-
     the-job training, or for arranging on-the-job trainers.
     Such training will normally be conducted during regular
     working hours.

(3)  Immediate supervisors may recommend participation in con-
     tinuing education and/or training programs when such in-
     struction is deemed beneficial or considered necessary for
     an employee's job performance.  In some cases, employees may
     be required to enroll in and complete such programs satis-
     factorily.

(4)  Final approval of all continuing education and/or training
     programs will be by the Director and must be submitted on the
     "Continuing Education" form.  See 509:4 for sample form.

(5)  The District will provide and pay all costs, see (6), for
     special training programs for safety and health matters or any
     other training programs deemed necessary or as required by
     government regulation for full-time employees.

(6)  With the Director's approval, the District may pay for special
     training for part-time employees.  They must also adhere to
     all guidelines as set forth in the Personnel Policy Manual.

(7)  If an employee is terminated or leaves voluntarily before one
     year of service, restitution of all costs associated with the
     training program(s) must be made to the District.

REV 10/96

205:2

(8)  All employees are required to attend an orientation meeting and
     inservice training sessions.  All such meetings are designed
     to improve job performance and the efficiency of the District
     and will take place during normal business hours or at the
     discretion of the immediate supervisor.

206:1

**MEDICAL PROCEDURES**

Policy:

It is the policy of the District that all full-time, selected part-time, seasonal or present employees, or any applicant to whom a job offer has been extended, may be required to submit to medical tests or examinations whenever management feels such actions are necessary for the safe or efficient operation of the District.

Comment:

(1)     The District requires all full-time employees, maintenance staff, trades, security staff, drivers of agency vehicles and other positions deemed appropriate, to successfully complete a medical examination after a position has been offered to the employee, but prior to starting employment. This medical examination is necessary to determine if the employee can perform the essential functions of the job offered to him with or without reasonable accommodations on the part of the District. The District will also require drug testing for all applicants offered a full-time position with the District and other applicants based upon the position offered.

A physician of the District's choice and at District expense will perform the examination. Employees must consent to the disclosure of the physician's findings, conclusions, and opinions to the District. Medical records will be maintained in a separate confidential file. Information contained in a medical file will not be released or disclosed without written consent, by court order, or except to persons with a lawful right or need to know.

Employees may be required to undergo subsequent medical examinations when such examinations are job-related and consistent with business necessity. Such examinations will be conducted under the same procedures and guidelines as outlined above for pre-employment medical examinations.

REV 11/05

207:1

SERIOUS DISEASES

Policy:

It is the policy of the District that employees with infectious, long-term, life-threatening, or other serious diseases may work as long as they are physically and mentally able to perform the duties of their job without undue risk to their own health or that of other employees or patrons.

Comment:

(1) Serious diseases for the purposes of this policy include, but are not limited to, cancer, heart disease, multiple sclerosis, hepatitis, tuberculosis, human immunodeficiency virus ("HIV"), and acquired immune deficiency syndrome ("AIDS").

(2) Neither prospective nor current employees shall be asked or required to respond to the questions of whether they are infected with HIV. The District may uniformly ask whether a prospective employee has any condition which would interfere with his ability to perform the particular job for which he is applying.

(3) Testing for HIV antibodies shall not be routinely conducted or required.

(4) An employee infected with HIV shall be dealt with as any other employee with a chronic illness or handicap. As long as the employee is able to perform the essential function of his/her job and does not pose a reasonable risk of communicating it to other employees or the public, he/she will be considered otherwise qualified for his/her job. If the infected person is unable to perform the essential functions of his/her job or there is a reasonable risk of communicating a contagious disease to others, when requested by the infected person, the Park District shall consider whether any "reasonable accommodation" will enable the person to perform those functions. Accommodation is not reasonable if it would be excessively expensive or would unduly disrupt the ordinary conduct of business.

(5) The Park District shall keep records noting incidents on non-compliance with the infectious disease guidelines in the Safety Manual. To the extent monitoring reveals a failure to follow recommended precautions, further education of the employee involved shall be provided, and if such non-compliance is of a nature that poses a threat to the health or safety of other employees or the public, disciplinary action shall be taken.

207:2

(6)   The Park District will attempt to maintain the confidenti-
ality of any diagnosis or medical records of employees with
serious diseases, unless otherwise required by law.  Infor-
mation relating to an employee's serious disease will not be
disclosed to other employees unless the information is, in
the opinion of the District, necessary to protect the health
or safety of the employee, co-workers, patrons or others.

(7)   Any employee concerned about being infected with a serious
disease by a co-worker, patron or others, should convey this
concern to their supervisor.  Employees who refuse to work
with or perform services for a person known or perceived to
have a serious disease, without first discussing their con-
cern with a supervisor, will be subject to discipline.  If
there is little or no evidence of risk of infection to the
concerned employee, that employee may be assigned to work with
or perform services for any other employee as required by the
District.

(8)   For further information, please see the extended policy
in the Park District's Safety Manual or the Administration
Office.

208:1

INTRODUCTORY PERIOD

Policy:

It is the policy of the Park District that all new employees and all present employees transferred (includes probationary and/or disciplinary) or promoted to a new job are to be carefully monitored and evaluated for an initial introductory period on the job of at least four (4) months. This introductory or training period can be extended by the Director an additional two (2) months. After satisfactory completion of the introductory or training evaluation, such employees will be evaluated on an annual basis as provided for in the Performance Appraisals section.

Comment:

(1) Supervisors or Division Superintendents are to observe carefully the performance of each employee in a new job position. Where appropriate, weaknesses in performance, conduct, or attitude are to be brought to the employee's attention.

(2) Supervisors or Division Superintendents will prepare a written evaluation of the employee's job performance at the end of the four month introductory period. This evaluation will include recommendations as to whether the employee should continue in the position. Copies of the evaluation will be given to the Director and included in the employee's personnel file.

(3) During the introductory or training period the employee's performance will be reviewed with respect to quality and quantity of work, ability, skills, attitude, attendance and such other factors as may be deemed appropriate.

(4) An employee may be terminated at any time during the introductory or training period with or without cause, but with due notice and hearing by the appropriate supervisor. Any recommendation for termination shall be in writing.

(5) Subject to staffing needs and budgetary requirements of the Park District, transferred or promoted employees who are unable to perform satisfactorily in their new jobs may, at the discretion of management, be returned to their original jobs, if a vacancy exists, or may be terminated.

(6) All newly hired employees who do not complete a year of employment are not eligible for severance or vacation pay. All transferred or promoted employees will remain eligible for all

REV 5/94

208:2

benefits while demonstrating their ability to perform their new jobs.

(7)    At all times, employment with the District is considered to be "at-will", and the employer/employee relationship may be terminated at any time for any lawful reason by either party.

209:1

TRANSFER

Policy:

It is the policy of the Park District that it may at its discretion, initiate or approve employee job transfers from one job to another or from one location to another.

Comment:

(1)  The District may require employees to make either a temporary or long-term job transfer in order to accommodate the organization's business needs.

(2)  Employees may request a voluntary job transfer.  However, to be eligible for a voluntary transfer, employees must meet the requirements of the new position, must have a satisfactory performance record and must have no adverse disciplinary actions during their employment with the District.

(3)  Employees requesting a voluntary transfer should submit their request in writing to their immediate supervisor or the Director.

(4)  The division superintendent or the employee's immediate supervisor will make the final transfer decision, subject to the Director's approval.

(5)  Transferred employees will serve in their new positions for an initial period of at least four months during which the provisions of the "Introductory Period" policy apply.

(6)  A transfer does not alter the basic employment-at-will relationship.

(7)  Transferred employees may be required to have a medical exam. (See MEDICAL PROCEDURES)

(8)  Transferred employees will retain their existing job seniority until they satisfactorily complete their introductory period on the job.  That seniority will be transferred to the employee's new job after the successful completion of the introductory period.

(9)  Pay for transferred employees will be handled as follows:

209:2

(a)  Employees transferred to a job within the same salary range will continue to receive their existing rate of pay;

(b)  Employees transferred to a job in a higher salary range will be paid at the higher rate subject to the discretion of the Director or after the introductory period is satisfactorily completed;

(c)  Employees transferred, at the District's request, to a job in a lower salary range will continue to be paid at their former rate for four weeks and then at the rate of the new position thereafter; and

(d)  Employees transferred, at their own request, to a job in a lower salary range will be paid at the lower rate commencing with the start of the new job.

(10) Job openings for which management seeks candidates from within the District will normally be posted, however, a transfer may be made without posting at the discretion of the Director.

REV 9/95

210:1

PROMOTION

Policy:

It is the policy of the District to hire employees for entry level positions, to provide training and development for employees when deemed necessary and to offer employees promotions to higher level positions when deemed appropriate. To fill vacancies above the entry level, management prefers to promote from within and will first consider current employees with the necessary qualifications and skills, unless outside recruitment is deemed to be in the best interest of the District.

Comment:

(1) An employee's basic eligibility for promotion will be determined by the requirements of the new job. In addition, the employee must have a satisfactory performance record and no adverse disciplinary actions while working for the Park District.

(2) Any current employee candidate for promotion will be screened and selected on the basis of attendance and work records, performance appraisals and job related qualifications including in some instances, aptitude or skill tests. A medical examination may be required. Seniority will also be considered.

(3) Job openings and promotions for which the District seeks candidates will be posted at the Frasor Center Administration Office. From time to time, however, management will, as it deems appropriate, fill job openings or make promotions without posting notices. When job openings or promotion opportunities are posted:

   (a) Interested employees must initiate a written transfer request within five business days of the posting to the Director or their immediate supervisor;

   (b) Supervisors and division superintendents may propose, within the same time period, employees for the position; and

   (c) The District may also solicit outside candidates during or after the posting period.

210:2

(4)  Promoted employees will be placed on probationary status for a
     period of four months.  During this period, the provisions of
     the Introductory Period policy will apply.

(5)  Seniority and pay for promoted employees will be handled as
     outlined in the Transfer policy.

211:1

HOURS OF WORK

**Policy:**

It is the policy of the District to establish the time and duration of working hours subject to the financial and staffing requirements of the District and may vary among departments.

**Comment:**

(1) The normal workweek is Monday through Sunday, beginning and ending at midnight on Sunday and consisting of forty hours. Regular part-time and part-time seasonal employees are not guaranteed any specific number of hours per day or per week.

(2) The normal workday will consist of eight consecutive hours of work with an unpaid meal period. The schedule of hours for employees will be determined by each department head. The department head will inform employees of their daily schedule of hours of work, including meal periods, and of any changes deemed necessary or desirable by the District.

(3) Department heads may schedule overtime when it is deemed necessary. Employees are not permitted to work overtime without prior approval. For purposes of overtime compensation, only hours worked in excess of forty during a workweek will be counted. Please see VACATION, HOLIDAYS, SHORT-TERM ABSENCES and PERSONAL DAYS.

(4) Employee attendance at meeting or training programs will be considered hours of work if such attendance is requested by the District and the meetings or training programs are held during the employee's normal working hours. No compensation or compensatory time off will be granted to any employee who attends a voluntary meeting after hours. Compensation will be paid for mandatory meetings after hours.

(5) All non-exempt employees are required to maintain an accurate and legible record of the hours worked. These time records (i.e., timecard/timesheet), which must be approved by your immediate supervisor are the basis for your paycheck calculation. Your time record covers two workweeks. Time is computed to the nearest quarter of an hour. All employees who work 7½ consecutive hours or more receive an unpaid thirty minute meal period after 5 hours. If you have permission to leave during working hours you must clock/sign in/out the time you leave and the time you return on your time record. You are responsible for your own time records. Violation of this

Rev. 1/05

policy may result in appropriate disciplinary action up to
and including immediate discharge. The following points
should be considered when completing a time record:

a.   Recording another employee's time record or falsifica-
     tion of your own time record is prohibited and is
     grounds for disciplinary action, up to and including
     dismissal.

b.   When a timeclock is available/designated, employees must
     clock-in and clock-out.

c.   When a timeclock is not available/designated, the
     employee must sign in/out on a District approved time-
     card or timesheet as authorized by the employee's
     immediate supervisor.

d.   If an employee fails to clock/sign in/out they must
     contact their immediate supervisor immediately.

e.   Failure to clock/sign in/out can result in disciplinary
     action up to and including immediate discharge.

f.   An employee's work period begins and ends when their
     scheduled shift begins and ends and not when they
     clock/sign in/out.

g.   Employee timecards/sheets are to be checked by
     designated full-time supervisors. Timecards/sheets are
     not to be altered. Approved timecard change forms are
     to be completed/attached to the timecard/sheet when
     changes are warranted. Timecard change forms are to be
     completed by the designated full-time supervisor and not
     the employee.

(6) Exempt employees are not required to sign in or out; however,
business trips, vacations, sick, personal days, etc. must be
recorded/authorized by the employee's respective supervisor
and/or department head.

All exempt employees will be required to maintain specific
hours. These hours may be changed only with the approval of
the department head and/or the Executive Director.

Exempt employees will not normally receive overtime compensa-
tion, however, they may be eligible for compensatory time-off
after working abnormally long hours at the discretion and
with the approval of the Executive Director. Compensatory
time for salaried personnel will not be granted on an hour
for hour matching basis, but will be determined by the
Executive Director.

211:3

No more than ten(10) days of compensatory time may be accumulated by an employee during the calendar year and can only be taken when it is convenient to the District and approved by the Executive Director.  The leave does not accumulate beyond the ten(10) days.

(7) For the purposes of paying overtime compensation, employees are classified as either **exempt** or **non-exempt** under the Fair labor Standards Act:

    EXEMPT –      Regular, salaried personnel employed in executive, administrative or professional capacities are exempt from the provisions of the Fair Labor Standards Act.  Exempt employees do not receive overtime compensation but may occasionally be eligible to receive compensatory time off after working abnormally long hours but only at the discretion of the Executive Director.  Compensatory time will not be on an hour for hour basis if granted.

    NON-EXEMPT –    Regular, part-time and seasonal hourly employees.  Workers in this classification who work beyond forty(40) hours per week will be compensated at a pay rate equal to one and one half times the employee's regular hourly rate.

                    Non-exempt employees required to carry a beeper and be "on-call" after normal working hours will be paid one hour and one half times the employee's regular hourly rate of pay with the following guidelines:

                    a) employee must be geographically able to answer a call within twenty minutes;

                    b) the employee will be paid for time spent at the site of the emergency call only;

                    c) compensation for transportation time will be allowed and shall be no more than thirty(30) minutes added to the total elapsed time on the employee's Incident Report for each call answered to a specific location; and

                    d) no alcoholic beverages may be consumed while on-call.

212:1

OUTSIDE EMPLOYMENT

Policy:

It is the policy of the District to allow its employees to engage in outside work or hold other jobs, subject to certain restrictions as outlined below.

Comment:

(1)   The District requires that employees' activities and conduct away from the job must not compete with or compromise its interests, or adversely affect job performance and the ability to fulfill all responsibilities to the District. Employees are also prohibited from using any District tools or equipment and are not to solicit or conduct any outside business during working hours.

(2)   Prior approval of the Director must be given prior to any outside employment or if other work activity is undertaken. Failure to do so will be cause for disciplinary action.

(3)   Salaried employees may be permitted, but are not encouraged, to engage in outside employment or other work activity inasmuch as they are expected to devote all of their working energies to the performance of their duties at the District.

(4)   Employees are cautioned to consider carefully the demands that an additional work activity would create as outside employment will not be considered an excuse for poor job performance, absenteeism, tardiness, leaving early or refusal to work overtime or different hours.

(5)   Employee requests for permission to accept outside employment, including self-employment, should be submitted in writing to the Division Superintendent or Director. The request should include who the outside employer would be, the nature of the job and the hours of employment. The Director will make the final decision on the request. Please see 212:3 for request form.

(6)   Division Superintendents and the Director will be particularly concerned about outside work requests that:

        (a)   May reduce the employee's efficiency in working for the District;

212:2

    (b)  Involves working for an organization which is a competitor of the District or does business with the District; or

    (c)  May adversely affect the District's image.

(7)  Employees who have accepted outside employment are not eligible for paid sick or personal absence when the absence is used to work on the outside job or is the result of an injury sustained on that job.  Fraudulent use of sick or personal absences will be cause for disciplinary action.

(8)  During any introductory period, outside employment will not be permitted.

212:3

STERLING PARK DISTRICT
REQUEST FOR AUTHORIZATION OF OUTSIDE EMPLOYMENT


I, _____, request permission to supplement
my employment as a Sterling Park District employee with the following
outside employment:

Name of Employer: _____

Address: _____

Phone Number: _____  Type of Work: _____

Days of Week: _____

Hours Per Day: _____  Hours Per Week: _____


Date: _____  Signature: _____


In accordance with the criteria established by Sterling Park District's
Outside Employment Policy, your request for supplemental employment has
been:

        Approved _____        Disapproved _____


_____        _____
Immediate Supervisor            Director

_____        _____
Date                            Date

213:1

DUAL EMPLOYMENT WITHIN DISTRICT

Policy:

It is the policy of the District that employees may have dual employ-
ment within the District using the following guidelines.

Comment:

(1) Employees may have dual employment within the District
    if the employment does not fall under that employee's
    supervision in any manner.

(2) Dual employment must not conflict with regular job re-
    sponsibilities.

(3) Administrative staff of the District are prohibited from
    having dual employment within the District.  Please see
    job classifications in Administration Office for deter-
    mining regular staff and administrative staff.

(4) All dual employment of full-time employees must be approved
    by the Director.

(5) All dual employment of part-time employees must be verified
    and approved by the Risk Management/Development Director.

(6) When an employee with dual employment is discharged for
    any reason from one facility, they will be considered
    discharged from the District.

REV 10/96

214:1

PART-TIME EMPLOYEES

Policy:

It is the policy of the District to supplement the regular work force with part-time employees or other forms of flexible staffing when needed because of periods of peak work load, employee absences or other situations as may be determined by management.

Comment:

(1)  A part-time employee is an individual who is hired either part-time or full-time for a specified, limited period.  A part-time employee may or may not work forty hours per week.

(2)  Part-time positions will be filled by Division Superintendents or Facility Managers with the Risk Management/Development Director's verification and approval and/or by the Director.

(3)  Some part-time positions may be filled by transferring an employee from another area or facility.

(4)  The District may utilize students and other similar applicants for flexible staffing purposes, if not prohibited by law.  When deemed necessary, such applicants will be required to provide a certificate of age.

(5)  Part-time employees do not qualify for vacation, holiday, sick or personal time pay.  Some part-time employees may qualify for the 1,000 hour rule for participation in the District's pension plan.

(6)  Any employee whose status changes from part-time to full-time will be considered as hired on the date of the change of status for purposes of eligibility for sick, holiday, vacation and personal days.

(7)  Part-time and seasonal employees will receive overtime compensation for those hours worked in excess of forty hours per workweek.  The overtime rate will be one and one-half the employee's hourly rate of pay.

(8)  Part-time employees will be evaluated annually and considered for pay increases on their anniversary date(s) and by position.  An evaluation does not mean an automatic increase in compensation.

(9)  Seasonal employees will be evaluated at the end of the season and considered for pay increases on their anniversary date.  An evaluation does not mean an automatic increase in compensation.

REV 10/96

215:1

VOLUNTEERS AND DOCENTS

Policy:

It is the policy of the District to use volunteers and docents in conducting routine Park District programs and in their course of business.

Comment:

(1)  All volunteers and docents who offer to work for the District free of charge are governed by the same policies as set forth in this Manual.

(2)  Volunteers and docents do not receive any benefits afforded employees of the District.  See exception under (5) below.

(3)  Volunteers and docents must be sixteen (16) years of age or older.

(4)  Volunteers and docents are not covered by the District's Workers' Compensation Insurance.

(5)  The District's insurance carrier provides volunteers and docents medical accident insurance in limited cases.  This insurance only takes effect after the volunteer's/docent's insurance.

REV 10/96

216:1

LAYOFF AND RECALL

Policy:

It is the policy of the District that, if it must reduce employment because of adverse economic or other conditions, layoffs and recall from layoffs will be conducted consistent with District requirements and in accordance with the procedures set forth below.

Comment:

(1) The District will attempt to avoid layoffs and, whenever possible, will consider alternatives to layoff before any final decisions are made. In the event that a layoff is expected, the District will attempt to communicate information about the impending layoff as soon as possible. However, the District reserves the right to alter the layoff procedure and withhold information about the layoff as permitted by law in order to protect the District's interests.

(2) Layoffs that are expected to be temporary will be handled according to the provisions of this policy. Layoffs that are known to be permanent will be made according to this policy and then handled according to policies outlined in TERMINATION OF EMPLOYMENT.

(3) Hourly employees within each affected department will be selected and laid off based on the staffing needs of the District. The following layoff order may, or may not, be adhered to:

   (a) Probationary employees;

   (b) Temporary, part-time, and part-time seasonal; and

   (c) Full-time employees are to be laid off based on their length of service, provided that the employees who are retained have the demonstrated ability and fitness to perform the available work. If after a reasonable time, an employee cannot perform the duties of a new job, that employee is to be laid off if the employee is ineligible to transfer to another department or facility.

REV 5/95

216:2

    (4)  Salaried employees within each affected unit are to be selected for layoff in the following order:

        (a)  Salaried employees whose work generally is of a routine or repetitive nature and does not regularly require the exercise of judgment are to be subject to the same layoff procedures set forth for hourly employees.

        (b)  All other salaried employees are to be selected for layoff based on the evaluation of the following criteria:

            (i)   Demonstrated current and past performance;

            (ii)  Promotion potential and transferability of skills to other positions within the District; and

            (iii)  Length of service with the District.

    (5)  An employee's length of service is measured from the original date of employment with the District so long as there has been no break in service greater than thirty (30) days. Employees with breaks in service greater than thirty days, but less than one year, are credited for their actual time worked; employees with a break in service greater than one year will receive credit for service from their most recent date of employment with the District.

    (6)  Employees selected for layoff will be given as much notice as is required by law or as much as is reasonable under the circumstances. Employees will be informed of the reason for the layoff, of the estimated length of the layoff and of any rights to appeal their selection for layoff.

    (7)  Employees who are laid off will be maintained on a recall list for one year or until management determines the layoff is permanent, whichever occurs first. Removal from the recall list terminates all job rights the employee may have. While on the recall list, employees should report to the Administration Office if they become unavailable for recall. Employees should also keep a current home address and phone number on file with the Administration Office.

REV 5/95

216:3

(8) Employees will be recalled according to need, classification, or ability to do the job. Notice of recall will be sent by registered mail, return receipt requested, to the current home address on file. Unless an employee responds to the recall notice within seven (7) days following receipt of the notice or its attempted delivery, the employee's name will be removed from the recall list and the employee will cease to have any job rights with the District.

(9) Credit for retirement benefits and seniority will cease during a layoff.

(10) No vacation or days of paid absence will be accrued during lay-off.

(11) Employees may use any vacation accumulated but not paid during a layoff.

(12) Please see the Administration Office for other benefits that may or may not continue due to a layoff.

(13) When all factors are equal, layoff decisions will be made on the basis of seniority for all employees.

REV 5/95

217:1

# TERMINATION OF EMPLOYMENT

## Policy:

It is the policy of the District to terminate employment because of an employee's resignation, discharge, or retirement; the expiration of an employment contract; or a permanent reduction in the work force. Discharge can be for any reason not prohibited by law. Employees are free to resign at any time and for any reason and the District reserves the right to terminate employment at any time and for any reason.

## Comment:

(1) Employees are requested to give written notice of their intent to resign. The following guidelines are suggested:

    (a) Supervisory and managerial employees should give four weeks' notice;

    (b) Clerical and administrative employees should give at least three weeks' notice; and

    (c) All other employees should give at least two weeks' notice.

(2) Employees who are absent from work for three consecutive days without being excused or giving proper notice will be considered as having voluntarily quit.

(3) For policies and procedures governing termination as a result of retirement, see RETIREMENT.

(4) For policies and procedures governing discharge for disiplinary reasons, see DISCIPLINARY PROCEDURES.

(5) Employees who are affected by a permanent reduction in force, may be considered for transfer within the District.

(6) Employees who qualify for vacation pay will be paid accrued vacation pay up to the date of termination. (See VACATION)

(7) Employees who qualify for pension benefits, if vested, or separation benefits if not vested, see RETIREMENT policy.

(8) All involuntary terminations will be handled discretely and confidentially.

217:2   -

(9)  An exit interview will be conducted with the terminating employee no later than the employee's last working day. It will be the responsibility of the interviewer to collect all Park District property including keys, tools, uniforms, protective gear, staff identification cards, credit cards, vehicle keys, etc., before releasing the employee's final paycheck.  The District may deduct from the final paycheck the value of any missing or damaged property or any monies which the employee owes the District.

(10)  A copy of written reports regarding terminations will be kept in the employee's personnel file.

(11)  Terminating employees may be eligible for future employment if so recommended by their supervisor and approved by the Director.

(12)  Requests for employment references should be made in writing to the Administration Office and must be authorized by the employee for release of same.  Generally, information released will be limited to verification of the employee's position, job location, and dates of employment with the District.  (See Section 901:2)

(13)  At the exit interview staff will discuss with the employee their continuing duty not to disclose confidential information and any terms of any agreement not to compete, if applicable.

(14)  The Park District reserves the right to terminate employment for any reason not prohibited by statute.

(15)  Termination and discharge procedures are only guidelines and do not constitute a legal contract between the District and its employees.  The District reserves the right to implement its policies and procedures as it sees fit.  In addition, specified grounds for termination are not all-inclusive since the District reserves the right to terminate employment.

(16)  Any employee who has dual employment within the District and is discharged for any reason, will be considered discharged from the District.

(17)  Employees covered by the District's insurance, savings or pension plan will be informed of their rights and proper forms must be signed, where applicable, at the exit interview.

(18)  All full-time employees must return their Personnel Policy Manual and Operation Procedure Reference Guide at their exit interview.

REV 10/96

218:1

# RETIREMENT

## Policy:

It is the policy of the District that employees may retire at any age.

## Comment:

(1) Employees who have been employed full-time for at least eight (8) years are vested in the District's pension plan. Employees must be fifty-five (55) years of age to qualify for pension benefits. Some restrictions may apply.

(2) Employees should submit their retirement plans in writing to the Director. (See TERMINATION OF EMPLOYMENT)

(3) Employees who have given notice of retirement may be asked to assist in the training of their replacement.

(4) The District may, at their discretion, set a mandatory retirement age for certain jobs where age is a bona fide occupational qualification and where that qualification is reasonably necessary to the normal operation of the District.

(5) Employees retiring may be eligible for various benefits. Please see the Administration Office for further details and latest information.

(6) Employees with less than eight (8) years of full-time employment with the District are not vested and are eligible for separation benefits as outlined by the Illinois Municipal Retirement Fund. A copy of the I.M.R.F. Manual is available in the Administration Office for any employee's examination.

218:2

(7) Employees who are retiring are eligible to receive pay for accrued vacation. (See VACATIONS)

(8) Employees who are retiring may be eligible to reapply for employment, and those who are interested in future temporary or part-time employment with the District should make that interest known at their exit interview.

(9) Employees who retire will be granted an exit interview at which time all Park District property including keys, tools, uniforms, staff identification cards, credit cards, vehicle keys, protective gear, etc., will be collected. These must be turned in before the employee is issued a final paycheck. The District may deduct from the final paycheck the value of any missing or damaged property or for any monies owed the District.

(10) Retiring employees must return their Personnel Policy Manual and Operation Procedure Reference Guide at their exit interview.

(11) Retiring employees covered by the District's insurance, pension or savings plan will be informed of their rights and all necessary paperwork must be signed at their exit interview.

(12) The spouse of the retiring employee may qualify for certain Park District benefits. Please see the Administration Office for latest information. These benefits may, or may not, include participation in programs, use of park facilities, health insurance, etc.

(13) The Illinois Municipal Retirement Fund agent holds a pre-retirement counseling program on a periodic basis which is open to all employees. Employees reaching the age of fifty-five (55) should contact the Administration Office if they would like to attend a pre-retirement program.

REV 10/96

219:1

RESIDENCY REQUIREMENTS

POLICY:

It is the policy of the District to require certain employees to maintain their domicile and bonafide place of residence within a certain proximity of Sterling Township.

COMMENTS:

(1)  In order to make certain employees available within a reason-able time on short notice, full-time employees hired after the enactment of this policy will be required to maintain their domicile and bonafide place of residence within a 15-mile radius of Sterling Township.  New hires will be given six months to relocate if presently living outside the 15-mile radius.  The six-month relocation time period may be extended with Board approval.  If any person affected by this section fails to com-ply with its provisions, the employee shall be subject to im-mediate termination by the District.

(2)  In order to make certain current full-time employees (those hired prior to the enactment of this policy) available within a reasonable time on short notice, Department Heads, Facility Managers/Supervisors and the Director will be required to main-tain their domicile and bonafide place of residence within a 15-mile radius of Sterling Township.  If any person affected by this section fails to comply with its provisions, the em-ployee shall be subject to immediate termination by the District.

(3)  Full-time employees hired prior to the enactment of this policy, with the exception of Department Heads, Facility Managers/Super-visors and the Director, shall have no residency requirement.

(4)  Part-time and seasonal employees, regardless of their date of hire, shall have no residency requirement.

NEW 11/96

3

301:1

# SALARY ADMINISTRATION

Policy:

It is the policy of the District to pay compensation which is nondiscriminatory and competitive with rates being paid for similar jobs by other employers in the community. However, all compensation policy decisions must take into consideration the District's overall economic condition and competitive position.

Comment:

(1) The Executive Director is responsible for reviewing all compensation and for making sure that each job is evaluated to determine whether compensation accurately and fairly reflects each individual's responsibilities and performance.

(2) The Executive Director will, when deemed appropriate, participate in or conduct compensation surveys covering other employers with similar jobs. This information will be used to help set pay policy and to determine the relative competitive position of the District's pay structure.

(3) Full-time employees will be evaluated annually on their anniversary date.

(4) Compensation decisions will be considered annually and will be based on performance, length of service, annual evaluation and budget constraints. A favorable employee evaluation does not necessarily guarantee an increase in pay at budget time.

(5) All salary adjustments will be effective the first complete payroll period after November 1.

(6) Employees who are not satisfied with the results of their compensation review or who have questions about the District's salary and benefits program should direct their concern to their immediate supervisor or the Executive Director.

302:1

PERFORMANCE APPRAISALS

Policy:

It is the policy of the District that the job performance of each full-time employee should be evaluated annually by the employee's supervisor and that the Board of Commissioners will annually evaluate the Director. The performance appraisal is a positive tool utilized by the Park District to reinforce and encourage quality employee performance.

Comment:

(1) Supervisors will complete performance appraisals upon the following occasions:

(a) by the end of their introductory period;

(b) annually, prior to or on, the employee's anniversary date;

(c) when an employee is transferred or promoted to a new job;

(d) when an employee is assigned to a new supervisor;

(e) at the time of the employee's termination, if a disciplinary or termination report is not prepared, and

(f) when a reduction in staff is necessary.

(2) Performance appraisals shall be written and will include such factors as quality and quantity of work, cooperation, promptness in completing assignments, initiative, reliability, attendance, judgment, conduct and acceptance of responsibility.

(3) The performance appraisal may include an action plan for both the employee and the supervisor with performance goals for the next evaluation period.

(4) Performance appraisals will be discussed between the employee and the evaluator(s). The employee and the evaluator(s) should sign and date the appraisal.

(5) Information derived from the performance appraisal may be considered when making decisions affecting an employee including, but not limited to, decisions concerning additional training, pay, promotion, transfer or continued employment.

REV 10/96

302:2

(6)   An employee receiving an unsatisfactory performance appraisal
      may be reassigned, demoted or discharged.

(7)   For part-time employee performance appraisals see Section
      214:1 (8) and (9).

303:1

SEVERANCE PAY

Policy:

It is the policy of the District that severance pay may be granted to terminated employees under certain limited circumstances.  The District will establish the terms for severance pay in writing and communicate these terms to employees as required by law.

Comment:

(1)  Employees will normally only be considered eligible for severance pay if a formal written agreement between the employee and the Director and/or the Board of Commissioners is initiated.

(2)  This written agreement will state specifically for what cause(s) severance pay will be granted.

(3)  After Board approval, this written agreement must be signed by both a member of the Board of Commissioners and/or the Director and the employee involved.

(4)  This written agreement will state specifically how (lump sum, installment, etc.), and how much compensation will be paid.

(5)  Normally, severance pay will be granted only to salaried full-time personnel.

304:1

# JOB EVALUATION

## Policy:

It is the policy of the District to evaluate all jobs in order to establish a consistent basis for measuring and ranking the relative worth of each job.

## Comment:

(1) Job descriptions for regular full-time positions shall be determined by the Director.

(2) Job descriptions for regular part-time and all seasonal positions will be determined by designated managerial/ supervisory personnel.

(3) Written job descriptions will be prepared for each position in the District.  Each job will be evaluated and ranked after consideration is given for job content and/or worth of the job in the external marketplace and the District.

(4) All jobs will be assigned a grade or classification based on their relative worth as determined in the evaluation.

(5) A salary range will be assigned to each grade or classification and provides for a spread from a minimum to a maximum rate.  Employee compensation within any grade or classification will be based on factors such as length of service, merit, experience, productivity and external market factors.

(6) A copy of all job descriptions, salary ranges and the organizational chart will be available at the Administration Office.

(7) Job descriptions will be reviewed on a periodic basis to assure they reflect current conditions.  New ones may be established based upon the needs of the District.

(8) Employees may request that jobs be reevaluated or that grades or classifications be adjusted.  Please make your concern known to your immediate supervisor or the Director.

305:1

PAY PROCEDURES

Policy:

It is the policy of the District to pay employees by check on a regular basis and in compliance with any applicable laws or regulations.

Comment:

(1) Employees normally will be paid every two weeks on Friday for a total of twenty-six (26) pay periods per year.

(2) If payday falls on a District paid holiday, employees will be paid on the last working day prior to the regular payday.

(3) Employees will receive, in addition to their check, a statement showing gross pay, deductions and net pay. State, federal and Social Security taxes, and pension contributions will automatically be deducted. No other deductions will be made unless required by law, contract or employee obligation. Employees may elect to have additional voluntary deductions taken from their pay but only if they authorize the deductions in writing.

(4) Pay stubs will show sick, vacation and personal time for all full-time employees.

    (a) Vacation time for the following year will be shown accruing plus any unused vacation time. Accrued time will be posted on the first payroll of the new month.

    (b) Sick time will accrue on the first payroll of the new month at a rate of eight hours per month.

(5) Employees who are terminating their employment with the District will receive their final check on the next payday immediately following their termination.

(6) Employees who are eligible for vacation pay may receive an early paycheck when written notice is given to their immediate supervisor two (2) weeks prior to the next payday.

(7) Salaried employees starting or terminating their employment with the District shall be paid one-tenth of the total bi-weekly salary for each day worked. Hourly paid employees will be paid for hours worked.

REV 10/96

305:2

(8) Each department/division superintendent is responsible for the verification of the hours of those employees who work under their jurisdiction. Altering of time cards is prohibited.

(9) If the District receives a Wage Garnishment notice on any employee, it will be processed to begin with the next pay period in accordance with the law. Garnishments may be cause for disciplinary action or a payroll deduction for reimbursement of administrative costs.

(10) Nonexempt employees will be paid overtime compensation at the rate of one and one-half times their regular hourly rate for work in excess of forty hours during their normal workweek.

(11) Nonexempt employees who must work on a scheduled holiday will receive overtime pay in addition to their regular pay for the holiday.

(12) Holiday hours count toward a standard forty hour week worked for figuring overtime compensation.

(13) Salaried employees who are required to work a holiday will be granted another day off. This day off must be taken during the same pay period.

(14) No paycheck will be given out to persons other than the employee without proper authorization.

(15) Employees who discover a mistake in their paycheck, lose their paycheck, or have it stolen, should notify the Administration Office immediately. In the case of a mistake, the error will be remedied as promptly as possible. In the case of loss or theft, the Administration Office will attempt to stop payment and reissue the employee a new one. However, the employee is solely responsible for the monetary loss. The District cannot be responsible for the loss or theft of a check if it cannot stop payment on the check.

4

401:1

TRAVEL

Policy:

It is the policy of the District that employee travel performed in the course of conducting Park District business must be approved in advance and that such travel should be engaged in and reimbursed according to the guidelines below.

Comment:

(1)    All travel, outside the Sterling-Rock Falls area, must be approved in advance by the employee's immediate supervisor or the Director.

(2)    All travel arrangements for transportation and lodging should, under normal circumstances, be made by the employee and approved by the Director.

(3)    Employees are expected to use the most expedient mode of transportation available and to stay in and eat at moderately priced establishments.

(4)    Employees should provide the Director with a copy of their itinerary before leaving on District business.

(5)    Employee expenses for approved travel will be paid or reimbursed by the District. Any travel expenses deemed unreasonable relative to the circumstances will not be paid and are the employee's personal responsibility.

(6)    Employees may obtain a cash advance for approved travel. Any surplus monies should be returned to the Administration Office along with receipts for items paid.

(7)    Employees will not be reimbursed for expenses incurred by a spouse or dependent.

(8)    Time spent by nonexempt employees in traveling on District business during normal working hours is considered hours worked for pay purposes.

(9)    Travel and transportation costs for new hires or interviewees for Park District salaried positions will be granted at the discretion of the Director.

REV 5/94

402:1

AUTOMOBILE USAGE

Policy:

It is the policy of the District to provide certain employees vehicles for business and limited personal use and to allow other employees to drive District vehicles on District business, and to reimburse employees for business use of personal vehicles according to the guidelines below.

Comment:

(1) Employees may not drive District vehicles without the prior approval of their supervisor.  Before approving a driver, each supervisor must check the employee's driver's abstract which will verify the employee's driving record and the existence of a valid driver's license.

(2) Employees approved to drive a District vehicle will be covered by the District's insurance coverage while driving said vehicle.

(3) Employees are to notify their immediate supervisor of any change(s) that may affect either their legal or physical ability to drive or their insurability.

(4) Employees holding jobs designated as requiring regular driving must, as a condition of employment, be able to meet the driver approval standards of this policy at all times.

(5) Some District vehicles may be permanently assigned to those staff members that are on twenty-four hour call.  Additional vehicles will be maintained in a motor pool for use by individual employees as needed.  Rental cars and vans may also be used by employees traveling out-of-town on District business, subject to approval by their immediate supervisor.

(6) Employees may be required to use their own vehicles for District business but only with the prior approval of their immediate supervisor.  If approval is granted, a mileage allowance shall be provided in accordance with IRS guidelines. A copy of the employee's vehicle insurance showing liability coverage must be provided and a driver's abstract check will also be conducted.

REV 8/96

402:2

(7) All employees authorized to operate a Park District vehicle or using their own personal vehicle will be personally responsible for all tickets and citations issued.

(8) All accidents must be reported to the employee's immediate supervisor within twenty-four (24) hours.

(9) Park District vehicles assigned permanently to staff members must remain on Park District premises when the employee goes on an extended vacation.

(10) Employees operating District vehicles or their own personal vehicle on District business, must wear seat belts as required by State Law.

(11) Employees may not operate a vehicle owned by the District unless such employee has a valid current proper classification license to operate that motor vehicle in the State of Illinois.

(12) A driver's abstract check will be run annually on all employees who drive Park District vehicles or who use their personal vehicle for Park District business.

(13) Those individuals now assigned District vehicles on a permanent basis, namely, the Director, Superintendent of Planning, Superintendent of Recreation and the Superintendent of Golf Operations, may use their assigned vehicle for non-business purposes within a five (5) mile radius of Sterling Township during their tenure with the District.

All future staff members, regardless of their position with the District, will be limited to using District vehicles for business use only.

(14) No employee, other than those listed in (13) above, is permitted to use a Park District vehicle for non-business purposes at any time.

(15) Employees must report any theft or malicious damage involving a District vehicle or personal vehicle used on District business to their immediate supervisor, regardless of the extent of damages. This report should be done as soon as possible but no later than forty-eight (48) hours after the incident.

REV 8/96

402:3

(16) No employee is permitted to operate a District vehicle or a personal vehicle for District business when any physical or mental impairment causes the employee to be unable to drive safely. This prohibition includes, but is not limited to, illness, medication or intoxication.

(17) Employees will be reimbursed for any tolls and parking fees incurred while on District business.

(18) Time spent by non-exempt employees in driving a District or personal vehicle on District business during normal working hours is to be considered hours worked for pay purposes.

(19) Smoking is prohibited in all Park District vehicles.

403:1

EMERGENCY TRANSPORTATION TIME

Policy:

It is the policy of the District to pay regular nonexempt hourly employees emergency transportation time.

Comment:

(1) Nonexempt hourly employees called for an emergency outside of their regular working hours shall be compensated for the time spent in transportation between the job and their home provided that the emergency working time is not continuous with a regular work period or the employee is not on a regular overtime assignment.

(2) Compensation for transportation time shall be no more than thirty (30) minutes added to the total elapsed time on the time card.

(3) Compensation for emergency transportation time will be considered overtime for pay purposes.

(4) Nonexempt hourly employees who are on-call will be given emergency transportation time not to exceed thirty (30) minutes per call answered.

(5) Scheduled mandatory work days, e.g., Saturdays in May, will not be considered for emergency transportation time.

REV 10/96

404:1

MEAL REIMBURSEMENT

Policy:

It is the policy of the District to provide, pay or reimburse employees
for business-related meals according to the guidelines below.

Comment:

(1)   Employees required to travel on District business or to confer-
      ences, seminars, etc., may be reimbursed, at the discretion of
      the Director,  for the cost of meals during their travel.   In
      addition, employees may be reimbursed for meals associated with
      approved activities of civic and professional organizations.

(2)   Nonexempt employees are eligible for a meal allowance if on
      Park District business outside the immediate area and prior
      approval by their immediate supervisor or the Director has been
      given.

(3)   Meal expenses must be reasonable and should be documented with
      a receipt for reimbursement.

405:1

MEMBERSHIP IN CLUBS
AND CIVIC ORGANIZATIONS

Policy:

It is the policy of the District to encourage employees to participate
in the activities of certain community clubs and civic organizations.

Comment:

(1) Any regular full-time salaried employee is encouraged to
seek membership in community clubs and civic organizations
where such membership will promote the District's best in-
terests and enhance its image in the community.  However,
employee participation in such community organizations must
not adversely affect the employee's job performance or place
the employee in the position of serving conflicting interests.

(2) Community clubs and civic organizations shall be defined to
include the Lions, Jaycees, Rotary or such other comparable
organizations as may be approved by the Director.

(3) The Park District will pay on behalf of any regular full-time
salaried employee who so requests, the annual dues of one such
club or organization in an amount to be approved by the Direc-
tor.

406:1

PARTICIPATION IN TRADE AND
PROFESSIONAL ASSOCIATIONS

Policy:

It is the policy of the District to encourage employees to participate
in certain trade and professional associations.

Comment:

(1) Regular full-time salaried employees are encouraged to par-
ticipate in trade and professional associations that promote
District goals, individual skills development and/or pro-
fessional recognition.

(2) Professional and trade associations shall be defined as any
professional organization which deals primarily with parks,
recreation, forestry or leisure services on an international,
national, regional or state basis.

(3) The Park District will pay on behalf of any regular full-time
salaried employee all annual membership dues and professional
certification fees to the Illinois Parks and Recreation Associ-
ation and the dues to one other professional organization in an
amount approved by the Director.

(4) Employee participation in trade and professional association
activities will not be considered as hours worked for pay pur-
poses unless it is at the District's request or under its di-
rection and control.

(5) Employees must have their supervisor's advance approval before
seeking or accepting any official position in a trade or pro-
fessional organization.  Before approval is granted, the super-
visor will determine the degree to which the employee is elig-
ible for compensation for working time lost and for reimburse-
ment of expenses incurred in performing official duties.

(6) Full-time salaried employees are encouraged to contribute
articles, present papers and give talks to clubs, service or-
ganizations and professional organizations.  However, em-
ployees must obtain prior approval of the Director on any
communication that might represent the District's position
on any subject or involves any information that is confiden-
tial.

5

501:1

## DISCLOSURE OF BENEFITS

Policy:

It is the policy of the District to provide its employees with various welfare, pension and deferred compensation plans. Information and summary communications intended to explain these benefit plans will be furnished to all plan participants and beneficiaries as requested. The Administrator of each benefit plan has the discretionary authority to determine eligibility for benefits and to interpret the plan's terms. The term "welfare plan" is defined to mean the District's dental and medical insurance reimbursement plans.

Comment:

(1)     The District offers certain benefits to eligible employees, including dental and disability insurance and pension and deferred compensation plans, as well as a medical insurance reimbursement plan. Eligibility will depend upon the specific requirements of each benefit plan. The District also provides a number of other benefits such as leaves of absences and paid vacation, holidays, personal and sick days.

(2)     All benefits provided by the District are described in official documents which are kept on file at the Administration Office. These documents are available for examination by any plan participant or beneficiary.

(3)     The Executive Director serves as the administrator of the District's welfare, pension and deferred compensation plans and compliance with all applicable laws and regulations. The Administration Office will also answer questions concerning benefits and to distribute proper forms to participating employees and beneficiaries.

(4)     Under the District's retirement and deferred compensation plans, each employee must designate a beneficiary for the employee's death benefits. Such designation must be in writing and on the proper form. It is the employee's responsibility to maintain the proper beneficiary designations.

(5)     The District reserves the right to modify, amend or terminate its welfare, pension and deferred compensation plan benefits as they apply to all current, former and retired employees.

502:1

VACATIONS

Policy:

It is the policy of the District to grant annual vacations with pay to full-time employees in accordance with the guidelines established below.

Comment:

(1)  The established vacation year is the calendar year, January 1 through December 31 each year.  Vacations are accrued or earned based on the employee's length of service.

(2)  Full-time employees will accrue paid vacation according to the following schedule:

| SERVICE PERIOD | PAID VACATION |
|----------------|---------------|
| 1st Year | 10 Days* |
| 2nd, 3rd, 4th Year | 10 Days |
| 5th, 6th, 7th, 8th, 9th Year | 15 Days |
| 10th Year and Thereafter | 20 Days |

*  At the end of one year of continuous employment, an employee earns ten days vacation.  Under unusual circumstances, five vacation days may be taken after six months service, with the approval of the Director.  In the event the employee is terminated during the first year of employment after having been permitted to use such vacation days, a deduction shall be made from the employee's pay for each vacation day used.

(3)  Employees are recommended to take vacations annually; however, unused vacation days may be accumulated to a maximum of forty-five (45) days.  Any unused vacation days in excess of the forty-five day maximum will be forfeited.  Vacation days are considered unused on December 31 of the year in which they were earned.

(4)  Accumulated vacation days may be taken in addition to the employee's yearly vacation time but must have prior approval of the employee's immediate supervisor or the Director.

(5)  Employees requesting vacation time in increments of more than five days must submit their request on the proper form two (2) weeks in advance to their immediate supervisor.

502:2

(6)   Part-time and seasonal employees are not eligible for paid vacation time. However, vacation days without pay may be taken with the approval of the employee's immediate supervisor.

(7)   Employees may take vacation time in increments of a minimum of four (4) hours; however, in some cases three and one-half (3½) hour increments might be granted. Example: employees working seven hour days or maintenance people who have their working day broken unevenly.

(8)   Vacation pay for salaried employees is based on a forty (40) hour week. Vacation pay for full-time hourly employees is based on the average number of hours worked in the preceding year but not to exceed forty (40) hours per week.

(9)   The District may grant experience credit to new management or supervisory personnel. The credit granted will be half (½) credit for each year of full time professional experience prior to employment with the Sterling Park District and subject to the discretion of the Director provided such prior experience is deemed to be related to their District position.

(10) Extended vacations of more than ten (10) consecutive work days shall be at the discretion of the Director.

(11) Upon termination of employment, the employee may elect to receive pay in lieu of vacation days off. The employee shall notify the Administration Office of this choice. This provision shall not apply to first year employees.

(12) If a paid holiday falls within an employee's vacation period, an additional day of vacation will be granted. This additional day may be taken at the beginning or end of the employee's vacation period or at another time during the vacation year, so long as the immediate supervisor has given prior approval.

(13) In the event of an employee's death, unused vacation time will be paid to the employee's beneficiary.

(14) Vacation time available will be shown on the employee's paycheck stub. Employees who feel there is a discrepancy in the calculation of their vacation pay or eligibility may request a review of that calculation by the Administration Office.

(15) Vacation scheduling conflicts will be based on seniority with the immediate supervisor responsible for adequate staffing levels.

REV 10/96

502:3

(16) Employees may not receive vacation pay in lieu of time off.

(17) No allowances will be made for employees for sickness or other compensable type of absence occurring during a scheduled vaca-tion.

(18) Vacation hours do not count toward a standard forty hour week worked for overtime pay.

(19) Vacation time shown on pay check stubs also reflects vacation time accruing for the following year.

REV 10/96

503:1

HOLIDAYS

Policy:

It is the policy of the District to designate and observe certain days each year as holidays.  Eligible employees will be given a day off with pay for each holiday observed.

Comment:

(1)  All regular full-time employees shall be entitled to the following holidays with pay:

New Year's Eve Day
New Year's Day
Spring Holiday
Memorial Day
Fourth of July
Labor Day
Thanksgiving Day
Day after Thanksgiving
Christmas Eve Day
Christmas Day

(2)  Full-time employees will receive their regular rate of pay for each observed holiday.

(3)  Part-time and seasonal employees are not entitled to receive time off holiday pay.

(4)  A holiday that occurs on a Saturday will be observed on the preceding Friday; a holiday that occurs on a Sunday will be observed on the following Monday.

(5)  If a holiday occurs during an employee's vacation period, the employee will be given an additional day of paid vacation or the employee may elect to take the additional day at a later time during the year, with their immediate supervisor's approval.

(6)  The District recognizes that some employees may wish to observe as periods of worship or commemoration, certain days which are not included in the District's holiday schedule.  Accordingly, employees who would like to take time off for such reasons may be permitted to do so if the employee's absence from work will not result in an undue hardship on the conduct of the Park District's business and if prior approval has been granted.  Em-

REV 4/96

503:2

ployees may use vacation time or personal days to receive pay for time off for these observances. With prior approval, employees may substitute a day for any holiday listed on page 503:1 under (1) for these observances.

(7) The District reserves the right to schedule work on an observed holiday. Normally, work on an observed holiday will be paid as if the day were a regularly scheduled day for part-time and seasonal employees. Full-time hourly employees working on a holiday will be paid time and one-half plus their regular hourly rate for hours worked. Salaried employees who must work on a holiday due to working at a seasonal facility will be granted another day off, however, that day must be taken during the same pay period.

(8) The hours employees work on a holiday will count toward a standard forty hour week worked for overtime compensation.

REV 9/95

504:1

# PENSION

**Policy:**

It is the policy of the District to provide a pension for all employees working over one thousand (1,000) hours per calendar year.

**Comment:**

(1) All employees working over one thousand (1,000) hours in a calendar year must participate in the District's pension plan.

(2) Payroll deductions will be made from the employee's paycheck to cover their share of the pension cost.

(3) The Park District will pay an amount established by the Illinois Municipal Retirement Fund to augment the employee's deduction.

(4) A statement of account for total benefits accrued under the pension plan will be mailed to all employees once a year directly from the Illinois Municipal Retirement Fund.

(5) Employees must designate a beneficiary in case of death when enrolling in the pension plan. Such designation must be in writing and on the proper form. It is the employee's responsibility to maintain the proper beneficiary designations.

(6) Employees are considered vested in the District's pension plan when they have eight (8) years of service, however, they must be fifty-five years of age before retiring to receive pension benefits.

(7) Employees may contact the Administration Office to review the complete Illinois Municipal Retirement Handbook or for any questions or concerns. A pamphlet outlining benefits is also available through the Administration Office.

505:1

## MEDICAL INSURANCE REIMBURSEMENT INCREMENT AND DENTAL INSURANCE

Policy:

It is the policy of the District to provide dental insurance and a medical insurance reimbursement increment for all regular full-time employees.

Comment:

(1)     The Park District will pay 100% of the dental insurance premium for all full-time employees.

(2)     Employees may purchase dental insurance for their dependents through the dental plan offered by the Park District under a payroll deduction plan. Please see the Administration Office for the latest rates.

(3)     Employees may examine the group policy booklet which is on file in the Administration Office at any time the office is open.

(4)     The Park District will give a special increment to the base wage for each full-time employee to assist in the purchase of private health insurance. The increment is based upon the following age categories: 29 years of age and under, 30-39 years of age and 40 years of age and above. Please see the Administration Office for the latest increment amount and the limitations regarding its distribution.

REV 7/04

506:1

**WORKERS' COMPENSATION**

Policy:

As a District employee, you are covered under the Illinois Workers' Compensation Act.  The Act provides for medical care and replacement of wages if you sustain an injury arising out of and occurring in the course of your employment with the District.  Non-job related illnesses or injuries, or illnesses or injuries not related to the performance of your assigned duties are not covered under the Act.  If you have any questions regarding workers' compensation, please see the Risk Manager, or contact the District's Workers' Compensation Coverage provider, PDRMA at 630-769-0332.

Comment:

    (1)    Any work-related injury or illness (even if the employee is uncertain if the injury or illness is work-related, but suspects it might be work-related) must immediately be reported directly to the employee's immediate supervisor or department head if the immediate supervisor cannot be reached directly.

        **Note:** Failure to immediately report an injury or illness may jeopardize the employee's eligibility for Workers' Compensation benefits.

    (2)    Upon notification, the District shall instruct the employee to report to a designated hospital or physician for an examination or treatment.  In the case of an emergency, the employee should go to the nearest hospital emergency room for treatment and then utilize the District's Physician Network Referral Service if additional treatment is necessary.

    (3)    All medical evaluations by any licensed physician must be submitted to the Risk Manager for the duration of your period of leave.

    (4)    The District reserves the right to have the employee examined by a licensed physician of its own choice at any time during the period of leave.  This examination will be at the District's expense and the physician will submit the results to the District.  The employee is entitled to a copy of this report.

506:2

(5)     The District may assign an injured employee to a modified duty assignment in accordance with the District's Modified Duty Program.

(6)     No employee shall be allowed to return to work without a statement from a physician approving the employee's return to work without restrictions, or with restrictions acceptable to the District.

(7)     The District reserves the right to re-assign the employee to another position at the same pay and benefits the employee received at the time of the injury.

(8)     When an employee has been released by a licensed physician to return to work on a modified duty basis, the employee may periodically be requested to return for medical evaluations. For these doctor visits, the employee will be compensated at the employee's current rate of pay only for the period of time necessary for the visit, including reasonable transportation time. The District reserves the right to verify the time of the visit. Time taken over and above that is necessary will be charged to the employee's available sick, personal or other time off. If the employee does not have any available time, the employee will be compensated only to the extent required by law.

506B:1

## MODIFIED DUTY PROGRAM

Policy:

The District is committed to providing employees with available and reasonable opportunities to maintain career and employment status and benefits, and to maximize the District's ability to provide its services offered to the public. To that end, we have developed a Modified Duty Program for employees who have sustained injuries or illnesses arising out of and in the course of their employment with the District ("work-related injury").

The purpose of the Modified Duty Program is to provide a temporary modified work assignment, when feasible, available and applicable. The feasibility of modified duty will be determined on a case-by-case basis, taking several factors into consideration, and is the sole discretion of the District. These factors include, but are not limited to, the attitude and aptitude of the employee, the specific physical or mental limitations, the essential functions of the temporary job assignment, the work environment and the ability of the District to provide accommodation. Modified duty may not be available for certain positions. Noncompliance or failure to cooperate with the Modified Duty Program may affect your Workers Compensation benefits and result in possible disciplinary action, up to and including dismissal.

The District is committed to providing employees with available, reasonable opportunities to maintain career and employment status and benefits. To that end, we have developed a Modified Duty Program for employees who have sustained injuries or illnesses arising out and in the course of their employment with the District ("work-related injury"). We feel that a Modified Duty Program is mutually beneficial and may aid in the employee's recovery.

Comment:

(1)     The purpose of the Modified Duty Procedure is to provide a temporary modified work assignment, when feasible, available and applicable. The feasibility of Modified Duty will be determined in the sole discretion of the District. Noncompliance with the Modified Duty Policy may result in a reduction of Worker's Compensation benefits and possible disciplinary action, up to and including dismissal.

REV 11/05

506B:2

For purposes of this policy, the following definitions apply:

(a)     "District Employee" means any individual who is employed by the District in a valid, authorized position.

(b)     "Modified Duty Program" is a temporary assignment of duties to a worker with an occupational injury or illness whose doctor indicates that the worker may return to work subject to specified restrictions, and has not yet reached a level of maximum recovery enabling the employee to return to regularly assigned duties. Modified duty may only be applicable to those employees who are eligible for temporary total disability benefits under the Illinois Workers' Compensation or Occupational Disease Acts (hereafter "Acts"), or asserting that their injury or illness is compensable under the Acts.

(c)     "Occupational Injury or Illness" means an injury or illness arising out of and in the course of the employee's employment and compensable under the Illinois Workers' Compensation Act or Occupational Disease Act. All claims for Workers Compensation benefits are subject to initial and continuing investigation.

(2)     Objectives

(a)     To return occupationally injured employees to work as soon as possible provided there is not a probability of re-injury or aggravation of an injury to themselves, and the return to work does not directly or indirectly adversely jeopardize the safety of others or is otherwise potentially detrimental to the District.

(b)     To minimize financial hardship and emotional stress to the employee who has sustained an occupational injury.

(c)     To assist employees in returning to work at a level close to their pre-injury earnings and productivity.

(d)     To retain qualified and experienced District employees.

REV 11/05

506B:3

(e)     To further the District's commitment and obligation to provide recreational programs, services and facilities to the public.

(3)     Basic Program Requirements

(a)     Employees may be assigned to a Modified Duty assignment when temporarily unable to perform the essential functions of their regular position due to occupational injury or illness, provided that the Modified Duty assignment fulfills a job function(s) useful to the District and is within limitations set by treating and/or evaluating physicians.  Modified Duty assignments will not create a new job, but instead will incorporate or modify an existing position on a temporary basis.  The assignment may include duties anywhere within the District.

(b)     A time limit will be established on a case-by-case basis for the length of time that modified duty will be made available.  This time limit shall be subject to review and revision at the sole discretion of the District.

(c)     The District will compensate an employee on modified duty at the employee's regular pay rate if possible.  If this is not possible, the employee will be compensated no less than 2/3 of what the employee's average weekly regular wage (excluding overtime) was prior to the accident, injury or illness.  Compensation may be made by the District and/or the Park.  District's worker's compensation coverage provider, the District Risk Management Agency (PDRMA).

(d)     There should be regular communication among the Risk Manager, and the employee's immediate supervisor, the physician and PDRMA throughout the course of treatment and recovery.

(e)     Employee Responsibilities:  Participates in the Modified Duty Program as assigned; reports any problems

REV 11/05

506B:4

with Modified Duty assignment to immediate supervisor; to promptly notify the immediate supervisor of any and all changes or modifications to the employee's work restrictions; provides all original copies of physician releases and reports and all medical records and forms to the Risk Manager promptly when received; if you are asked to complete a task that you cannot complete or in any way adversely affects your injury, you must immediately notify the person who assigned you the tasks. In addition, if your injury requires that you see a physician for subsequent visits for the same injury, you must inform your immediate supervisor prior to any and all visits so your immediate supervisor can complete the necessary forms and make the necessary arrangements for your absence if you must visit the doctor during your working hours. If your immediate supervisor is unavailable, you must so contact the supervisor at the succeeding level of authority in your department. In order to avoid disruption of District operations, you should schedule doctor's appointments during non-work hours. Please note, under the Illinois Workers' Compensation Act (820 ILCS 305/12), the District may ask an employee entitled to receive disability payments under the Act to undergo an examination by a duly qualified medical practitioner or surgeon selected by the District at any time and place reasonably convenient to the employee, for the purpose of determining the nature, extent and probable duration of the injury received by the employee, and for purposes of ascertaining the amount of compensation which may be due the employee from time to time for disability according to the provisions of the Act.

(f)     An employee who declines a Modified Duty position, which is within the limitations, as determined by the treating or evaluating physician, may be subject to disciplinary action and possible dismissal. The employee may also lose eligibility for Workers Compensation benefits.

506B:5

(g)     Periodic review will be conducted while an employee is on Modified Duty status to determine the appropriateness and reasonableness of continuing the employee in the assignment. A review may be conducted at any time.

(4)     Procedure

(a)     The department head or direct supervisor is typically responsible for the management of employees on Modified Duty status. He may also coordinate Modified Duty assignments with other departments, the Risk Manager, and PDRMA. Each department is responsible for keeping a list of Modified Duty assignments up-to-date, and for advising the Risk Manager of any changes to their modified duty lists.

(b)     When an employee is injured, the attending physician will be asked to complete a Physician's Evaluation of Functional Capabilities. This form, sent to the physician by the Risk Manager, requests a list of the duties the employee is capable of performing and any physical limitations he may have.

(c)     The Physical Evaluation Form must be returned by the employee to the Risk Manager, who will contact the employee's immediate supervisor. The immediate supervisor will work with the department head or facility manager in assigning modified duty to the employee, if possible or applicable.

(d)     In some cases, departments may not have any available Modified Duty tasks. If so, the Risk Manager will be contacted to work with other departments to arrange Modified Duty assignments in their Facility.

(e)     All Modified Duty Assignments are subject to continuing review of the existing medical restrictions of the employee, and departments will continue to develop and coordinate appropriate duty assignments with the Risk Manager, and PDRMA, and monitor ongoing medical status and work adjustment.

REV 11/05

506B:6

(f)    When applicable, the possibility of medical manage-
ment and/or vocational services will be explored and
communicated to all parties involved.

(g)    Employees will be compensated at the pre-determined
rate of pay while performing Modified Duty assign-
ments, including time necessary to report to a physi-
cian's office for further review.  Time above and
beyond that which is necessary for the doctor's visit,
including reasonable transportation time, will be
charged against the employee's available sick, personal,
or other time off.  If the employee does not have any
available time, he will be compensated for such time
only to the extent required by law.

507:1

SOCIAL SECURITY

Policy:

It is the policy of the District that all employees will be covered by
the provisions of the Social Security Act.

Comment:

(1) All employees will be covered by the Social Security Act
with payroll deductions taken from their compensation.

(2) The District will make matching payments to the Social
Security Administration on all employees according to
applicable laws.

(3) Please contact the local social security office for more
information.

508:1

PERSONAL DAYS

Policy:

It is the policy of the District that employees be granted two (2) personal days per calendar year subject to the following guidelines.

Comment:

(1)  All regular full-time and salaried employees will be granted personal days.

(2)  Compensation for personal days will be the employee's regular rate of pay.

(3)  Personal days may not be taken consecutively or as additional vacation days.

(4)  Employees must request personal days at least one week in advance of the desired date and are subject to the approval of the Director.

(5)  Personal days may be taken only at a time mutually convenient to the employee and the District.

(6)  Personal days are not cumulative.

(7)  No compensation will be paid for unused personal days at the end of the calendar year.

(8)  Personal days can only be taken in increments of four or eight hours.

(9)  Personal days do not count toward a standard forty hour week worked for overtime compensation.

(10)  One personal day will be granted for an employee hired between January 1 and June 25.  No personal day will be granted to new employees hired from June 26 to December 31. (Effective 9/1/94)

(11)  The personal day granted to new employees hired between January 1 and June 25 cannot be taken before the employee's six month anniversary with the District.

REV 9/95

509:1

CONTINUING EDUCATION

Policy:

It is the policy of the District to encourage employees to further their education using the following guidelines and at the Director's discretion.

Comment:

(1) Full-time employees asking the District for educational assistance:

(a) will be encouraged to further their education in courses of study directly related to the employee's present job or which will enhance the employee's potential for advancement to another position with the District and to which the individual has a reasonable expectation of advancing;

(b) full-time employees may take one academic course per semester, not to exceed six (6) semester hours in any one year at an in-state institution. Upon satisfactory completion of the course (a grade of "C" or better in under graduate; "B" or better in graduate), the Park District will reimburse the employee for a portion of, or all, tuition fees depending upon the type of course and budgetary limitations. All other costs incurred in connection with such course work shall be the responsibility of the employee;

(c) all resource materials received in courses that are fully paid by the District, will remain the property of the District;

(d) to be eligible for reimbursement, courses or programs must be offered by accredited institutions of learning;

(e) employees who want educational assistance must have the prior approval of the Director before enrollment and such requests must be in writing and submitted on the "Continuing Education" form. (See 509:4) Such approval will not

REV 10/96

509:2

be granted without a positive recommendation by the employee's immediate supervisor and based upon the nature and purpose of the course of study, the benefits to be derived by the employee and the District, the employee's level of responsibility and length of service, the estimated cost and potential lost time while the employee participates in the course of study;

(f)   employees receiving reimbursement from any outside sources, such as the Veterans Administration or scholarships, may receive partial reimbursement from the District, but never more than 100% of the total tuition costs;

(g)   employees seeking reimbursement for educational purposes must submit to the Director a certified transcript of their grades and receipts for the expenses incurred;

(h)   employees who are requested by the District to take a specific course or program will be reimbursed for all costs in advance;

(i)   employees who, prior to completing the approved course, voluntarily leave the District or are terminated for reasons of conduct will not be reimbursed for the expenses associated with the course;

(j)   employees seeking reimbursement for educational expenses must agree in writing to repay the District in full if they leave the District voluntarily or are terminated within one year from the date of reimbursement. At the discretion of the Director, this repayment may be waived;

(k)   employees are expected, under normal circumstances, to schedule class attendance and the completion of study assignments outside of their regular working hours. It is expected that educational activities will not interfere with the employee's work and unsatisfactory job performance during enrollment may result in forfeiture of educational assistance. The employee will receive no compensation or compensatory time off for attending classes outside of their regular working hours when granted educational assistance by the District; and

REV 10/96

509:3

(1)  in exceptional cases, course work may be approved for a part-time employee. Reimbursement will be made only if the activity had prior approval by the employee's immediate supervisor or the Director.

2.  Full-time employees not asking the District for educational assistance:

(a)  employees wishing to further their general education during normally scheduled working hours must have their school hours approved;

(b)  some considerations for approval might include the following: the employee's present job, if the course of study will enhance the employee's potential for advancement to another position with the District and if the individual has a reasonable expectation of advancing, the benefits to be derived by the District and the employee, the employee's level of responsibility and length of service with the District and the estimated cost and potential lost time while the employee participates in the course of study;

(c)  if approved, employees will receive no pay or compensatory time off while attending classes;

(d)  employees may use vacation time for classes held during normal working hours;

(e)  employees are expected, under normal circumstances, to schedule class attendance and the completion of study assignments outside of their regular working hours;

(f)  if hours are granted during normal working hours they must not interfere with the employee's job performance or scheduled work assignments; and

(g)  school hours will not be granted, in most cases, if they are scheduled during the employee's scheduled work hours.

REV 10/96

509:4

CONTINUING EDUCATION
APPROVAL FORM

NAME _____

COURSE TITLE _____

COLLEGE _____

CLASS HOURS _____

COST OF CLASS _____   CREDITED HOURS _____

I am hereby requesting approval for the above mentioned class.  I realize
that I must maintain a "C" in the class (if an undergraduate), and a "B"
(if a graduate) for reimbursement of my expenses;  that if I voluntarily
leave my position or am terminated by the District within one year of re-
imbursement for this class, I must repay the District in full; and that
all other guidelines in the Personnel Policy Manual must be followed.

SIGNATURE _____   DATE _____

APPROVED BY DIRECTOR _____   DATE _____

NEW 10/96

510:1

EMPLOYEE COUNSELING

Policy:

It is the policy of the District to assist employees with counseling and referral services which will help in solving personal problems, both on and off the job.

Comment:

(1) Employees experiencing personal problems are encouraged to seek assistance from their immediate supervisor or the Director.  Personal difficulties such as marital, family, emotional, stress, interpersonal, medical, financial and legal problems, plus alcohol and drug abuse, can adversely affect job performance.

(2) Employees needing extended treatment should request a sick leave of absence in accordance with the District's leave policy.

(3) Employees, in some instances, may be covered by the District's health insurance for rehabilitation.  Please see the group policy manual in the Administration Office or check with the District's insurance carrier.

(4) Employees are responsible for their job performance.  Excessive absenteeism, change in attitude and substandard job performance is not in the District's best interest.  Performance appraisals are based on factors related to job performance so it is in the employee's best interest to seek counseling, if necessary.

(5) The District will, to the degree that its resources (excluding financial) permit, attempt to provide counseling and reference information to employees.  Please see the Director with any questions or concerns.

(6) Communications, between employees, supervisors, Director, professional counselors or agencies as a result of this policy are to be strictly confidential, except to the degree necessary to protect the safety of the employee and/or others or to protect the security of District property.

511:1-

RELOCATION

Policy:

It is the policy of the District to assist and reimburse eligible employees for the reasonable costs of relocation.

Comment:

(1)  Only the Director and Superintendent positions of the District are eligible to be considered for moving cost reimbursement.

(2)  Moving costs, or a portion thereof, for experienced new hires in the above positions may be negotiated at the discretion of the Director, using the following guidelines:

    (a)  Packing, insuring, shipping, storing, and unpacking of household goods and personal effects.

(3)  The District will, when appropriate and to the extent feasible, provide information on jobs available in the immediate area for the relocating employee's spouse.

(4)  See TRAVEL if any travel benefits may apply due to relocation.

REV 5/96

512:1

USE OF FACILITIES,
PROGRAMS AND EQUIPMENT

Policy:

It is the policy of the District to encourage employees to participate
in athletic, exercise and recreational programs and to allow limited use
of District facilities.

Comment:

(1)   Participation in District athletic and recreational programs
      is open to all employees, is voluntary and should take place
      outside of working time.  When approved by the Director, par-
      ticipation may be extended to employee families, retired em-
      ployees and guests.

(2)   Employees participating in District sponsored athletic and
      recreational programs are required to notify their immediate
      supervisor of any known limitations affecting their ability
      to participate safely in the programs.  Participating employees
      will be required to sign waiver of liability forms.

(3)   Staff passes will be issued to all full-time regular employees
      and their dependents who are living at home or are full-time
      students who reside with them.  No staff passes will be issued
      without a signed liability waiver from the employee and/or his/
      her dependents.

(4)   Staff passes will not be issued to part-time and seasonal em-
      ployees.  Part-time and seasonal employees may be allowed to
      participate in District programs or have limited use of Dis-
      trict facilities.  If an employee's name appears on the current
      payroll list, privileges will be granted.  See your immediate
      supervisor as some restrictions may apply.  All part-time and
      seasonal employees must sign in before participation can begin
      in any program or before use of any facility will be granted.

(5)   Staff passes provide free use of various District facilities
      and free participation in various District programs.  Certain
      restrictions may apply.  Please see your immediate supervisor
      for the latest information.

REV 5/95

512:2

(6)  Division Superintendents may allow full-time regular employees limited personal use of Park District property or equipment with the exception of vehicles, machinery, power tools, audio-visual equipment or items of noted value in which case approval must be granted by the Director.  Center restrictions may apply.  See (7).

(7)  Maintenance facility rules may include, but are not limited to, the following:

    (a)  The mandatory use of any necessary personal protective equipment or machine guards;

    (b)  Non use of "hot work" equipment such as torches, welding equipment, etc., to minimize fire hazards;

    (c)  Non use of lift equipment for hoisting heavy objects;

    (d)  Non use of equipment that would allow the employee to perform work in excess of ten (10) feet high; or

    (e)  Non use of hazardous chemicals.

(8)  All maintenance employees must punch out on the time clock before participating in any recreational program or working in any maintenance facility; all other staff will be considered "not on working time" after their normal working day for purposes of controlling any potential worker's compensation exposure.

REV 5/95

513:1

DEFERRED COMPENSATION PLAN

Policy:

It is the policy of the District to provide a deferred compensation plan for all full-time employees as a supplemental retirement savings plan.

COMMENT:

(1)  All eligible employees may participate in the District's deferred compensation plan on a voluntary basis.

(2)  Authorized payroll deductions will be taken from the employee's wages before federal and state taxes are computed.

(3)  All eligible employees must authorize this deduction and sign up for the plan with the payroll department and the administrator of the District's plan.

(4)  Employees may contact the Administration Office to review the complete Deferred Compensation Program handbook.  A pamphlet outlining the program is also available through the Administration Office.

NEW 5/94

SICK DAYS                                                     514:1

Policy:

It is the policy of the District to permit employees to be absent from
work on a short-term basis under certain circumstances, including
sickness or injury.   In order to help employees maintain their income
during authorized absences, the District will provide compensation for
such absences according to the guidelines below.

COMMENT:

   (1)   Sick leave accumulates at the rate of one day per month of
         employment to a maximum of eighty (80) days.  Sick days
         over the eighty day limit will be accumulated and can be
         used toward service credit with the Illinois Municipal
         Retirement Fund for retiring employees.

   (2)   See Section 702:1 for complete details covering sick days
         and rules governing use of the same.

REV 9/95

515:1

## FLEXIBLE BENEFIT PROGRAM

Policy:

The program allows full-time employees to elect non-taxable benefits from the program's component plans in lieu of cash compensation. The taxable cash contribution will be reduced to reflect non-taxable contributions by the District's Flexible Benefit Program and its Component Plans.

Comment:

(1)    The Flexible Benefit Program is available to all full-time employees.

(2)    The Component Plans include the Employee Premium Plan, Dependent Care Plan and the Health Expense Plan.

(3)    Employees may examine the general rules of the Flexible Benefit Program as well as the rules relating to each of the component plans in the Administrative Office at any time the office is open.

6

601:1

EMPLOYEE SAFETY

Policy:

It is the policy of the District to comply with all applicable federal, state and local health and safety regulations and to provide a work environment as free as feasible from recognized hazards. Employees are expected to comply with all safety and health requirements whether established by management or by federal, state, or local law.

Comment:

(1) The District has appointed a Safety Coordinator whose responsibilities include:

(a) Monitoring compliance with District safety rules and regulations and the applicable safety and health standards established as a result of the Occupational Safety and Health Act of 1970 and any other applicable federal, state, or local employee safety laws or regulations;

(b) Investigating, correcting and eliminating recognized unsafe and unhealthful working conditions or potential hazards;

(c) Conducting periodic informal safety and health inspections of all work areas, machinery, equipment, facilities, lift trucks, grounds and any other recognized potentially hazardous District property.

(d) Representing the District during investigations conducted by the District's insurance carrier or any other organization;

(e) Organizing the training and retraining of employees as required by law;

(f) Monitoring compliance with the various requirements established by any law or the District's insurance carrier relating to recordkeeping and the retention of records;

(g) Posting notices and keeping records as may be required by law or the District's insurance carrier;

(h) Establishing and conducting fire drills, testing of fire equipment and enforcing no smoking policies where appropriate;

601:2

    (i) Investigating all accidents, hazardous incidents and fires involving District employees, or which occur on District premises and preparing the required reports; and

    (j) Developing contingency disaster preparedness plans.

(2) Immediate supervisors' safety responsibilities include:

    (a) Familiarizing themselves with all safety and health procedures relevant to the operations under their supervision;

    (b) Inspecting their work areas periodically;

    (c) Training their employees in safety matters or arranging for such training where appropriate;

    (d) Identifying conditions that are recognized in the District as being unsafe; and

    (e) Reporting accidents and injuries to the Safety Coordinator immediately.

(3) Employees should report to the Safety Coordinator or their immediate supervisor all observed safety and health violations, potentially unsafe conditions and any accidents resulting in injuries to employees or patrons.

(4) Employees are encouraged to submit suggestions to the Safety Coordinator concerning safety and health matters.

(5) The District will provide special clothing or equipment when such clothing or equipment is required by regulation or by District policy. Employees are responsible for the proper use and maintenance of such clothing and equipment and will be subject to discipline for failure to comply with this obligation.

(6) Immediate supervisors will provide the following information to employees, who are exposed to known toxic substances and recognized harmful physical agents, at the time they are first hired and at least annually after that:

REV 10/96

601:3

(a) the existence, location and availability of any employee exposure or medical records pertaining to employees .exposed to toxic substances or harmful physical agents which are maintained by or for the District;

(b) the identity of the person responsible for maintaining and providing access to such records; and

(c) the right of each employee or the employee's designated representative to examine and copy such records.

All employees will also be notified that they may be required to submit to medical examinations and tests at intervals determined by the length of their time on the job and whenever there is reason to believe that they were unduly exposed to toxic substances or harmful physical agents. Copies of the OSHA regulation requiring access to employee exposure and medical records are available in the office of the Safety Coordinator for examination.

(7) All employees are required to familiarize themselves with the District's Safety Manual and sign an "Acknowledgment of Receipt Form". A copy of the Safety Manual is available at all District facilities and the Administration Office. Failure to comply with safety regulations will result in disciplinary action, up to and including termination.

REV 10/96

602:1

MAINTENANCE OF WORK AREAS

Policy:

It is the policy of the District that work areas are to be kept clean and orderly at all times.

Comment:

    (1) All employees are responsible for maintaining their work areas in a clean and orderly fashion at all times. To fulfill this responsibility, each employee should, at a minimum, do the following:

        (a) Prior to the end of the workday, clean and store all tools and equipment and properly secure any items, papers, or information of value;

        (b) Keep work areas free of food and related litter; and

        (c) Place coats, boots, umbrellas and other items of clothing in designated areas so that work stations are not unnecessarily cluttered.

    (2) Immediate supervisors are responsible for making sure that their employees maintain their work areas in accordance with the requirements of this policy, and

        (a) Make sure that aisles, floors and walls are free of unnecessary items and that all end-of-the-shift tasks have been performed;

        (b) Monitor the facilities and equipment and issue maintenance requests where appropriate;

        (c) Arrange for the removal of any items from the work place that are not needed for the comfort and enhancement of the employees and patrons or that might impede traffic flow;

        (d) Report to the Safety Coordinator any existing or potential work-place hazards; and

        (e) Ensure that all trash, waste, etc., are properly disposed.

    (3) All employees on duty are prohibited from using tobacco in District facilities and vehicles, on District premises, or

REV 9/95

602:2

anywhere the employee is on duty (i.e., purchasing supplies, delivering equipment or working at District functions such as Gus Macker, Pumpkin Dash, swim meets, etc.)  Any tobacco controversy that cannot be satisfactorily resolved by the individuals involved and/or their immediate supervisor, should be referred to the Director.

(4)  A copy of the summary of the Illinois Clean Indoor Air Act is available for reference in the Administration Office for any employee who might have any questions or concerns.

REV 9/95

603:1

PERSONAL PROPERTY

Policy:

It is the policy of the District to assist its employees in safeguard-
ing their personal property while at work.

Comment:

(1)  Employees are expected to exercise reasonable care to safe-
     guard personal items of value brought to work.  Such items
     should never be left unattended or in plain view.  The Dis-
     trict does not assume responsibility for the loss or theft of
     personal belongings and employees are advised not to carry
     unnecessary amounts of cash or other valuables with them when
     they come to work.

(2)  Employees will be assigned a locker for safekeeping a few,
     small personal effects during working hours if lockers are
     available at the facility where the employee works and if re-
     quested by the employee.  The assigned lockers should be kept
     locked at all times.

(3)  Articles of personal property found on the premises should be
     returned to the owner, if known, or turned in to the employee's
     immediate supervisor or the Director.  Inquiries regarding lost
     property should be directed to the facility manager or the Di-
     rector.

(4)  The District will reimburse employees for damage to their per-
     sonal property resulting from an accident on the job, provided
     the accident is not caused by the negligence of the employee.
     Personal property is defined as the personal belongings of an
     employee such as work clothing and glasses.  The accident must
     be reported immediately and the employee's immediate supervisor
     must verify the circumstances and the damages.

604:1

SELLING AND SOLICITATION

Policy:

It is the policy of the District to prohibit selling, distribution and solicitation on its premises by nonemployees and to permit solicitation and distribution by employees only as outlined below.

Comment:

(1)  The District limits selling, solicitation and distribution on its premises because, when left unrestricted, such activities can interfere with the normal operations of the District, can be detrimental to employee efficiency and can be annoying to patrons.

(2)  Persons who are not employed by the District are prohibited from soliciting funds or signatures, conducting membership drives, distributing literature or gifts, offering to sell merchandise or services (except by representatives of suppliers) or engaging in any other solicitation or similar activity on District premises.

(3)  The Director may authorize fund drives on behalf of charitable organizations or for employee gifts.  Employees will not be discriminated against because of their willingness or unwillingness to participate.

(4)  Employees are not permitted to sell or distribute merchandise of any kind on District premises unless authorized by the Director.

(5)  Distribution of literature is prohibited in work areas at all times.

(6)  Distribution of literature in such a manner as to cause litter on District property is prohibited.

(7)  The District maintains bulletin boards to communicate District information to employees, to post notices required by law and to post patron information.  Employees may, however, post notices on bulletin boards provided that the material posted:

(a)  Can be removed by the District after one week or earlier if the space is necessary for District communications; and

(b)  Is in good taste and is not scandalous or indecent.

REV 5/94

604:2

(8)  Employees are expected to devote their full attention to their
     assigned work during their working time.  Accordingly:

     (a)  Employees may not transact business, sell or distribute
          any goods, products or literature for personal gain on
          District property during their assigned working hours;

     (b)  Employees may not transact business with other employees
          during the employee's assigned work hours; and

     (c)  Employees may not disturb members of the public who are
          transacting business with the District to sell or distri-
          bute any goods, products or literature.

(9)  Use of District membership lists is strictly prohibited.

605:1

PARKING

Policy:

It is the policy of the District to provide parking facilities, when practical, for the benefit and convenience of its employees, patrons and visitors.

Comment:

(1)   The District will provide parking for as many employees as it deems practical.  If overall demand exceeds the availability of spaces, preference will be given to regular full-time employees on the basis of grade and seniority.

(2)   The District will provide assigned spaces for handicapped employees and patrons.

(3)   All employees are expected to observe the parking rules established by the Park District Board of Commissioners.

(4)   All parking lots are part of the District premise and, therefore, all District policies and rules apply to employees and their vehicles while on the parking lot.

(5)   Employees who use the District parking lots do so at their own risk and should keep their cars locked while on the lot.  The District assumes no responsibility for any damage to, or theft of, any vehicle or personal property left in the vehicle while on the parking lot.

606:1

SECURITY

Policy:

It is the policy of the District to make reasonable efforts to provide
security for its property, its employees, patrons and authorized visi-
tors to its premises.

Comment:

(1) Employees are expected to know and comply with the District's
security procedures and are expected to report any violations
or potential problems to their immediate supervisor or the
Director.  Employees violating security procedures will be sub-
ject to discipline, up to and including termination; and in
addition, illegal acts committed by employees may be reported
to law enforcement authorities.

(2) The District has accepted certain responsibilities regarding
security.  These responsibilities include, but are not lim-
ited to the following:

(a) Recommendation, implementation, and enforcement of all
security procedures, plus periodic audits of existing
procedures;

(b) Evaluation, specification, installation, maintenance,
and operation of all security devices and systems;

(c) Overseeing, contracting and employing sheriff's deputies
as appropriate;

(d) Conducting background investigations of applications for
employment;

(e) Communications and relationships with law enforcement
agencies;

(f) Developing systems to issue and control employee passes
and keys and to identify and control the District's physi-
cal assets;

(g) Investigating theft and vandalism, including employee
theft;

(h) Monitoring solicitations and control of all nonemployees
on District premises;

REV 10/96

606:2

(i)  Safeguarding confidential information and the release of sensitive information;

(j)  Communicating security procedures to employees and training and retraining of employees with respect to their security responsibilities.

(3)  Employees leaving the premises with District property or equipment must have written authorization from their immediate supervisor to do so.  Employees are responsible for the proper care and return of all District property and equipment assigned to their possession.

(4)  Employees are subject to search, surveillance and interrogation whenever management feels such action must be taken to maintain security.  Employees may be asked to take a polygraph examination when the District is investigating economic losses such as those resulting from theft, embezzlement, sabotage or similar economic loss.  The District will only ask those employees who had access to the property that is being investigated and only those employees whom it has reason to suspect were involved in the incident.  No employee will be required to take a polygraph examination as part of a District investigation.  Further, no adverse action will be taken against any employee solely on the basis of the results of a polygraph test nor will the employee's job be in jeopardy for refusing to take a polygraph test.

(5)  Employees working in sensitive jobs may be required to meet applicable special security requirements which might include bonding or other special security measures.  Failure or inability to meet and/or comply with any special security requirements are grounds for termination of employment or rejection of an applicant.

(6)  Employees may enter or remain on the District's premises outside of their normal working hours only when they have been authorized to do so.  Immediate supervisors or the Director should notify the security deputy of such authorization. The District may issue an approved list which will be updated periodically and given to the deputy involved.

(7)  Employees are expected to exercise reasonable care for their own protection and for that of their personal property while on District premises.  The District assumes no liability for loss, damage or theft of personal property.

REV 10/96

607:1

# SEARCH OF LOCKERS, DESKS, AND OTHER DISTRICT PROPERTY

**Policy:**

Employees should understand that while certain District property such as desks, lockers, and vehicles are available for their use, they remain the property of the District and are subject to inspection, with or without notice. Employees are not permitted to store any wrongfully obtained illegal or prohibited items or substances in or on District property or otherwise misuse District property.

Whenever necessary, and at the District's discretion, District property and employee's work areas (i.e., desks, file cabinets, lockers, vehicles, etc.) may be subject to a search without notice. Employees are required to cooperate.

The District will generally try to obtain an employee's consent before conducting a search of District property or work areas, but may not always be able to do so.

Any property belonging to the District is subject to search if it is reasonably suspected that the property holds or contains any illegal or prohibited items or substances or missing or stolen District or District patrons' funds or property.

**Comment:**

    (1)    To safeguard the property and personal safety of our employees and the District, the District reserves the right to inspect any packages, parcels, purses, handbags, gym bags, briefcases, lunch boxes, or any other possessions or articles carried to and from Park District by employees and all other persons leaving and entering the District's premises.

    (2)    The District reserves the right to inspect an employee's office, desk, files, lockers or other area or article on District premises. As noted above, all lockers, offices, desks, telephones, computers, files and so forth, are the property of the District and are issued for the use of employees only during their employment with the District.

    (3)    Inspections may be conducted at any time at the discretion of the District. The District is not responsible for the loss of personal property.

607:2

    (4)    Employees working on District premises or entering or leaving the premises who refuse to cooperate in an inspection, as well as employees who after the inspection are believed to be in possession of unauthorized District property, confidential material, stolen property, weapons, alcohol, or illicit drugs, will be subject to disciplinary action, up to and including discharge.

7

701:1

## ATTENDANCE AND PUNCTUALITY

**Policy:**

It is the policy of the District to require employees to report to work punctually as scheduled and to work all scheduled hours and any required overtime. Excessive tardiness and poor attendance disrupt work flow and patron service and will not be tolerated.

**Comment:**

    (1)    Unauthorized or excessive absences or tardiness will result in disciplinary action, up to and including termination. See BEHAVIOR OF EMPLOYEES.

    (2)    Lateness applies not only to reporting late for work at the scheduled starting time, but also to leaving early for lunch or returning late, or leaving work before the scheduled quitting time.

    (3)    Immediate supervisors will notify employees of their starting and ending times.

    (4)    All full-time employees should notify the Frasor Center when they will be absent from work, either for a full or partial day.

        (a)    This notification includes sick, vacation or a personal day. (Please see policy manual for excused reasons for using a sick day, as well as procedures covering vacation or personal day approval.)

        (b)    Please call 622-6200 between the hours of 8:00 A.M. to 5:00 P.M. and ask for the Administration Office to report your absence.

        (c)    If between the hours prior to 8:00 A.M. or after 5:00 P.M., call 622-7827 and leave a message on the answering machine at the Frasor Center.

        (d)    Notification of your immediate supervisor of your absence is also mandatory.

        (e)    A Personnel Action Report must be filled out upon your return to work for any absence; or, depending upon the type of absence, a Personnel Action Report may be required and approval needed before the absence. After the report is signed by your immediate supervisor, it should be turned in to the Administration Office.

701:2

     (f)     If an absence has been pre-approved steps (a) through (e) do not have to be followed if the following conditions have been met:

          (i)     Personnel Action Report has been filled out;

          (ii)     immediate supervisor has signed report; and

          (iii)     it is on file at the Administration Office.

(5)     Part-time personnel are only required to report to their immediate supervisor if they are unable to work.

(6)     Non-exempt employees will not receive compensation for time missed because of tardiness or early leaving.

(7)     Employees who report for work in improper attire will not be permitted to work.

(8)     Employees who report for work in a condition deemed not fit for work, whether for illness or any other reason, will not be allowed to work.

(9)     Employees are expected to report for work during inclement weather conditions if the District does not declare an emergency closing. All full-time staff will be granted an authorized paid absence if the District declares an emergency closing. Non-exempt employees who are late because of weather conditions will be given a chance to make up their missed time if work schedules and conditions permit.

(10)     All non-exempt employees must obtain permission from their immediate supervisor in order to leave the District premises on personal business during working hours.

(11)     Employees who are absent from work for three consecutive days without giving proper notice to the District will be considered as having voluntarily quit. At that time, the District will formally note the termination and advise the employee of the action by certified mail. Unusual circumstances, in the Executive Director's opinion, may justify the failure to inform the District of an absence, in which case the employee will be notified of the Executive Director's decision.

702:1

SHORT-TERM ABSENCES

Policy:

It is the policy of the District to permit employees to be absent from work on a short-term basis under certain circumstances, including sickness or injury. In order to help employees maintain their income during authorized absences, the District will provide compensation for such absences according to the guidelines below.

Comment:

(1) A short-term absence is any absence continuing two weeks or less. Absences longer than two weeks or that are designated as Family and Medical Leave Act absences must be converted to a leave of absence if employment rights are to be maintained.

(2) An authorized short-term absence may include any of the following (the phrase "immediate family" includes the employee's spouse, brother, sister, father, mother, children, stepchildren, father-in-law, mother-in-law, brother-in-law, sister-in-law, and any member of the employee's extended family living in the employee's household):

(a) Sickness or injury resulting in temporary disability of the employee or a member of his immediate family;

(b) Death, funeral, or estate settlement in the employee's immediate family;

(c) Birth of a child to or adoption by the employee and/or the employee's spouse;

(d) Jury duty or testifying as a subpoenaed witness in a judicial proceeding, see (4);

(e) Voting in local, state or national elections, see (13); or,

(f) Approved voluntary participation in community projects.

(3) In order for short-term absences to be considered authorized and, therefore, eligible for compensation, employees must obtain approval for the absence from their immediate supervisor. Employees should give their supervisor as much advance notice of an absence as possible. Unauthorized absences and absences in excess of that allowed under this policy, except for an approved leave of absence, will be considered abuses of this policy and are grounds for disciplinary action up to and in-

702:2

cluding termination.

(4) Short-term absences resulting from jury duty, testifying as a subpoenaed witness, emergency District closings and approved participation in community affairs will not be charged against an employee's accumulated days of paid absence. Non-exempt employees will be paid their regular base rate for authorized absences to serve as a juror or subpoenaed witness. Exempt employees will also receive pay for any days they serve as a juror or witness in a workweek in which they also perform work. All monies received for jury duty or as a witness must be turned into the District for monies expended through payroll. Mileage monies received for jury duty do not have to be turned in. Meals are an expense borne by the County, therefore no monies will be received by the employee.

(5) Employees are prohibited from falsifying the reason for an absence. The District may require an employee to submit to a medical examination to verify a claimed sickness or injury. If this examination should establish that the employee is not actually suffering from an illness or injury, the employee will be subject to disciplinary action, up to and including termination, and absence compensation will be stopped immediately. Any medical examination required by the District will be by a doctor selected by the District and at District expense.

(6) Compensation during authorized absences will not be granted prospectively before days of paid absence have been accrued.

(7) Authorized days off for short-term absences will not be considered as working time for calculating weekly overtime compensation.

(8) All full-time and salaried employees will accumulate sick leave at the rate of one (1) day per month of employment to a maximum of eighty (80) days. Sick days over the eighty day limit will be accumulated only to be used toward service credit with the Illinois Municipal Retirement Fund for retiring employees. For each twenty (20) days of unused sick leave, retiring employees will be credited with one additional month of employment service to a maximum of one (1) year for purposes of calculating retirement benefits.

(9) Regular part-time and seasonal employees are not eligible for sick leave pay.

702:3

(10) Unused sick leave days are not convertible into pay, personal days, holidays or vacation.

(11) Sick hours do not count toward a standard forty hour week worked for overtime compensation.

(12) Employees who terminate employment with the District, for any reason, will not receive compensation for unused sick days.

(13) Employees returning from a short-term absence of over two days must report to their immediate supervisor and certify that they are fit to return to work.

(14) Employees may request a maximum of two hours off to vote only if the polls are not open two hours before or after their scheduled work period.  The employee may be allowed to make up the lost time or it can be charged against accumulated sick leave.

(15) Employees who wish to observe other religious observances other than those specified under HOLIDAYS may substitute one of the specified holidays or take vacation or personal time for these religious observances.

703:1

LEAVES OF ABSENCE

Policy:

It is the policy of the District to grant employees extended leaves of absence from the District under certain circumstances and for any leaves mandated by law. Except as stated below, employees will not receive compensation during a leave of absence.

Comment:

    (1)   The District will comply with the provisions of the federal Family and Medical Leave Act ("FMLA"). Please see Sections 705:1 and 705:1A for highlights on this Act. A complete copy of the Act is available for reference in the Administration Office.

    (2)   Employees may be eligible for leaves of absence if they have completed at least one year of service (or a lesser amount if specified by law). The duration of each leave of absence and the compensation received by the employee, if any, shall be determined by the District Director. The following types of leaves will be considered:

        (a)   Sick Leave of Absence: Employees who are unable to work because of an illness or disability and whose illness or disability continues beyond the coverage afforded in the District's policy on short-term absences, may be granted a sick leave of absence. The District may require certification, on a periodic basis, of an employee's continuing illness or disability by the employee's physician and/or a physician selected by the District.

        (b)   Parental Leave of Absence: Female employees, when not disabled by pregnancy or childbirth, and male employees may be granted a parental leave of absence to care for a child upon birth, placement for adoption or foster care.

        (c)   Personal Leave of Absence: Employees may be granted a personal leave of absence to attend to personal matters in cases in which the District determines that an extended period of time away from the job will be in the best interest of the employee and the District.

        (d)   Family Care Leave of Absence: Employees may be granted a family care leave of absence for the purpose of caring

REV 9/95

703:2

for a child, spouse, or parent who has a serious health condition. The District requires certification of the family member's serious health condition, both before the leave begins and on a periodic basis, by the family member's health care provider.

(e) Continuing Education Leave of Absence: Employees who desire to continue their education in preparation for added responsibilities with the District may be granted an educational leave of absence at the discretion of the Director or the Board of Commissioners.

(f) Military Leave of Absence: A military leave of absence, other than voluntary enlistment in the full-time military after employment with the District, will be granted if an employee is inducted or is recalled to active duty in the Armed Forces of the United States for a period of not more than four years plus any involuntary extension for not more than one year. Employees who perform and return from military service in the Armed Forces, the Military Reserves, or the National Guard shall have and retain such rights with respect to reinstatement, seniority, vacation, layoffs, compensation and length of service pay increases as may be from time to time provided by applicable federal and state law.

Upon satisfactory completion of military service and timely notice of intent to return to work, an employee will be reinstated to a job comparable to the one an employee left, provided the employee is qualified and the District's circumstances have not changed to the extent that it would be impossible or unreasonable to provide re-employment. An employee must reapply for a job within ninety (90) days after being released from active duty. Reservists and National Guardsmen returning from initial active duty for training must apply for reinstatement within thirty-one (31) days after being released from military duty. Employees returning from all other active duty for training must report to work on the first scheduled working day following completion of training. If an employee, on return from military service, is physically unable to perform the duties of the employee's previous job, the District will attempt to place the employee in a position of similar status and pay that is compatible with the employee's physical abilities.

REV 9/95

703:3

Employees with one year or more of service will be protected against loss of income as a result of participation in annual encampment or training duty in the U.S. Military Reserves or the National Guard. In these circumstances, the District will pay the difference between what an employee earns from the government for military service and what the employee would have earned as normal straight time earnings on the job. This difference will be paid for up to two (2) weeks in a calendar year.

(3)     Employees should be aware that unemployment benefits will be denied by the State of Illinois during a Leave of Absence because there was work available but the employee elected to take a Leave of Absence for whatever reason.

(4)     When possible, requests for a leave of absence or any extension of a leave of absence should be submitted in writing to the employee's immediate supervisor or the Director thirty (30) days prior to commencement of the leave period or extension. The final decision will be made by the Director. This written request should state the date when the employee desires the leave to begin and the probable date of return.

(5)     Employees returning from a leave of absence will be reinstated to their same job or one of similar status and pay provided the District's circumstances have not changed to the extent that it would be impossible or unreasonable to provide reinstatement. If the same job or one of similar status and pay is not available, reinstatement may be deferred until a position is available and the employee may be granted a preference in recall. Employees returning from a military leave must also comply with all of the reinstatement requirements specified by federal law.

(6)     If an employee fails to return to work at the conclusion of an approved leave of absence, the employee will be terminated from employment.

(7)     Insurance benefits of the employee will be cancelled during the employee's leave of absence. However, with the consent of the insurance carrier and the Director, approval may be given for the employee to make timely payments of all premiums due. Payments would be made at the Administration Office.

Employees taking a leave under the Family Medical Leave Act are entitled to receive health benefits during the leave at the same level and terms of coverage as if they had been working throughout the leave. If applicable, the employee must continue to pay their family medical coverage premium. In

703:4

some instances, the District may recover premiums it paid to maintain health coverage for an employee who fails to return to work from FMLA leave.

(8)    The District will provide benefits to employees on leave as required by law. Benefits that accrue according to length of service, such as paid vacation, holiday, personal and sick days, do not accrue during periods of leave.

704:1

## MEAL BREAKS

**Policy:**

It is the policy of the District to provide meal breaks during the course of each workday.

**Comment:**

(1)  Full-time employees are allowed a meal break near the middle of the workday.  The time allowed will generally be sixty (60) minutes; however, in some cases a thirty (30) minute meal break will be allowed and scheduled at the discretion of the employee's immediate supervisor with appropriate regard for the work load.

(2)  Part-time and seasonal employees scheduled to work more than seven and one-half (7½) consecutive hours during any workday will receive a meal break of the same duration as full-time employees beginning no later than the fifth (5th) hour.

(3)  Employees working beyond his/her regular shift does not have to be given a second meal period unless the assignment is for another full shift of seven and one-half (7½) hours or more.

(4)  Employees will not be compensated for their meal breaks unless they are required to work during their breaks.  Nonexempt employees must punch in and out for all meal breaks.

(5)  Employees may not leave early or extend meal breaks beyond their assigned period, will not be compensated for time lost because of tardiness and will be subject to discipline if late.

(6)  Immediate supervisors and the Director are responsible for balancing work loads and scheduling meal breaks.  Whenever necessary, the duration and time of meal periods may be changed.

REV 5/94

## FAMILY AND MEDICAL LEAVE

**POLICY:**

The FMLA provides eligible employees with up to 12 workweeks of unpaid leave for certain family and medical reasons during a 12-month period. During this leave, an eligible employee is entitled to continued group health plan coverage as if the employee had continued to work. At the conclusion of the leave, subject to some exceptions, an employee generally has a right to return to the same or to an equivalent position.

Certain highly compensated key employees may be denied reinstatement when necessary to prevent substantial and grievous economic injury to the Park District's operations. A key employee is a salaried employee who is among the highest paid 10% of employees at that location or any location within a 75-mile radius. Employees will be notified of their status as a key employee, when applicable, after they request a Family and Medical Leave.

It is the policy of the District to comply with the federally mandated Family and Medical leave Act of 1993 ("FMLA"). The FMLA provides:

**COMMENT:**

(1) Any full-time or part-time employee who has worked for the Park District for at least 12 months, and for at least 1,250 hours during the 12-month period immediately preceding the start of the leave.

(2) A leave may be taken for the following reasons: (1) birth and care of a newborn child; (2) placement of a son or daughter for adoption or foster care in the employee's home; (3) to care for the employee's parent, spouse or child (but not in-law) with a serious condition; or (4) to attend the employee's own serious health condition which renders the employee unable to perform the functions of the employee's job.

For purposes of this policy, "serious health condition" means an injury, illness, impairment, or physical or mental condition that involves **one** of the following:

a. **Hospital Care.** Inpatient care in a hospital, hospice, or residential medical care facility, including any period of incapacity relating to the same condition.

b. **Absence Plus Treatment.** A period of incapacity of more than three consecutive calendar days (including any subsequent treatment or period of incapacity relating to the same condition) that also involves either: (1) treatment two or more times by a health care provider, by a nurse or physician's assistant under direct

supervision of a health care provider, or by a provider of health care services under orders of, or on referral by, a health care provider; or (2) treatment by a health care provider on at least one occasion that results in a regimen of continuing treatment under the supervision of the health care provider.

c. **Pregnancy.** Any period of incapacity due to pregnancy or for prenatal care.

d. **Chronic Conditions Requiring Treatment.** A chronic condition that: requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistance under direct supervision of a health care provider; continues over an extended period of time; and may cause episodic rather than a continuing period of incapacity.

e. **Permanent/Long-Term Conditions Requiring Supervision.** A period of incapacity that is permanent or long-term due to a condition for which treatment may be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider.

f. **Multiple Treatments (non-chronic conditions).** Any period of absence to receive multiple treatment (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or in referral by, a health care provider, either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment.

(3) Employees qualifying for leave under the FMLA may take up to a maximum of 12 calendar weeks of leave over a rolling 12 month period measure retroactively from the last day of leave. Where both a husband and wife are employed by the Park District, their combined leave under this policy is 12 weeks over the 12 months where the leave involves the birth or adoption of a child or the care of a seriously ill parent.

Leave because of an employee's own serious health condition, or to care for an employee's spouse, child or parent with a serious health condition, may be taken all at once or, where medically necessary, intermittently or on a reduced work schedule.

(4) Intermittent leave is leave taken in separate blocks of time. A reduced work schedule leave is a leave schedule

that reduces an employee's usual number of hours per
workweek or hours per workday.

If an employee takes leave intermittently or on a reduced
work schedule basis, the employee must, when requested,
attempt to schedule the leave so as not to unduly disrupt
the Park District's operations.  When an employee takes
intermittent or reduced work schedule leave for foreseeable
planned medical treatment, the Park District may temporarily
transfer the employee to an alternative position with
equivalent pay and benefits for which the employee is
qualified and which better accommodates recurring periods of
leave.

(5)  Leave to care for a newborn or for a newly placed child must
     conclude within 12 months after the birth or placement of
     the child and may not be taken intermittently or on a
     reduced work schedule unless the Park District agrees with
     respect to an individual leave request.

(6)  You must substitute any accrued paid vacation days, paid
     personal days, and paid sick days for unpaid leave under
     this policy, and any such paid time off must be taken at the
     same time as your Family and Medical Leave.  All time missed
     from work that qualifies for both Family and Medical Leave
     and for workers' compensation will be counted toward your
     twelve weeks of Family and Medical leave.  If you qualify
     for both Family and Medical Leave and any other leaves,
     Family and Medical Leave must be taken first.

(7)  While a full-time employee is on FMLA leave, the Park
     District will maintain the employee's group dental coverage
     under the same conditions that the employee had at the start
     of FMLA leave for a period not to exceed the FMLA 12-week
     period.  The employee will be responsible for any premium
     contribution and/or payment to other employee elected
     benefit programs.  To the extent that an employee's FMLA
     leave is paid, the employee's portion of dental insurance
     premiums will be deducted from the employee's salary.  For
     the portion of FMLA leave that is unpaid, the employee's
     portion of dental insurance premiums may be paid pursuant to
     a system voluntarily agreed to by the Park District and the
     employee.  Other benefits, if any, such as vacation, sick
     leave, or personal days, shall not accrue while an employee
     is on unpaid FMLA leave.  Employees on FMLA leave, however,
     will not forfeit any benefits that accrued prior to the
     start of FMLA leave by virtue of taking FMLA leave.

(8)  Requests for FMLA leaves must be made in writing.  At least
     30 days advance notice for the birth or adoption of a child
     or for planned medical treatment should be given.  In cases
     of emergency, notice should be given as soon as is practical
     (usually within one or two business days).  A delay in

705:4

submitting this request may result in a delay of the start of your leave.

a.  The request must specify, in detail, the reasons for requesting the leave and the length of time the employee intends to be away.

b.  In cases where an employee requests leave for the employee's own serious health condition or to care for a seriously ill family member, the Park District may require medical certification from a health care provider to support the request. Medical certification forms are available from the business office.

c.  If the Park District has reasons to doubt the employee's initial certification, the Park District may: (a) with the employee's permission, have a designated health care provider contact the employee's health care provider in an effort to clarify or authenticate the initial certification; and/or (b) require the employee to obtain a second opinion by an independent Park District-designated provider at the Park District's expense. If the initial and second certifications differ, the Park District may, at its expense, require the employee to obtain a third, final and binding certification from a jointly selected health care provider.

During FMLA leave, the Park District may request that the employee provide recertification of a serious health condition at intervals in accordance with the FMLA. In addition, during FMLA leave, the employee must provide the Park District with periodic reports regarding the employee's status and intent to return to work. If the employee's anticipated return to work date changes and it becomes necessary for the employee to take more or less leave than originally anticipated, the employee must provide the Park District with reasonable notice (i.e., within 2 business days) of the employee's changed circumstances and new return to work date. If the employee gives the Park District notice of the employee's intent not to return to work, the employee will be considered to have voluntarily resigned.

d.  A request for a leave of absence must be approved by the employee's supervisor(s) and the Executive Director.

e.  An approved medical leave of absence will be considered FMLA if it qualifies as such under the FMLA regulations promulgated by the U.S. Department of Labor.

f.  If an employee's request does not meet the requirements for FMLA leave of absence, the employee may apply for a personal leave of absence. (See Section 3-9)

705:5

(9)   The District will initiate FMLA leave when it is known that the leave is being taken for an FMLA required reason. The employee will be notified in writing by the District confirming that the leave is designated as an FMLA absence.

(10) Upon returning from FMLA leave, the employee will be reinstated to the employee's original or equivalent position with equivalent pay and benefits. In the case of an employee's own serious health condition, a physician's statement certifying the employee's ability to perform the essential functions of the job is required. However, an employee is entitled to reinstatement only if he would have continued to be employed had FMLA leave not been taken. Thus, an employee is not entitled to reinstatement if, because of a layoff, reduction in force or other reason, the employee would not be employed at the time job restoration is sought.

(11) An employee who fails to return to the available position on the first day after the leave of absence has expired will be considered to have voluntarily resigned. However, pursuant to the Park District's American with Disabilities Act Policy, employees may request extended unpaid leave as a "reasonable accommodation" under the ADA (See Section 1-3). The Park District may recover health insurance premiums that the Park District paid on behalf of the employee during any unpaid FMLA leave except the Park District's share of such premiums may not be recovered if the employee fails to return to work because of the employee's or a family member's serious health condition or because of their circumstances beyond the employee's control. In such cases, the Park District may require the employee to provide medical certification of the employee's or the family member's serious health condition.

FMLA regulations require the employer to grant the IMRF Leave, *if the employer ever granted an IMRF Leave to any member in the past.*

However, if an employer has never granted an IMRF Benefit Protection Leave and a member on FMLA leave requests one, the employer is not required to grant the leave under this legislation.

An IMRF Benefit Protection Leave remains limited to 12 months of service credit over the member's entire IMRF career.

(12) IMRF members on FMLA leave will remain eligible for IMRF disability and death benefits if they were eligible for those benefits when leave began. FMLA leave will not interrupt IMRF disability and death benefit protection.

705:6

The usual rules require an IMRF member to have 12 months of continuous service credit in order to be eligible for IMRF disability benefits.  This rule will not apply if a member's gap in IMRF service is due to an FMLA leave.

(13) IMRF members on FMLA leave will not earn pension service credit for the month(s) in which they are not paid.  If a member on FMLA leave wishes to receive IMRF pension service credit, the member must apply for an IMRF Benefit Protection Leave and pay the member contributions and any applicable interest.  A member on an IMRF Benefit Protection Leave is afforded the opportunity to establish pension service credit even though the member is not being paid.

(14) For further information or clarification about FMLA leave, please contact the District's Administrative Office.

8

801:1

## EXAMPLES OF REASONS FOR DISCIPLINARY ACTION

**Policy:**

You may be warned, suspended, and/or dismissed whenever it is determined, in the District's sole discretion, to be in its best interests. The Executive Director, under normal circumstances will review and approve all recommendations for termination before any final action is taken. Listed below are some examples of reasons for disciplinary action. This list, however, does not constitute an exhaustive list of all of the actions that may subject you to disciplinary action including discharge and does not change the employment-at-will relationship between the employee and the District. Instead, the following lists sets forth some of the more typical cases that arise in the course of an employment relationship. They include but are not limited to:

(1)     Failure to adhere to District policies and/or procedures including without limitation safety policies, ordinances and procedures.

(2)     Absence from duty without permission, habitual tardiness, excessive absenteeism, or misrepresentation of material facts relating to the use of leave.

(3)     Extending breaks or lunches and/or not taking breaks or lunches at scheduled times.

(4)     Leaving job during working hours without permission.

(5)     Failure to obey any lawful official rule, regulation or order, or failure to obey any proper direction made or given by your supervisor(s).

(6)     Inability or unwillingness to take orders from supervisor(s).

(7)     Uncooperative, hostile or discourteous attitude or conduct toward your supervisor(s), the Board, co-workers or members of the public or threatening or striking any person who is in or on District property or participating in District activities.

(8)     Being wasteful of or the willful destruction of District supplies, materials, vehicles, equipment, tools, working time or other District property.

801:2

(9)     Failure to wear uniform or safety equipment (e.g., safety shoes, glasses, goggles, and/or face shield) as required by this Manual and/or department manuals, rules and/or procedures or the failure to wear appropriate clothing for duties as required by this Manual or department manual, rules and/or procedures.

(10)    Endangering one's safety and/or the safety of others because of failure to act properly and safely in the performance of job duties.

(11)    Failure to follow any federal, state, local or District law, rule of regulation while on duty or while in or on District property or engaging in criminal activity while on duty or while in or on District property.

(12)    Failing to report an accident or known hazardous conditions to your immediate supervisor.

(13)    Gambling or fighting while on duty.

(14)    Being under the influence or possession of intoxicants or illegal drugs while on duty or on District property or failing to notify the District that you are taking legal drugs when such notice is required.

(15)    Theft or misappropriation or the careless, negligent or improper use of funds or property belonging to the District, fellow employees or the public.

(16)    Possession of weapons in or on District property or while on duty.

(17)    Felony conviction.

(18)    Incompetent, inefficient or negligent performance of duties; inability or failure to perform duties properly.

(19)    Failure to maintain driver license or other license or certification which may be required for your position or as provided in this Manual.

(20)    Smoking on any District property and areas.

(21)    Harassment of other employees or members of the public.

(22)    Dishonesty; lying to District personnel of falsifying or providing misleading information on forms, records or report, provided to or on

801:3

behalf of the District including without limitation accident reports, employment applications/resumes, financial reports, reimbursement reports and departmental reports.

(23)    Time card or sign-in book violations.

(24)    Unauthorized possession, use of copying of any records that are the property of the District.

(25)    Sleeping on duty.

(26)    Violation of employee policies, rules or guidelines or engaging in any conduct determined by the District in its sole discretion not to be in its best interests.

(27)    Any violation of policies or procedures regarding the privacy of individually identifiable health information (or protected health information), as mandated by the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

802:1

## PERSONAL APPEARANCE OF EMPLOYEES

**Policy:**

In order to maintain the District's public image with the patrons and taxpayers, promote a productive work environment and to comply with applicable health and safety standards, it is the policy of the District that each employee's dress, grooming and personal hygiene should be appropriate to the work situation as more specifically set forth herein.

(1)    An appropriate, well-groomed, neat appearance, like proper maintenance of work areas, is an ongoing requirement of employment with the District.

(2)    Full-time employees must comply with the following personal appearance standards:

   (a)    All full-time employees, unless noted otherwise, are expected to dress in a professional businesslike manner. Employees should not wear suggestive attire, jeans, athletic clothing, shorts, thong or rubber flip-flop type sandals, t-shirts, baseball hats, tennis shoes and similar casual attire since this clothing does not present a businesslike appearance.

   (b)    Maintenance/Custodian personnel, as well as the Assistant Golf Course Superintendent, are required to wear the District's authorized uniform. Golf/Park maintenance personnel may also wear hemmed blue jean shorts when the daily work tasks permit (e.g., pants must be worn when working with potentially hazardous equipment such as string trimmers, sprayers, etc.). The hem length of the shorts must have an inseam length of at least 4 inches.

   (c)    The Golf and Tennis Professionals are required to dress in a manner deemed acceptable by their respective professional associations.

(3)    Part-time employees must comply with the following personal appearance standards:

   (a)    Facility Supervisors/Cashiers at:

      -    Westwood/Duis Center/Emerald Hill Pro Shop/Dillon Home are required to wear Docker-style pants in the tan

REV 11/05

802:2

family with a solid brown or black leather belt with a plain buckle and a District authorized staff shirt.

- Oppold Marina/Lawrence Park Pool are required to wear Docker-style pants in the tan family with a solid brown or black leather belt with a plain buckle or Docker-style shorts in the tan family with an inseam length of least 4 inches and a District authorized staff shirt.

- Food service personnel are required to wear Docker-style pants in the tan family or navy blue with a solid brown or black leather belt with a plain buckle or Docker-style shorts in the tan family or navy blue with an inseam length of at least 4 inches and a District authorized staff shirt.

(b) Lifeguards at:

- Lawrence Park Pool/Duis Center will be required to wear the District's authorized swimsuit, shorts, shirt, cap and sweat pants depending upon location and weather conditions at the time.

(c) Attendants at:

- Westwood are required to wear Docker-style pants in the tan family with a solid brown or black leather belt with a plain buckle and a District authorized staff shirt.

- Emerald Hill/Lawrence Park Pool/Oppold Marina are required to wear Docker-style pants in the tan family with a solid brown or black belt with a plain buckle or Docker-style shorts in the tan family with an inseam length of at least 4 inches and a District authorized staff shirt.

(d) Custodians/Maintenance personnel are required to wear jean pants and a District authorized staff shirt. Golf/Park maintenance personnel may also wear jean shorts when the daily work tasks permit (e.g., pants must be worn when working with potentially hazardous equipment such as string trimmers, sprayers, etc.). The hem length of the shorts must have an inseam length of at least 4 inches.

REV 11/05

802:3

(e)    Program personnel will be required to dress in a manner as established by the District to be appropriate to the activity and will wear, when required, a District authorized staff shirt.

(f)    Unless the job assignment requires a different type of footwear, part-time staff may wear dress shoes/sandals or primarily white or black athletic shoes with matching laces.  Only lifeguards are permitted to wear thong or rubber flip-flop type sandals while on duty.

(g)    Headwear may not be worn by facility supervisors, cashiers and attendants.

(4)    The District has designated Friday's as a "casual dress" day for full-time and part-time employees.

(a)    All employees may wear jeans or other casual pants or shorts. They do not have to be Docker-style in the tan family (as per section 3), but they must be hemmed, with no holes or tears.

(b)    Part-time employees must wear a District authorized staff shirt.

(c)    All other dress code policies remain in effect.

(5)    The District expects that all employees will be mature in choosing the type of hairstyle, accessories and makeup worn while working.  All employees shall abide by the following guidelines:

(a)    HAIR: Your hair should be neatly combed and trimmed at all times.  Staff with long hair should wear it in such a manner that it does not fall forward over their face while performing their job. Any hairstyle or color determined to be inappropriate by the District will not be allowed.  Lines or shave designs will not be allowed.  Mustaches and beards are permitted as long as they are neatly groomed.

(b)    FINGERNAILS:  Clean and presentable fingernails are essential

(c)    JEWELRY: Earrings must be the stud type or hoops not exceeding 1" below the ear lobe.  Excessive and inappropriate jewelry will not be permitted.  Body and facial (including tongue) piercing jewelry must always be removed or covered by clothing. Novelty buttons must also always be removed.

802:4

    (d)    TATOOS: Tattoos cannot be offensive in nature (i.e., words including profanity and/or symbols). Any tattoo design deemed to be inappropriate by the District would not be allowed. Tattoos must not be placed so as to draw inappropriate attention. Excessive visible tattoos will not be permitted.

(6)    The District expects that all employees wear clothing that is not in disrepair (e.g., not torn, no holes, slits, etc.). Shirts must always be tucked in. Employees required to wear a staff shirt may wear a District authorized sweatshirt, vest or cardigan over the staff shirt.

(7)    Certain employees may be required to wear certain clothing due to safety conditions or job requirements. Safety gear, when required, will be purchased by the District.

(8)    Any clothing supplied by the District may not be altered in any way. Also, any clothing supplied by the District shall not be worn outside the workplace.

(9)    Any employee who cannot comply with this policy based upon disability, religion, national origin or any other legally recognized basis shall forward a written request to the Executive Director for an authorized deviation from this policy. Said request shall include the policy exception requested and include the basis for said request.

(10)    Any employee who cannot comply with this policy based upon a specific work assignment may seek an exemption during the assignment by the employee's immediate full-time supervisor.

(11)    Any employee who does not meet the standards of this policy will be required to take corrective action that may include leaving the premises. There will be no compensation for time missed and repeated violations may result in disciplinary action, up to and including termination.

803:1

## PERSONAL FINANCES OF EMPLOYEES

Policy:

It is the policy of the District to require employees to meet and discharge their financial obligations in a timely manner.

Comment:

(1)    Employees should manage their personal finances so that they do not adversely impact job performance or the District's image. The failure of employees to meet financial obligations may impose an administrative and financial burden on the District in terms of extra bookkeeping and the need to respond to and comply with court processes.

(2)    The District will not disclose employee financial information to outside parties without express written permission of the employee.

(3)    The Office Manager or Administrative Assistant is the only person authorized to receive a writ of garnishment or attachment or any similar order requiring payment of a portion of an employee's compensation to someone other than the employee. They will notify the affected employee immediately upon receipt of any of the above authorizations and deduct from the employee's compensation the required amount. The amount deducted will not exceed that permitted by law.

(4)    No employee will be terminated because of the fact that his earnings have been subjected to garnishment for one indebtedness. However, repeated garnishments for more than one indebtedness may result in discipline, up to and including, termination, depending on the circumstances of the case and any restrictions under state law.

(5)    A credit check may be necessary, with employee's permission, if job offer entails handling money or making financial decisions.

(6)    The District will not deny employment to, or terminate the employee of, any person solely because that person has filed a petition for bankruptcy.

804:1

# PATRON RELATIONS

Policy:

It is the policy of the District to be patron and service oriented and to require employees to treat patrons in a courteous and respectful manner at all times.

Comment:

(1) Employees must understand the patron comes first, is the primary source of the District's income, and is, therefore, the ultimate source of each employee's job security and income. All employees must have an obligation to represent the District in a positive fashion and to make patrons feel as comfortable as possible in dealing with the District.

(2) Employees with patron contact are expected to know the District's programs and services and to learn the wants and needs of patrons and seek new ways to serve them.

(3) Employees are encouraged to report recurring patron-related problems to their immediate supervisor and/or make suggestions for changes in District policies or operating procedures to solve problems.

(4) Employees should be prepared to listen carefully to patron inquiries and complaints and then deal with them in a responsive, professional manner. If a controversy arises, the employee should attempt to explain District policy in a clear, yet deferential manner. If a patron becomes unreasonable or abusive, the patron should be referred to the employee's immediate supervisor.

(5) Employees should be particularly careful to exercise courtesy and thoughtfulness in using or answering the District's telephone. A positive telephone contact with a patron or supplier can enhance goodwill while a negative experience can destroy a valuable relationship.

(6) Most of the District's customers speak English as their primary language. Therefore, it is required that employees speak English when dealing with patrons. This rule does not apply, however, in situations where the patron's primary language is one other than English and the employee is also conversant in the other language.

805:1

## USE OF COMMUNICATION SYSTEMS

**Policy:**

It is the policy of the District to provide the communication services and equipment necessary for the conduct of District business.

**Comment:**

(1)    Employees should familiarize themselves with the numerous types of communication services and equipment used by the District, including mobile units, fax machine, telephones, TDD phone, etc. In turn, the employee should choose the proper vehicle for each business communication.

(2)    Employees should not use District communication services and equipment for personal purposes except in emergencies and with the approval of the Executive Director or their immediate supervisor. Employees should be aware there are usage charges or other related expenses for most of these services.

(3)    Employees who use any of the above services should reimburse the District for any related charges.

(4)    Employees should make provisions to have emergency or other necessary calls routed to Frasor Center. The District cannot and does not accept responsibility for the prompt or accurate relay of personal messages.

(5)    Employees are not to use the District's address for receiving personal mail and may not use District stationery or postage for personal letters.

(6)    Business cards will be issued to District personnel at the discretion of the Executive Director.

(7)    Hourly employees are not permitted to use personal cell phones to make or receive personal calls when clocked in during work hours. Cell phones are not to be worn or carried by an hourly employee when clocked in, unless authorized by the department head. Cell phones can only be used if an hourly employee is on an unpaid meal break. If a family emergency call is made to an employee, the call should come through the District's phone system.

806:1

CONFLICTS OF INTEREST

Policy:

It is the policy of the District to prohibit its employees from engaging in any activity, practice or act which conflicts with, or appears to conflict with, the interests of the District, its patrons or its suppliers. Since it is impossible to describe all of the situations which may cause or give the appearance of a conflict of interest, the prohibitions included in this policy are not intended to be exhaustive and only include some of the more clear-cut examples.

Comment:

(1)  Employees are expected to represent the District in a positive and ethical manner and are not to engage in, directly or indirectly either on or off the job, any conduct which is disloyal, disruptive, competitive or damaging to the District.

(2)  Employees are not to accept any employment relationship with any organization which does business with the District or is a competitor of the District.  This prohibition on employment includes serving as an advisor or consultant to any such organization, unless that activity is conducted as a representative of the District.

(3)  Employees must disclose any financial interest they or their immediate family have in any firm which does business with the District or which competes with the District.

(4)  Employees and their immediate family are not to accept gifts, except those of nominal value, or any special discounts from any person or firm doing, or seeking to do, business with the District.  The Director should be informed of any gifts, rewards or other remunerative devices received by an employee, and in turn will make a decision if the gift, reward or device can be retained.

(5)  Employees may learn or become aware of information about the District which, if known to the public, might affect the decision of a reasonable investor to buy or sell properties interested in by the District.  Employees are prohibited from misusing such material and inside information prior to public disclosure.  Employees are not to disclose inside information to anyone, either inside or outside the organization, who does not have a legitimate business need to know it.

807:1

## CONFIDENTIAL NATURE OF DISTRICT AFFAIRS

Policy:

It is the policy of the District that the internal business affairs of the District, particularly confidential information, represent proprietary assets that each employee has a continuing obligation to protect.

Comment:

(1) Information designated as confidential is to be discussed with no one outside the organization and only discussed within the organization on a "need to know" basis.

(2) Employees are prohibited from attempting to obtain confidential information for which they have not received access authorization.

(3) All media inquiries and other inquiries requesting confidential information should be referred to the Director.

(4) Inquiries seeking information concerning current or former employees should be referred to:

    (a) the Administration Office for employment dates, position held or to answer/confirm written requests; or

    (b) the Director for all personal questions and job reference information.

(5) Employees are not to discuss with the officers, directors or employees of competing companies any topic which might give the impression of an illegal agreement in restraint of trade. For example, price fixing of fees and charges.

(6) Employees are prohibited from using any confidential information for their own personal gain.

REV 10/96

808:1

DISCIPLINARY PROCEDURE

Policy:

It is the policy of the District that all employees are expected to comply with the District's standards of behavior and performance and that any noncompliance with these standards must be remedied.

Comment:

(1)   Under normal circumstances, the District endorses a policy of progressive discipline in which it attempts to provide employees with notice of deficiencies and an opportunity to improve.  It does, however, retain the right to administer discipline in any manner it sees fit.

(2)   The normal application of progressive discipline should be:

(a)   ORAL REPRIMAND - If an employee is not meeting District standards of behavior or performance, the employee's immediate supervisor should take the following action:

(i)    Meet with the employee to discuss the matter;

(ii)   Inform the employee of the nature of the problem and the action necessary to correct it; and

(iii)  Prepare a memorandum for the immediate supervisor's own records indicating that the meeting has taken place.

Oral reprimands will be used for minor misconduct or performance problems or for first offenses where the offense is not of a sufficiently serious nature to warrant more severe disciplinary action.

(b)   WRITTEN REPRIMAND - If there is a second occurrence, the immediate supervisor should hold another meeting with the employee and take the following action:

(i)    Issue a written reprimand to the employee;

(ii)   Warn the employee that a third incident will result in more severe disciplinary action; and

(iii)  Prepare and forward the written, signed report to the Director describing the first and second in-

- 808:2

cidents and summarizing the action taken during the meeting(s) with the employee. This report should include both the signature of the immediate super-visor as well as the employee involved.

Written reprimands will be used for repeated misconduct of a minor nature or for more serious misconduct which does not warrant suspension, discharge or demotion.

(c) SUSPENSIONS - If there are additional occurrences, the immediate supervisor should select one of the following courses of action:

   (i)   Issue a written reprimand or warning;

   (ii)  Suspend the employee without pay for up to five (5) working days, or

   (iii) Suspend the employee indefinitely and recommend termination.

Suspensions will be documented. The reasons and length of time of the suspension must be in writing and signed by the employee and the immediate supervisor. The immed-iate supervisor will note on the document if the employee refuses to sign. A witness should sign to attest to that fact, if possible.

(3) The progressive disciplinary procedures and supporting docu-ments shall indicate the time between occurrences.

(4) Progressive disciplinary procedures may also be applied to an employee who is experiencing a series of unrelated problems in-volving job performance and/or behavior.

(5) In cases involving serious misconduct, such as a major breach in policy or violation of law, the procedures contained in 2(c) may be disregarded. The immediate supervisor should sus-pend the employee immediately and, if appropriate, recommend termination of the employee. Employees suspended from work will not receive or accrue any employee benefits during the suspension, unless the Director grants an exception.

(6) The Director should, under normal circumstances, review and approve all recommendations for termination before any final action is taken.

808:3

(7)    At any investigatory interview conducted for the purpose of
       determining the facts involved in any suspected violation of
       District rules and regulations or violations of any law, the
       following procedures apply:

       (a)    Prior to the interview, the employee who is suspected of
              violating District rules and regulations or the law should be
              told in general terms what the interview is about.

(8)    Employees who believe that they have been disciplined too
       severely or without good cause are encouraged to utilize the
       grievance procedure described in the Manual.

(9)    Any employee may appeal a written reprimand, suspension or
       demotion or any disciplinary action other than an oral reprimand
       which is imposed without a prior hearing in accordance with the
       provisions of this Manual.

809:1

# ALCOHOL AND DRUG ABUSE

**Policy:**

It is the policy of the District to maintain a work place that is free from the effects of drug and alcohol abuse.

The District has implemented an Alcohol and Drug Abuse Policy in response to overwhelming evidence that alcohol and drug abuse has a detrimental impact on employees' health, job performance, safety, and efficiency. Since District employees operate, supervise and maintain parks, facilities, programs and equipment for use by members of the public and perform services that may have a direct effect on the health and safety of members of the public and fellow employees, the District wishes to maximize the health and safety of its patrons and employees.

This policy also expresses the District's desire to satisfy the requirements of the federal and state Drug Free Workplace Acts (41 U.S.C.A. § 701 *et seq.* and 30 ILCS 580/1 *et seq.*). In accordance with these statutes and concerns, the District has resolved to maintain a drug free workplace.

The purpose of this policy is to inform employees of the District's investigation, treatment and disciplinary policy relating to alcohol and drugs. As such, **all** district employees will abide by its terms. As with all policies in this Manual, this policy is subject to periodic addition, modification, or deletion.

This policy does not replace any of the provisions or requirements of the District's Controlled Substance and Alcohol Testing Policy for positions that require a Commercial Drivers License (CDL). District employees who operate District commercial motor vehicles and possess a commercial drivers license have special responsibilities necessitated by the fact that they operate vehicles that require additional skill and attentiveness over that of non-commercial motor vehicles. As part of its continuing commitment to safety and to comply with federal law, the District has established a controlled substance and alcohol testing policy for District positions that require a commercial drivers license (see Section 810:1-10 Alcohol and Drug Procedures for CDL Employees). Both the District and the federal government recognize that it is important to establish programs to help prevent accidents and injuries resulting from the misuse of alcohol or use of controlled substances by drivers of commercial motor vehicles. The Alcohol and Drug Procedures For CDL Employees is in addition to and supplements and complements rather than supercedes all other District policies, rules, procedures, and

REV 5/05

809:2

practices, including without limitation this Alcohol and Drug Abuse Policy. However, for persons, to whom the Alcohol and Drug Procedures For CDL Employees applies, in the event of any conflict between any of the provisions of the Alcohol and Drug Procedures For CDL Employees and the provisions of any other District policy, rule, procedure, or practice, the provisions of the Alcohol and Drug Procedures For CDL Employees will control.

**Comment:**

(1)    **PURPOSE**

The District has implemented this policy in response to overwhelming evidence that alcohol and drug abuse has a detrimental impact on employees' health, job performance, safety, and efficiency. Since District employees operate, supervise and maintain parks, facilities, programs, and equipment for use by members of the public and perform services that may a direct effect on the health and safety to members of the public and fellow employees, the District wishes to assure the health and safety of its patrons and employees.

This policy also expresses the District's desire to satisfy the requirements of the federal and state Drug Free Workplace Acts (41 U.S.C.A. § 701 *et seq.* and 30 ILCS 580/1 *et seq.*). In accordance with these statutes and concerns, the District has resolved to maintain a drug free workplace.

The purpose of this policy is to inform employees of the District's investigation, treatment and disciplinary policy relating to alcohol and drugs. As such, all District employees will abide by its terms. As with all policies in this Manual, this policy is subject to periodic addition, modification, or deletion.

This policy does not replace any of the provisions or requirements of the District's Controlled Substance and Alcohol Testing Policy for positions that require a Commercial Driver's License (CDL). See Alcohol and Drug Procedures For CDL Employees Policy.

District employees who operate District commercial motor vehicles and possess a commercial driver's license have special responsibilities and necessitated by the fact that they operate vehicles that require additional skill and attentiveness over that of non-commercial motor vehicles. As part of its continuing commitment to safety and to comply with federal

809:3

law, the District has established a controlled substance and alcohol testing policy for District positions that require a commercial driver's license ("Alcohol and Drug Procedures for CDL Employees Policy"). Both the District and the federal government recognize that it is important to establish programs to help prevent accidents and injuries resulting from the misuse of alcohol or use of controlled substances by drivers of commercial motor vehicles. The Alcohol and Drug Procedures For CDL Employees Policy is in addition to and supplements and complements rather than supercedes all other District policies, rules, procedures, and practices, including without limitation this Alcohol and Drug Abuse Policy. However, for persons, to whom the Alcohol and Drug Procedures For CDL Employees applies, in the event of any conflict between any of the provisions of the Alcohol and Drug Procedures For CDL Employees Policy and the provisions of any other District policy, rule, procedure, or practice, the provisions of the Alcohol and Drug Procedures For CDL Employees will control.

(2)    **ACTS PROHIBITED**

The unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance, including cannabis and alcohol, is prohibited on District Property or while acting on behalf of the District.

(3)    **DEFINITIONS**

For purposes of this Policy, the following definitions apply:

(a)    "Alcohol" means any substance containing any form of alcohol, including but not limited to: ethanol, methanol, propanol, and isopropanol.

(b)    "Cannabis" is defined as provided in the Cannabis Control Act (720 ILCA 550/1 *et seq.*) which provisions are specifically incorporated in this Policy by reference.

(c)    "Controlled Substance" means a controlled substance in schedules I through V of Section 812 of Title 21 of the United States Code, which provisions are specifically incorporated in this Policy by reference.

(d)    "Criminal Drug Statue" means a criminal statute involving the manufacture, distribution, dispensation, possession, or use of any controlled substance or cannabis.

REV 5/05

809:4

(e) "Director" is the Executive Director of Parks and Recreation of the Sterling Park District.

(f) "District Property" means any building, park, gym, pool, office, common area, open space, vehicles, parking lot, or other area owned, leased, managed, used or controlled by the Park District. District Property also includes property used by District patrons while on District sponsored events of field trips or property of others when presence thereon by the District employee is related to employment with the District.

(g) "Drugs" means Legal Drugs and controlled substances, including cannabis.

(h) "Legal Drugs" mean prescription drugs and over-the-counter drugs which have been obtained legally and are being used in the manner and for the purpose for which they were prescribed or manufactured.

(i) "Medical Facility" means any physician, laboratory, clinic, hospital, or other similar entity.

(j) "Policy" means this Alcohol and Drug Abuse Policy of the Sterling Park District.

(k) "Possess" means to have either in or on an employee's person, personal effects, desk, files, or other similar area.

(l) "Public Safety Responsibility" means a position in which the nature of an employee's duties is such that impaired perception, reaction time, or judgment may place a member or members of the public or other employees at risk of serious bodily harm, or is responsible for the administration or enforcement of alcohol/drug policies.

(m) "Under the Influence" means that the employee is affected by alcohol or drugs in any determinable manner. A determination of being under the influence can be established by a professional opinion, a scientifically valid test, a layperson's opinion, or the statement of a witness.

REV 5/05

809:5

(4)    **VOLUNTARY TREATMENT**

It is the responsibility of each employee to seek assistance before alcohol or drug problems lead to disciplinary action. The District will not discipline an employee who voluntarily seeks treatment for a substance abuse problem if the employee is not in violation of the District's drug and alcohol policy or other rules of conduct. Seeking such assistance will not be a defense for violating the District's drug and alcohol policy, nor will it excuse or limit the employee's obligation to meet the District's policies, rules of conduct, and standards including, but not limited to, those regarding attendance, job performance, and safe and sober behavior on the job. Employees who suffer from alcohol and drug abuse are encouraged to consult voluntarily with District management and undergo appropriate medical treatment. Participation in such treatment will be at the employee's expense. Park District management will attempt to keep such voluntary discussions and medical treatment confidential in accordance with this Policy.

(5)    **SCREENING AND TESTING**

The District may require employees whose job functions require them to operate or maintain vehicles or machinery, handle hazardous or toxic materials or substances of any kind, or have Public Safety Responsibility to be screened or tested on a random basis, or may require any employee to be screened or tested following a work place accident involving a possible violation of safety rules, during and after an employee's participation in an alcohol or drug counseling or rehabilitation program, or upon reasonable suspicion that the employee is under the influence of alcohol or drugs. The screening or testing will be conducted by a medical facility selected by the District at the District's expense. The screening or testing may require an analysis of the employee's breath, urine and/or blood or such similar substance as the medical facility may recommend. Employees who undergo alcohol or drug screening or testing will be given the opportunity, prior to the collection of a specimen or other testing, to disclose the use of legal drugs and to explain the circumstance of their use. If an initial test is positive, a second test will be conducted from the same sample. A confirmed positive drug and/or alcohol test may result in disciplinary action, up to and including discharge.

Each District employee is required to sign a consent form, a copy of which is included with this Policy, at the time this Policy is distributed to the employee. Prospective employees applying for positions that require a

809:6

commercial driver's license will be required to sign a consent form prior to taking the pre-employment drug screening. Prospective employees for positions that require a pre-employment physical will be required to sign a consent form prior to taking the pre-employment physical.

Each employee and prospective employee may also be required to sign a separate consent form requested by the Medical Facility conducting the screening or testing. Refusal to sign any requested consent form will result in non-hire or disciplinary action up to and including dismissal, as deemed appropriate by the District, in its sole discretion, under the circumstances.

(6)    **TREATMENT**

If the medical facility recommends treatment, the District may, depending on the circumstances as determined in the sole discretion of the District, give the employee one opportunity to undergo treatment offered by a clinic or trained professional mutually acceptable to the District and employee.

Participation in such treatment will be at the employee's expense. The employee must enter the treatment program within ten (10) days from the time of recommendation of treatment. The District may reinstate the employee provided that the employee submits a statement issued by the medical facility certifying successful completion of the treatment program, that the employee is released to return to work, and that the employee agrees to all conditions of reinstatement as determined by the District, which may include, but is not limited to, future alcohol and/or drug testing.

(7)    **USE OF LEGAL DRUGS**

Any employee who operates or maintains a vehicle or machinery, handles hazardous materials or substances of any kind, or has public safety responsibility and who has taken a legal drug must report the use of such legal drug to their immediate supervisor if the legal drug may cause drowsiness or if it may alter judgment, perception, or reaction time. The burden is on the employee to ascertain from the employee's doctor or pharmacist whether or not the legal drug may have such a potential side effect. The information will be retained by the District in a confidential manner and will be disclosed only to persons who need to know. The employee's immediate supervisor, after conferring with the department

809:7

head or Director, will decide whether or not the employee may safely continue to perform the job while using the legal drug. Failure to declare the use of such legal drugs may be cause for discipline up to and including dismissal.

(8)    **NOTICE OF CONVICTIONS**

Any employee who is convicted of violating any federal or state criminal drug statute must notify the Director within five (5) days of such conviction. For purposes of this notice requirement, a conviction includes a finding a guilt, a no contest plea, and/or an imposition of sentence by any judicial body for any violation of a criminal statute involving the unlawful manufacture, distribution, sale, dispensation, possession or use of any controlled substance or cannabis. Failure to notify the Director may subject the employee to disciplinary action, up to and including dismissal.

(9)    **DISCIPLINE/PENALTIES FOR VIOLATION**

(a)    An employee who reports to work or is found during working hours to be or to have been under the influence of alcohol, controlled substances, or cannabis or who manufactures, possesses, uses, sells or dispenses alcohol, controlled substances, or cannabis while on District property or while acting on behalf of the District, is convicted of a drug related crime, causes financial or physical damage to the District property, its employees or patrons as the result of alcohol or drug abuse, or fails to report the use of legal drugs in accordance with this Policy, will be disciplined in accordance with the Disciplinary Action Section of the District's Personnel Policy Manual. In addition to or in the alternative, depending on the circumstances as determined by the District in its sole discretion, the District may require the employee to successfully complete an alcohol and/or drug abuse assistance or rehabilitation program approved for such purposes by the District and by a federal, state or local health law enforcement or other appropriate agency. An employee who participates in a treatment program will be expected to meet job performance standards and comply with all rules established by the District. Participation in a treatment program will not, in itself, protect the employee from disciplinary actions should job performance remain unsatisfactory.

REV 5/05

809:8

(b)   In addition to the examples of misconduct that may subject an employee to disciplinary action contained in this Policy and the Manual, the District will discipline an employee up to and including dismissal for the following:  (1) if the employee refuses to submit to diagnosis, testing or screening upon request of the District;  (2) if the employee tampers in any way with the specimen given to the medical facility for purposes of alcohol or drug screening or testing;  (3) if the medical facility recommends treatment and the employee refuses to undergo such treatment;  (4) if, while undergoing treatment, the employee fails or refuses to follow the course of treatment;  (5) if the employee, during the course of or following treatment, is again under the influence of alcohol or drugs in violation of this Policy; or  (6) if the employee fails to notify the Director of a conviction for violating any federal or state Criminal Drug Statute in accordance with the "Notice of Conviction" section of this policy.

(10)   **PRE-EMPLOYMENT SCREENING**

As a final prerequisite  in the District's employment selection procedure, persons otherwise offered a full-time, labor intensive position with the Park District will be required to undertake a physical examination which may include a drug and alcohol screening test.

(11)   **INSPECTIONS**

In order to assure that employees comply with the prohibition on manufacturing, distributing, dispensing, possessing, or using alcohol, controlled substances, or cannabis, employees may be subject to inspection as follow:

(a)   Lockers, desks, files, vehicles, equipment and other containers and property owned or leased by the District and which an employee is permitted to use during employment with the District, are and remain the property of the District.  Employees are not permitted to keep controlled substances, cannabis or alcohol in or on such property.  Any such property reasonably suspected of having or holding such substances is subject to search by the District.

(b)   Any refusal to submit to such an inspection will be treated as an act of insubordination and may result in disciplinary action, up to and including dismissal.

809:9

(12)    **RECORDS**

The District will maintain medical records relating to alcohol or drug abuse, diagnosis, and treatment confidential and in a file separate from the regular personnel files. Access will be limited to those who need to know. The District will not disclose these records to persons outside the District without the employee's consent unless disclosure of the records is necessary for legal or insurance purposes.

(13)    **CONSENT TO DRUG AND/OR ALCOHOL SCREENING OR TESTING FORM**

I hereby voluntarily consent to submit to drug/or alcohol screening or testing by a physician, clinic, laboratory or medical facility chosen by the Sterling Park District ("District") at the District's expense. I hereby consent to the physician, clinic, laboratory or medical facility taking and analyzing a sample or specimen of my breath, urine, saliva, blood and other similar substance. I also authorize the physician, clinic, laboratory or medical facility to disclose his, her or its findings, conclusions and opinions regarding the drug and/or alcohol screening or testing to a District official or a designated representative.

I hereby further consent to District's contacting my physician or pharmacist to verify my reported use of legal drugs in accordance with the Park District's Alcohol and Drug Abuse policy and authorize my physician or pharmacist to provide all information requested by the District regarding my use of such drugs, including without limitation the possible effects of such use on my performance of my job functions.

I also acknowledge receiving, reading and understanding the Park District's Alcohol and Drug Abuse Policy. I understand that, in accordance with this policy, failure to execute this document and submit to drug and/or alcohol screening or testing, or failure to report to the District the use of legal drugs as required by the policy, may result in non-hire or disciplinary action, up to and including termination.

Employee Name: _____

(Print)

Employee Signature: _____

Date: _____

Witness Signature: _____

REV 5/05

810:1

## ALCOHOL AND DRUG PROCEDURES FOR CDL EMPLOYEES

**Policy:**

In an effort to promote public safety and to help prevent accidents and injuries in the U.S. Department of Transportation (D.O.T.) instituted regulations that establish a zero tolerance level for the presence of alcohol or controlled substances in the system of any individual who operates or maintains a commercial class vehicle. The regulations establish testing requirements to help ensure compliance with the alcohol and controlled substance prohibitions. The controlled substances prohibited by the D.O.T. regulations are: Marijuana, Cocaine, Opiates, Amphetamines, and Phencyclidine (PCP). The following procedures have been developed to implement the D.O.T. regulations which can be found in 49 CFR Parts 40 and 382. The numbers inside the parentheses appearing in many of the sections refer to 49 CFR Part 40 or 382 sections relevant to the particular procedure. Employees who violate this policy are subject to disciplinary action, up to and including discharge.

**Comment:**

(1)     Adverse Effects of Alcohol and Drug Use

Unlawful use of drugs and alcohol poses a number of risks. Alcohol and drug abuse can lead to a number of health problems, such as lung cancer, obstructive pulmonary disease, chronic respiratory infections, liver disease, high blood pressure, cardiac disease, and seizures. Drug users are at an increased risk for AIDS and hepatitis.

The impairments drugs cause mean users (and their nearby co-workers) suffer more accidental injuries and motor vehicle accidents. Drugs can also rob the user of his or her ability to place for and reach long-term goals, to deal constructively with stress and anxiety, or to have successful and satisfying friendships and family relationships. Because drug use is unlawful, lives can be ruined when users are arrested, jailed or injured by drug-related violence.

(2)     Affected Employees
(a)     The following employees are subject to these alcohol and drug procedures, restrictions, and requirements: All employees who are required to have a valid CDL drivers license as a condition of employment and operate a commercial vehicle for the Sterling Park District. This includes full-time and part-time employees.

Rev 5/05

810:2

    (b)    The above employees are subject to these procedures and regulations at all times while on duty including all overtime and call back time. An exception may be made by the Director to exempt an employee from alcohol use restrictions if the employee is attending off site training and is not expected to return to duty for the remainder of the day.

(3)    Employee Requirements (382.201 to .215):

To meet the D.O.T. regulations, the following requirements are placed upon affected employees. Exceptions to these requirements may be made by the Director in making temporary work assignments for employees.

    (a)    Affected employees will not consume any product containing alcohol or controlled substances while on duty.

    (b)    Affected employees will not report for duty while there is any alcohol or controlled substance in their system (unless the use is pursuant to the instruction of a physician who has been informed of the affected employee's job duties, and has advised the affected employee that the substance does not adversely affect his/her ability to safely perform his/her job.

    (c)    Affected employees will not possess any product containing alcohol or controlled substances while on duty.

    (d)    Affected employees cannot report for duty within four hours of having consumed alcohol and may not perform safety-sensitive functions (this includes but is not limited to operating motor vehicles or equipment) within four hours after using alcohol.

    (e)    Affected employees must immediately report for testing when so ordered, and must cooperate with testing personnel and procedures.

    (f)    Affected employees must agree to release testing results to the District and to the substance abuse professional (S.A.P.), and to release the substance abuse professional's report to the District.

    (g)    Affected employees cannot consume alcohol for eight hours following an accident involving a death or an accident for which the employee receiving a moving violation for their operation of a commercial class vehicle which contributed to the accident or until the employee undergoes a post-accident or controlled substance

810:3

test, whichever occurs first. The employee must remain available for testing for a period of eight hours for an alcohol test or 72 hours for a controlled substance test.

(4)   Tests Performed:

Detailed descriptions of the testing procedures are contained in 49 CFR Part 40 and Part 382. A brief description of the testing procedure follows.

(a)   Alcohol Test

1.   Employee immediately reports to the designated testing facility, shows a photo identification card, and signs testing form.

2.   Employee blows into alcohol testing device. If employee cannot exhale sufficient quality of air through the machine for a complete test a medical exam will be performed.

3.   If test results are negative the employee returns to work. Results will be reported to the Director.

4.   If test results are positive, another test will be performed after a 15-minute wait but before 20 minutes. The employee may not eat or drink anything nor belch during the waiting period for the retest.

5.   If retest results are negative, test is reported to the Director as negative.

6.   If retest results are positive, the test results are immediately reported to the Director.

(b)   Controlled Substances Test: Testing will only be performed for the five controlled substances prohibited by the D.O.T. regs – Marijuana, Cocaine, Opiates, Amphetamines, and Phencyclidine.

1.   Employee immediately reports to the designated testing facility, shows a photo identification card, and signs the testing form.

810:4

2.  Employee provides a urine sample. If unable to provide sufficient quantity for testing, the employee will be asked to drink water (up to 24 oz. in two hours) and attempted again.

3.  Hospital personnel will perform required testing to verify that the specimen sample has not been tampered with. The employee returns to work.

4.  Sample is sent to Lab where it is split in half. A screening test is performed on a portion of one of the sample splits. If negative results are obtained the testing is reported as negative to the medical review officer (M.R.O.) who in turn reports negative results to the Director.

5.  If screening tests are positive, sophisticated confirmation testing is performed on the rest of the split sample. Results are reported to the M.R.O. If negative the M.R.O. reports a negative result to the Director.

6.  If the results are positive, confirming the presence of one of the five controlled substances, the M.R.O. will contact the employee to talk over the results of the test to determine if there is a legitimate clinical reason for the presence of the drug, and will decide if test results are negative or positive.

    If the employee cannot be reached by the M.R.O., the Director will be contacted to tell the employee to contact the M.R.O. If contact is not made in 72 hours the M.R.O. will determine the test results as positive. The M.R.O. reports to the Director test results as positive or negative.

7.  If test results are positive, the employee will be removed from duties of operating or maintaining a commercial class vehicle. The employee has 72 hours in which to request a retest of the second split sample, and can request that the split sample be tested at a second lab. A negative retest of the split sample will cancel the first positive results.

810:5

(5)     Six circumstances under which testing will be performed:

(a)     Pre-employment Testing (382.301,.413)

1.     Before a new employee is hired or before an existing employee may be transferred to a position in which operating or maintaining a commercial class vehicle is required, both alcohol and controlled substance testing is required.

2.     If an employee has not been in a random testing pool for one month, then alcohol and controlled substance testing must be performed before the employee may operate or maintain a commercial class vehicle.

3.     Alcohol test results must be below 0.04 and controlled substances negative or the employee cannot be hired to the position without a substance abuse professional evaluation. There is no requirement that the prospective employee be hired or that they see the M.R.O. or S.A.P., but an attempt must be made to inform the prospective employee of the test results and to seek an evaluation.

4.     In addition to submitting to testing, the prospective employee must supply the District with the names of all firms for which they have been employed in the previous two years operating or maintaining commercial class vehicles. The prospective employee must cooperate fully with the District in obtaining from each of the previous employer's results of any positive test, S.A.P.'s reports, and any refusals to test.

(b)     Random Testing (382.305)

1.     All affected employees will be placed in pool from which random selections for testing will be made. Random testing will be both alcohol and controlled substances.

2.     The annual rate of testing for the entire pool will be as directed by the U.S. Secretary of Transportation, currently 10% per year for alcohol and 50% per year for illegal drugs.

810:6

3.  Every employee in the selection pool has an equal chance of being selected each time a drawing is made.

4.  Selection for testing will be performed on a sufficiently random basis by the Consortium.  Employees will not know when testing is complete for the year nor when to anticipate the next selection.

5.  A surplus of names will be generated so that another selection may be made in place of an employee who is temporarily on leave.

(c)  Reasonable Suspicion Testing (382.307)

1.  When a supervisor has reason to believe that an employee has alcohol or controlled substances in their system they contact another maintenance supervisor ( or equally trained supervisor) who will also observe the employee.  If both supervisors are in agreement, the employee will be driven to the designated testing facility for alcohol or controlled substances testing as appropriate.

2.  The supervisor's determination must be based upon specific, describable, current observations of the employee's appearance, behavior, speech or body odor.  Possession alone is not sufficient cause to require the employee to submit to testing.

3.  When a reasonable suspicion determination has been made, the employee must immediately stop operation or maintenance of a commercial class vehicle.  (For 24 hours or until a negative test result whichever comes first.)

4.  The employee will be informed of his or her right to consent or refuse testing, and the consequences of refusing testing or failing an alcohol or drug test.  The employee will be asked to review and sign a Consent/Refusal Form.

5.  The supervisor calls the designated testing facility to advise that the employee will be reporting for the testing.  The employee under suspicion must be accompanied to the testing facility, preferably by a supervisor.

810:7

6.    If an employee refuses to submit to a test, he will be required to call someone to drive him home. If unable to find someone, a cab will be called. The District will pay for the cab with reimbursement by the employee when he returns to work. If the employee insists on driving himself, the local Police Department will be called and notified.

7.    Testing for alcohol reasonable suspicion should be performed within two hours, but cannot be conducted if eight hours have passed since the determination was made. A written report must be submitted to the Director for the file explaining why testing was not performed within two hours. Controlled substances testing should be performed as soon as possible but not after 32 hours since the determination was made.

8.    The supervisor(s) making the determination must submit a signed written description citing the specific observations which led to the reasonable suspicion testing. The written description should be submitted before the test results have been received.

(d)    Post Accident Testing (382.303)

1.    A surviving driver of a commercial class vehicle involved in an accident in which a death occurred or for which the driver received a ticket for the operation of their commercial vehicle have contributed to the accident, will be tested for both alcohol and controlled substances.

2.    The driver will remain readily available for testing after an accident until 32 hours have passed or earlier if a supervisor advises that testing will not be necessary.

3.    A driver cannot consume any alcohol within eight hours following an accident unless a supervisor advises that no testing will be required or testing has already been performed.

4.    If a death occurs or a driving citation is issued, alcohol testing will be performed within two hours but no testing after eight hours, and controlled substance testing within 32 hours. A written record must be submitted to file

Rev 5/05

810:8

explaining why alcohol testing could not be performed within two hours if such is the case and a record if either testing could not be performed.

(e)    Return to Duty Testing (382.309):  Alcohol and controlled substances testing will be performed with negative test results (less than 0.02 alcohol) on all affected employees who:

1.    Have been removed from duty of operating or maintaining a commercial class vehicle for refusing to test or testing positive for controlled substances or alcohol greater than 0.04.  Employee will be responsible for all costs associated with this classification of return to duty testing or

2.    Have not been in a random testing pool for more than 30 days.  (Employees who have been on extended leave).

(f)    Follow-Up Testing (382.311,.605)

1.    Any affected employee who has refused to test or who has tested positive for controlled substances or greater than 0.04 alcohol content and has been determined by a substance abuse professional to require help in dealing with their substance abuses problem will be subject to follow up testing.

2.    The Director will order the affected employee to immediately report for surprise alcohol or controlled substance (or both) testing at the frequency prescribed by the substance abuse professional.  The Director will advise the S.A.P. of the test results.  The duration of surprise testing will continue as long as required by the S.A.P. to a maximum of five years.

3.    At a minimum, six unannounced tests will be required within the first 12 months of return to duty.  This minimum must be conducted regardless of whether the S.A.P. deems no more testing is required.

4.    Employee is responsible for all costs associated with follow-up testing.

810:9

(6)    Consequence of failed or refused tests (382.605)

    (a)    An employee will be immediately removed from duty upon the employee's refusal to cooperate with testing procedures or upon receipt of positive test results. Employees who refuse to submit to testing or fail an alcohol or drug test are subject to disciplinary action, up to and including discharge.

    (b)    The employee selects a substance abuse professional (S.A.P.). The employee is responsible for payment to the substance abuse professional and subsequent counseling and rehabilitation. The employee's medical insurance may be used to help pay for these services. A list of S.A.P.'s will be provided the employee, however, the employee is free to choose any certified S.A.P.

    (c)    The employee signs a release allowing the Park District to release the test results to the S.A.P. and signs a release for the S.A.P. to report back to the Director.

    (d)    The S.A.P. will report back to the Director that the employee:

        1.    Does not require any help in dealing with a substance abuse problem – in which case the employee may be returned to full duty.

        2.    That the employee requires and is cooperating with continued counseling and rehabilitation and may return to full duty, or may not return to full duty yet.

        3.    That the employee requires but is not cooperating with counseling and rehabilitation and may not return to duty.

    (e)    The employee is responsible for obtaining any counseling or rehabilitation prescribed the S.A.P. and must provide appropriate releases for counseling and rehabilitation professionals to report back to the S.A.P. Employees are advised that the U.S. D.O.T. regulations require that the additional counseling and rehabilitation not be performed by any business entity in which the S.A.P. has a financial interest.

Rev 5/05

810:10

    (f)    When the S.A.P. reports to the Director that the employee may return to full duty of operating and maintaining commercial class vehicles the employee must:

        1.    Test negative in return to duty alcohol or controlled substances testing (or both tests if so indicated by the S.A.P.)

        2.    Continue with any rehabilitation therapy if so prescribed by the S.A.P.

        3.    Test negative in unannounced follow-up testing as prescribed by the S.A.P. or at a minimum, six tests in the first 12 months of returning to duty as ordered by the Director.

(7)    Required Training

    (a)    All affected employees will be informed of the new D.O.T. regulations and these policies and procedures to implement the regulations.

    (b)    All supervisory personnel will receive training in recognizing physical signs of alcohol misuse and controlled substance use prior to any employee being ordered to submit to reasonable suspicion testing by that supervisor. Sixty minutes of training for alcohol misuse recognition and 60 minutes of training for controlled substance use recognition is required.

    (c)    All new employees and newly transferred employees to affected positions will receive training prior to operating or maintaining a commercial class vehicle. All newly hired supervisory personnel will receive 60 minutes of alcohol misuse recognition training and 60 minutes of controlled substances use training prior to their requiring any employee to submit to reasonable suspicion testing.

    (d)    All employees will sign a receipt that they attended the training. The receipt will be kept in Park District records.

Rev 5/05

811:1

## USE OF DISTRICT COMPUTER SYSTEMS

**Policy:**

It is the policy of the District that the use of its computers and software is limited to solely to appropriate business use. Except as otherwise provided below, employees are not allowed to use the computer system for their personal benefit. Employees are strictly forbidden from installing software on the system. Further, this policy reaffirms that the District's employees have no reasonable expectation of privacy with respect to any computer hardware, software, electronic mail or other computer or electronic means of communication or storage, whether or not the employees have private access or an entry code into the computer system. The District reserves the right to monitor the use of its computer system.

**Comment:**

(1)     Subject to approval from the employee's department head, an employee's occasional use of District computer facilities for personal use and outside projects may be acceptable. However, in order to keep these uses to a reasonable level, approval to use the system in such a manner must be given by the employee's department head. Moreover, please be aware that the District may purge files on its computer at any time, without notice. The District is not responsible for any personal files or outside project files that may be purged or lost.

The use of the system for such personal efforts must occur outside of the employee's working time, and any files created are to be deleted at the end of the project or personal use. Also, because of the normal heavy load on the system, personal use and outside projects will not receive priority over operational requirements, system maintenance, or file back up.

Rev 5/05

812:1

## INTERNET USE POLICY

**Policy:**

Although the District recognizes that the Internet may have useful applications to the District's business, employees may not engage in Internet use without prior written approval from the employee's department head or Director, and unless a specific business purpose requires such use. Absent such approval, employees may not access the Internet using the Park District's computer systems, at any time for any reason. "Surfing the Net" is not a legitimate business activity.

Management approval is required before anyone can post any information on commercial on-line systems or the Internet. Any approved material that is posted should obtain all proper copyright and trademark notices. Absent prior approval from the District to act as an official representative of the District, employees posting information must include a disclaimer in that information stating:

> *"Views expressed by the author do not necessarily represent those of the Sterling Park District."*

Certain employees may be provided with access to the Internet to assist them in performing their jobs. The Internet can be a valuable source of information and research. In addition, E-mail can provide excellent means of communicating with other employees, our patrons, outside vendors, and other business. Use of the Internet, however, must be tempered with common sense and good judgment.

If you abuse your right to use the Internet, it will be taken away from you. In addition, you may be subject to disciplinary action, including possible termination, and civil and criminal liability.

Your use of the Internet is governed by this policy and the E-mail Policy.

**Comment:**

(1)     The District is not responsible for material viewed or downloaded by users from the Internet. The Internet is a worldwide network of computers that contain millions of pages of information. Users are cautioned that many of these pages include offensive, sexually explicit, and inappropriate material. In general, it is difficult to avoid at least some contact with this

Rev 5/05

812:2

material while using the Internet. Even innocuous search requests may lead to sites with highly offensive content. In addition, having an e-mail address on the Internet may lead to receipt of unsolicited e-mail containing offensive conduct. Users accessing the Internet do so at their own risk.

(2)   Employees must not deliberately perform acts that waste computer resources or unfairly monopolize resources to the exclusion of others. These acts include, but are not limited to, sending mass mailings or chain letters, spending excessive amounts of time on the Internet, playing games, engaging in online chat groups, printing multiple copies of documents, or otherwise creating unnecessary network traffic. Because audio, video and picture files require significant storage space, files of this or any other sort may not be downloaded unless they are business-related.

(3)   The computers and computer accounts given to employees are to assist them in performance of their jobs. Employees should not have an expectation of privacy in anything they create, store, send, or receive on the computer system. The computer system belongs to the District and may only be used for business purposes.

(4)   The District has the right, but not the duty, to monitor any and all of the aspects of its computer system, including, but not limited to, monitoring sites visited by employees on the Internet, monitoring chat groups and news groups, reviewing material downloaded or uploaded by users to the Internet, and reviewing e-mail sent and received by users.

(5)   The District may use software to identify inappropriate or sexually explicit Internet sites. Such sites may be blocked from access by District networks. In the event you nonetheless encounter inappropriate or sexually explicit material while browsing on the Internet, immediately disconnect from the site, regardless of whether the site was subject to District blocking software.

(6)   Material that is fraudulent, harassing, embarrassing, sexually explicit, profane, obscene, intimidating, defamatory, or otherwise unlawful, inappropriate, offensive (including offensive material concerning sex, race, color, national origin, religion, age, disability, or other characteristic protected by law), or violative of the District's equal employment opportunity policy and its policies against sexual or other harassment may not be downloaded from the Internet or displayed or stored in the District's computers. Employees encountering or receiving this kind of

Rev 5/05

812:3

material should immediately report the incident to their immediate supervisors of the Business Office. The District's equal employment opportunity policy and its policies against sexual or other harassment apply fully to the use of the Internet and any violation of those policies is grounds for discipline up to and including discharge.

(7)     Employees may not use the District's Internet connection to download games or other entertainment software, including wallpaper and screen savers, or to play games over the Internet.

(8)     Employees may not illegally copy material protected under copyright law or make that material available to others for copying. You are responsible for complying with copyright law and applicable licenses that may apply to software, files, graphics, documents, messages, and other material you wish to download or copy. You may not agree to a license or download any material for which a registration fee is charged without first obtaining the express written permission of your department head or Director.

(9)     To ensure security and to avoid the spread of viruses, employees accessing the Internet through a computer attached to the District's network must do so through an approved Internet firewall. Accessing the Internet directly by modem is strictly prohibited unless the computer you are using is not connected to the District's network.

(10)    Files obtained from sources outside the District, including disks brought from home; files downloaded from the Internet, newsgroups, bulletin boards, or other online services; files attached to e-mail; and files provided by customers or vendors may contain dangerous computer viruses that may damage the District's computer network. Employees should never download files from the Internet, accept e-mail attachments from outsiders, or use disks from non-District sources, without first scanning the material with District-approved virus checking software. If you suspect that a virus has been introduced into District's network, notify the Director immediately.

(11)    Without the express permission of their immediate supervisors, employees may not send unsolicited e-mail to persons with whom they do not have a prior relationship.

(12)    As with all District policies, this policy may be amended or revised from time to time as the need arises. Users will be provided with copies of all amendments and revisions.

Rev 5/05

812:4

Violations of this policy will be taken seriously and may result in disciplinary action, including possible termination, and civil and criminal liability.

Use of the Internet via the District's computer system constitutes consent by the user to all of the terms and conditions of this policy.

813:1

## TAPE RECORDING POLICY

**Policy:**

It is a violation of District policy to record conversations with a tape recorder or other recording device unless prior approval is received from your department head or all parties to the conversation give their consent.

The purpose of this policy is to eliminate a chilling effect on the expression of views that may exist when one person is concerned that his conversation with another is being secretly recorded. This concern can inhibit spontaneous and honest dialogue especially when sensitive or confidential matters are being discussed.

Violation of this policy will result in disciplinary action, up to and including immediate termination.

814:1

## CHILDREN IN THE WORKPLACE

**Policy:**

The presence of children in the workplace with the employee parent during the employee's workday is inappropriate and is to be avoided except in extra-ordinary emergency situations. This policy is established to avoid disruptions and distractions in job duties of the employee and co-workers, reduce property and general liability, and help maintain the company's professional work environment.

**Comment:**

1.    Childcare is the personal responsibility of the employee and it is the further responsibility of the employee to prearrange for childcare in the event of an emergency. Bringing a child to work with the employee is only an option when all other emergency options have been exhausted.

2.    If bringing a child to work with the employee is unavoidable, the employee must contact his/her supervisor as soon as possible to discuss the situation and obtain permission to have the child accompany the employee while working. Factors the supervisors will consider are the age of the child, how long the child needs to be present, the work environment in the employee's area, and any possible disruption to the employee's and co-workers' work. Consideration will not be given to allowing a child with an illness to come to work with the employee.

3.    A child brought to the workplace in unavoidable situations will be the responsibility of the employee parent and must be accompanied and be under the direct supervision of the employee parent at all times. Excessive need to bring a child to the workplace may result in discipline, including terminations.

Rev 11/05

9

901:1

PERSONNEL RECORDS

Policy:

It is the policy of the District to maintain personnel records for applicants, employees, and past employees in order to document employment-related decisions, evaluate and assess policies and comply with government recordkeeping and reporting requirements.

Comment:

(1)  The District strives to balance its need to obtain, use, and retain employment information with each individual's right to privacy.  To this end, it attempts to restrict the personnel information maintained to that which is necessary for the conduct of its business or which is required by federal, state or local law.

(2)  The Director is responsible for overseeing the recordkeeping for all personnel information and will specify what information should be collected and how it should be stored and secured.

(3)  Employees have a responsibility to make sure their personnel records are up to date and should notify the Administration Office in writing of any changes in at least the following:

(a)  Name;

(b)  Address;

(c)  Telephone number;

(d)  Marital status (for benefits and tax withholding purposes - new W-4 form needed);

(e)  Number of dependents (new W-4 form needed);

(f)  Addresses and telephone numbers of dependents and spouse or former spouse (for insurance purposes only);

(g)  Beneficiary designations for any of the District's insurance, disability, and pension plans (new forms must be signed);

(h)  Person(s) to be notified in case of emergency; and

REV 10/96

901:2

(i)  Any additional amount to be withheld from their pay-
     roll check for federal or state taxes (must complete a
     new W-4 form).

(4)  Employees may inspect their own personnel records and may
     copy, but not remove, documents in the file.  Records deemed
     confidential or sensitive may be excluded from the inspection
     and all inspections must be scheduled at a mutually convenient
     time with the Administrative Assistant or Executive Secretary.

(5)  Only supervisory and management personnel who have an employ-
     ment-related need-to-know for information about another em-
     ployee may inspect the files of that employee.  Such an in-
     spection of files will be approved by the Director.

(6)  The Administration Office will only release personnel infor-
     mation which is general, such as employment dates and position
     held.  The release of any other personnel information will
     only be given after obtaining the written consent of the em-
     ployee involved.

(7)  The Director will field all questions pertaining to personal
     information and job references.

(8)  All employees, full-time, part-time and seasonal, along with
     their supervisor, are required to fill out a Personnel Infor-
     mation and Check List Form.  Please see the following two
     pages:

     a)  Form 901:3 - to be used for full-time personnel; and

     b)  Form 901:4 - to be used for part-time and seasonal
                      personnel.

REV 10/96

901:3

# PERSONNEL INFORMATION AND CHECK LIST FORM

NAME _____ DATE OF BIRTH _____

ADDRESS _____

PHONE _____

DATE OF HIRE _____ TERMINATION DATE _____

POSITION _____ STARTING WAGE _____

CHECK LIST

| | |
|---|---|
| _____ | Employee Application/Resume On File |
| _____ | Conditional Job Offer On File |
| _____ | Criminal Background Results On File |
| _____ | Medical Examination Results On File |
| _____ | Drug Test Results On File |
| _____ | Functional Screening Results On File (if applicable) |
| _____ | I-9 Immigration Form On File |
| _____ | W-4 Forms On File |
| _____ | Copy of Current Driver's License On File |
| _____ | Drivers Abstract On File |
| _____ | Copy of Social Security Card On File |
| _____ | Received Copy of Personnel Policy Manual/Signed Acknowledgement |
| _____ | Received Copy of Job Description |
| _____ | Crisis Management Plan Acknowledgment |
| _____ | IMRF Forms |
| _____ | Dental Forms |
| _____ | Flex Account Forms |
| _____ | PEBSCO Forms |
| _____ | Life Insurance Forms |
| _____ | AFLAC Forms |
| _____ | PDRMA AD&D Forms |
| _____ | Signed Orientation Checklist On File |

PERSON TO NOTIFY IN CASE OF EMERGENCY _____

TELEPHONE NUMBER OF ABOVE _____

PERSON(S) AUTHORIZED TO PICK UP PAYROLL CHECK OTHER THAN EMPLOYEE:

_____

With the employee's signature affixed below, in addition to attesting the above information is correct, employment will be at-will.

_____        _____
SIGNATURE OF EMPLOYEE            DATE

_____        _____
S.P.D. AUTHORIZATION             DATE
REV 7/04

901:4

# PERSONNEL INFORMATION AND CHECK LIST FORM

## (PART-TIME)

NAME _____    DATE OF BIRTH _____

ADDRESS _____

PHONE _____

DATE OF HIRE _____    TERMINATION DATE _____

POSITION _____    STARTING WAGE _____

<u>CHECK LIST</u>

| | |
|---|---|
| _____ | Employee Application/Resume On File |
| _____ | Criminal Background Results On File |
| _____ | Functional Screening Results On File (if applicable) |
| _____ | I-9 Immigration Form On File |
| _____ | W-4 Forms On File |
| _____ | Copy of Current Driver's License On File |
| _____ | Drivers Abstract On File (if Applicable) |
| _____ | Copy of Social Security Card or Birth Certificate On File |
| _____ | Received Copy of Part-Time Personnel Policy Manual/Signed Acknowledgement |
| _____ | Received Copy of Job Description |
| _____ | Crisis Management Plan Acknowledgment |
| _____ | IMRF Forms (if Applicable) |
| _____ | Signed Orientation Checklist On File |

PERSON TO NOTIFY IN CASE OF EMERGENCY _____

TELEPHONE NUMBER OF ABOVE _____

PERSON(S) AUTHORIZED TO PICK UP PAYROLL CHECK OTHER THAN EMPLOYEE:

_____

With the employee's signature affixed below, in addition to attesting the above information is correct, employment will be at-will.

SIGNATURE OF EMPLOYEE _____    DATE _____

S.P.D. AUTHORIZATION _____    DATE _____

REV 7/04

902:1

PARTICIPATION IN COMMUNITY AFFAIRS

Policy:

It is the policy of the District to encourage employees to participate in the community service affairs of charitable, educational, religious, fraternal and civic organizations.

Comment:

(1)  Employee participation in community activities must not adversely affect the employee's job performance, be detrimental to the District's interests or place the employee in the position of serving conflicting interests.

(2)  Time spent on community affairs, when not undertaken at the request of the District, should normally be outside of the employee's regular working hours and, therefore, will not be considered hours of work for pay purposes.

(3)  Reimbursement for the expenses or fees involved in community activities will be handled in accordance with the provisions of MEMBERSHIPS IN CLUBS AND CIVIC ORGANIZATIONS.

(4)  The District may identify certain community activities in which it wants to be represented and then designate the employees it will sponsor for participation or membership in such organizations.  Employees so designated will represent the District in the organization/activity and will be expected to promote the District's interests.  Under these circumstances, time spent on the community activity will be considered hours worked for pay purposes.

(5)  Any public communication which might be considered as representing the District's position must be approved in advance by the Director.  Employees are not to discuss internal confidential affairs in any public forum.

(6)  The District does not make contributions or expenditures in connection with any election to political office or in connection with any primary election, political convention, or caucus held to select candidates for political office.

(7)  Employees planning to campaign for, seek, or accept appointment to public office must give prior notice of their intentions to the Director.  The Director will review the District's requirements to avoid conflicts of interest and to maintain

902:2

satisfactory attendance, effort and performance standards.
Employees engaging in political activities must do so as in-
dividuals on their own time, never as representatives of the
District, and may make no representations otherwise.  Please
see POLITICAL ACTIVITIES.

903:1

# GRIEVANCE PROCESS & PROCEDURE

**Policy:**

Any employee who has a grievance arising from his employment with the District is encouraged to attempt to resolve problems with the person(s) involved. If that is unsuccessful or if, for any reason, you feel uncomfortable discussing the problem with the person(s) involved, you may use the grievance procedure:

(1)     You may present a grievance to your immediate supervisor. Your immediate supervisor will meet with you and give you a response within three (3) working days of discussing the grievance with you. In most cases, the problem can and should be resolved with a frank and open discussion between you and your immediate supervisor. However, if a satisfactory resolution is not reached at this level, you may proceed to step 2.

   (a)     If you feel uncomfortable discussing your grievance with your immediate supervisor you may immediately proceed to step 2. In all cases, the Executive Director's decision will be final.

(2)     You may present a written grievance to the supervisor at the succeeding level of authority in your department. The supervisor will investigate the matter, discuss the matter with you and your immediate supervisor and should give you a written response within three (3) working days of discussing the grievance with you. If you are not satisfied with the resolution at this stage, you may continue this process through each succeeding level of authority in your department up to the Executive Director. In the event it is necessary for you to process your grievance up to the Executive Director, the Executive Director should issue a written decision within ten (10) working days of discussing the grievance with you unless investigation requires a longer period of time. Any decision of the Executive Director is final and not subject to further review.

(3)     Division Directors may by-pass steps 1 and 2 and take their grievance directly to the Board of Commissioners. A decision will be rendered by the Board within (10) working days and will be in written form.

(4)     This grievance procedure does not apply to performance evaluations, suspensions, dismissals or other disciplinary actions which may be reviewed in accordance with Section 801:1.

REV 11/05

903:2

(5)    The District will not discriminate or retaliate against an employee if the employee, in good faith, processes a grievance through this procedure or, in good faith, testifies, assists or participates in a grievance procedure investigation.  A copy of all correspondence relating to the grievance will be placed in the employee's personnel file.

904:1

POLITICAL ACTIVITIES

Policy:

It is the policy of the District that employees may be involved with political activities as long as they do not occur during regularly scheduled working hours and subject to the following guidelines:

Comment:

(1)  Employees may take an active part in the campaign of, or make contributions or donations to, any candidate in a Park District election.

(2)  Employees may sign petitions, seek signatures, work at the polls or distribute badges, pamphlets or handbills for any candidate for election to a Park District office.

(3)  The support or promotion of any political activities or interests by District personnel during working hours with Park District resources is strictly prohibited.  "Working time" is defined to mean that portion of any work day that you are scheduled to perform job duties for the District.

(4)  Employees may not participate in political activities while in Park District uniform or clothing identifying the employee as a Park District employee.

REV 9/95

905:1

MEETINGS

Policy:

It is the policy of the District that staff members may be required or asked to attend meetings.

Comment:

(1) A voluntary annual meeting of all full-time employees will take place to discuss matters of mutual interest to the District and its employees. The Director shall chair the meeting which will be held during the normal work week but may be held outside of normal work hours. No pay or compensatory time off will be granted.

(2) Each department, facility or program area may hold staff meetings for full-time, part-time and/or seasonal employees. At the discretion of the supervisor, some of these meetings may be mandatory. In this case, employees will be paid for attending the meeting. All other meetings will be considered voluntary and employees will not be paid for attending.

(3) The Director may, at his discretion, request employees to attend board meetings to make reports, engage in discussion or participate in such other manner as the Director may deem necessary without additional compensation or compensatory time off.

(4) All employees are welcome to attend any public or open meeting of the Park District Board of Commissioners if prior notification is given to the Director.

(5) Employees wishing to address the Board shall submit such requests to the Director who in turn shall consider such written requests in accordance with the provisions of the Open Meetings Act.

REV 9/95

10

## STERLING PARK DISTRICT
## EMPLOYEES' FACILITY BENEFITS

Employees of the Sterling Park District may receive benefits at various facilities, programs or special events. Restrictions do apply, so please read the following carefully. If you have any questions please ask your immediate supervisor or call the Administration Office.

### DUIS CENTER

Gym/Swimming Pool

| | |
|---|---|
| Full-time | Available during public hours at no charge to employee, immediate family, and one guest per employee and one guest per family member. |
| Part-time/ Seasonal | Available during public hours at no charge to employee only. |

Court Rentals

| | |
|---|---|
| Full-time | (Same as Westwood) |
| Part-time/ Seasonal | (Same as Westwood) |

### LAWRENCE PARK

Swimming Pool

| | |
|---|---|
| Full-time | (Same as Duis Center) |
| Part-time/ Seasonal | (Same as Duis Center) |

### OPPOLD MARINA

Paddle Boats, Rowboats, Canoes

| | |
|---|---|
| Full-time | Available at no charge during non-holiday weekends to employee, immediate family, and one guest per employee and one guest per family member. |
| Part-time/ Seasonal | Available at no charge during non-holiday weekdays to employee only. |

REV 11/05

**WESTWOOD**

<u>Court Rentals and Batting Cage Rentals</u>

Full-time | Available at no charge during public hours to employee, their immediate family, and one guest per employee and one guest per family member.

Part-time/
Seasonal | No privileges.

<u>Weight Room, Track Building</u>

Full-time | Available to employee, immediate family, and one guest per employee and one guest per family member.

Part-time/
Seasonal | Available to employee only at no charge during public hours.

**PROGRAMS/SPECIAL EVENTS**

Full-time | Available during public hours at no charge to employee and immediate family.  Please see your immediate supervisor as some restrictions may apply.

Part-time/
Seasonal | No privileges

**EMERALD HILL GOLF COURSE AND LEARNING CENTER**

<u>Golf Course</u>

Full-time | Available at no charge during public hours to employee, immediate family, and one guest per employee and one guest per family member on a non-tee time basis.

Part-time/
Seasonal | Available at no charge to employee only on a non-tee time basis.

<u>Driving Range</u>

Full-time | Available to employee, immediate family, and one guest per employee and one guest per family member at no charge during public hours, based upon availability.  Two token limit per day per family member.

Part-time/
Seasonal | Limited use to employee only during public hours at no charge, based upon availability.  One token limit per day.

Golf Carts

| | |
|---|---|
| Full-time | Available at no charge to employee, immediate family, and one guest per employee and one guest per family member during public hours on a non-tee time basis. |
| Part-time/ Seasonal | Available for $7.00 for eighteen (18) holes and $5.00 for nine (9) holes at the discretion of the Golf Pro/Facility Supervisor. Non-employee passengers pay regular ½ cart fees. |

## DILLON HOME MUSEUM

| | |
|---|---|
| Full-time | Available during public hours at no charge to the employee, immediate family, and one guest per employee and one guest per family member. |
| Part-time/ Seasonal | Available to employee only at no charge during public hours. |

## GENERAL INFORMATION

| | |
|---|---|
| * RESIDENT DESIGNATION: | All employees will be treated as a Sterling Township resident when fees are assessed. |
| * IMMEDIATE FAMILY: | Includes employee, spouse, any member of employee's family living in the same household under the age of 18, and any full-time college student up to the maximum age of 23 whose principal address is that of the employee. |
| * IDENTIFICATION: | Passes will be issued to full-time employees and their immediate family only. These people should be prepared to identify themselves by using their staff pass, if requested. |
| | Upon termination of employment with the Sterling Park District, the employee's staff pass, along with their immediate family member's passes, will become void and all passes must be returned. |
| | Part-time/Seasonal employees will not receive staff passes. These employees will receive benefits if their name appears on a payroll list distributed bi-weekly by the payroll department. |
| * WAIVERS: | All employees, immediate family members, and guest(s) will be required to sign a waiver prior to receiving their staff pass, prior to participating in any District program, or prior to using any District facility. |
| * GUESTS: | All guests must be accompanied by the full-time employee or an employee's immediate family member in the same activity or use at the particular facility. |
| * SECTION 512:1 | Please refer to Section 512:1 of our Personnel Policy Manual for additional information. |

**REV 11/05**

Westlaw.

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 1528255 (N.D.Ill.)
**2005 WL 1528255 (N.D.Ill.)**

**C**Palmer v. Great Dane Trailers
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
Kristine M. PALMER, Plaintiff,
v.
GREAT DANE TRAILERS, a Division of Great Dane Limited Partnership, Defendant.
**No. 05 C 1410.**

June 28, 2005.

Robert H. Muriel, Edward George Renner, Muriel Renner LLC, Chicago, IL, for Plaintiff.
David N. Michael, Gould & Ratner, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

ST. EVE, J.
**\*1** Plaintiff Kristine M. Palmer ("Palmer") sued Great Dane Trailers, a division of Great Dane Limited Partnership ("GDLP") alleging that GDLP: (1) failed to comply with and willfully violated the Fair Labor Standards Act, 29 U.S.C. § 201 (2005), *et seq.,* ("FLSA"), (2) breached the Illinois Minimum Wage Law, 820 Ill. Comp. Stat. 105/1 (2005), *et seq;* ("IMWL"), and (3) violated the Illinois Wage Payment and Collection Act, 820 Ill. Comp. Stat. 115/1 (2005), *et seq.,* ("IWPCA"). GDLP moves to strike the statutory penalty remedy sought by Palmer under the IMWL count and to dismiss the IWPCA claim. The Court grants GDLP's motion.

LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint, not the merits of the case. *Triad Assoc., Inc. v. Chicago Hous. Auth.,* 892 F.2d 583, 586 (7th Cir.1989). The Court will only grant a motion to dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Centers v. Centennial Mortgage, Inc.,* 398 F.3d 930, 933 (7th Cir.2005) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). When determining a motion to dismiss, a court is restricted to reviewing the pleadings, which consist of the complaint, any attached exhibits, and the supporting briefs. *See Thompson v. Illinois Dept. of Prof'l Regulation,* 300 F.3d 750, 753 (7th Cir.2002).

For a motion to strike, a court "may order stricken from any pleading any insuficient defense or any redundant, immaterial, impertinent, or scandalous matter."FED. R. CIV. P. 12(f).

BACKGROUND

For the purposes of this Opinion, the Court accepts the following facts as true.

I. The Parties

GDLP is the world's largest trailer company. It designs and produces freight vans, refrigerated vans, and flat bed trailers for hauling cargo. (R. 1-1; Compl. ¶ 3.)

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1528255 (N.D.Ill.)
**2005 WL 1528255 (N.D.Ill.)**

Palmer is a former GDLP employee who at one time held the title of "Assistant Cost Estimator." (*Id.* ¶ 4.) At all relevant times, GDLP employed Palmer, except for a short period of time in 2001 and after August 8, 2003, when Palmer voluntarily resigned a second and final time. (*Id.* ¶ 8.)

## II. Palmer's Allegations Related to Her Employment

During the periods it employed Palmer, Great Dane willfully employed Palmer for over forty hours per week. (*Id.* ¶ 9.) Great Dane failed to pay Palmer for those hours over forty in a week at a rate of one and a half times Palmer's regular hourly rate. (*Id.*) In doing so, Great Dane willfully and improperly classified Palmer as a full time exempt salaried employee when it knew or should have known that Palmer did not exercise unfettered discretion and independent judgment. (*Id.* ¶ 10.)According to Palmer this classification was incorrect because Palmer's work at Great Dane as an Assistant Cost Estimator was routine, formulaic, and closely scrutinized and supervized.(*Id.*)

## II. Palmer's Complaint

**\*2** In Count I, Palmer contends that GDLP failed to pay her for overtime (time and a half) for hours she worked in excess of forty hours a week, thereby violating the FLSA. Count II alleges that GDLP willfully violated the FLSA. Count III alleges that by failing to pay overtime, GDLP violated the IMWL. As part of her remedy, Palmer seeks statutory damages equal to two percent of the amount of the earned but unpaid overtime wages for each month following

the month such overtime was originally due Palmer. Count IV alleges that GDLP violated the IWPCA by failing to pay Palmer the overtime pay that she allegedly earned.

## ANALYSIS

The Court addresses GDLP's motion to strike Palmer's statutory penalty under the IMWL in Section I and GDLP's motion to dismiss Palmer's IWPCA claim in Section II.

## I. Whether Palmer May Seek the IMWL Statutory Penalty on Her Own Behalf

In support of its motion to strike, GDLP argues that as a matter of law, only the Illinois Department of Labor, and not an individual, may sue for the statutory penalty under the IMWL. The IMWL grants an employee the right to bring a civil action to recover the amount by which the employer underpaid the employee. 820 Ill. Comp. Stat. 105/12-a (2005). The IMWL further provides that:

At the request of the employee or on motion of the Director of Labor, the Department of Labor may make an assignment of such wage claim in trust for the assigning employee and may bring any legal action necessary to collect such claim, and the employer shall be required to pay costs incurred in collecting such claim. Every such action shall be brought within 3 years from the date of the underpayment. Such employer shall be liable to the Department of Labor for 20% of the total employer's underpayment and shall be additionally liable to the employee for punitive damages in the amount of 2% of the amount of any

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 1528255 (N.D.Ill.)
**2005 WL 1528255 (N.D.Ill.)**

such underpayments for each month following the date of payment during which such underpayments remain unpaid.

*Id.* GDLD argues that as a matter of law, only the Illinois Department of Labor can sue for the Statutory Penalty under the IMWL. In support of this interpretation, GDLD cites *Gelb v. Air Con Refrigeration & Heating, Inc.,* 356 Ill.App.3d 686, 292 Ill.Dec. 250, 826 N.E.2d 391 (Ill.App.Ct.2005). The Illinois appellate court in *Gelb* found that the "statute only mentions punitive damages payable to employees in the context of an action assigned to and subsequently brought by the Director of Labor. It makes no provision for employees to recover punitive damages aside from assigning their claims to the Director." *Id.* at 403.

Because Palmer brings her IMWL claim pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367, Illinois law supplies the interpretation of the IMWL. *See Chrysler Realty Corp. v. Thomas Indus., Inc.,* 97 F.Supp.2d 877, 879 (N.D.Ill.2000) (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Where, as here, the highest state court has yet to consider an issue, the federal court will generally follow a state appellate court decision. *See West v. American Telephone and Telegraph,* 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940) ( "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise").

**\*3** The Court finds the Illinois appellate court's reasoning in *Gelb* persuasive.[FN1] The plain language of the statute limits punitive damages to the situation where the Director of Labor is suing on behalf of the employee. *See Community. for Creative Non-Violence v. Reid,* 490 U.S. 730, 739, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) ("In interpreting a statute, [the Court] must first begin with the text"); *United States v. Ron Pair Enters.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters' ").

> FN1. Palmer attempts to cast doubt upon the validity of *Gelb* by submitting that the plaintiff is seeking an appeal to the Illinois Supreme Court (the court of appeals already declined to rehear the case). At the present time, however, the Court finds the appellate court's reasoning to be the most persuasive interpretation of the relevant section of the IMWL and therefore the most accurate reflection of how the Illinois Supreme Court would rule in this case. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *also see White v. U.S.,* 680 F.2d 1156, 1161 (noting that *Erie* requires the federal court to predict how the state supreme court would decide the case).

Similar to *Gelb,* Palmer chose not to assign

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 4
Not Reported in F.Supp.2d, 2005 WL 1528255 (N.D.Ill.)
**2005 WL 1528255 (N.D.Ill.)**

her case to the Director of Labor and seeks to recover the statutory penalty on her own. The plain meaning of the statute prevents such action. Accordingly, the Court grants GDLP's motion to strike the remedy seeking the statutory penalty.

II. Palmer's IWPCA Claim

In support of its motion to dismiss Palmer's IWPCA claim, GDLP contends that the proper avenue for seeking unpaid overtime when not covered by an agreement or contract is through the FLSA and IMWL, and not the IWPCA. GDLP argues that Palmer cannot use the IWPCA to extend the statute of limitations for any claims under the FLSA or IMWL which are time barred. The Court agrees with GDLP. The plain meaning of the IWPCA indicates that pay is only recoverable under the statute when the employer has breached contractual obligations. The IWPCA states that wages "shall be defined as any compensation owed an employee by an employer *pursuant to an employment contract or agreement* between the two parties, whether the amount is determined on a time, task, piece, or any other basis of calculation ." 820 Illl. Comp. Stat. 115/2 (emphasis added)."Payments to separated employees shall be termed 'final compensation' and shall be defined as wages, salaries, ... and any other compensation owed the employee by the employer *pursuant to an employment contract or agreement* between the two parties."*Id.* (emphasis added)."Employers shall notify employees, at the time of hiring, of the rate of pay and of the time and place of payment."820 Ill. Comp. Stat. 115/10.[FN2]

> FN2. Courts in this district have recognized that the IWPCA focuses

on the contractual obligations of the employer. "Just as the IWPCA does not mandate vacation pay, it does not mandate overtime pay, but merely requires that the employer pay its employees the wages it has promised them."*Colgren v. County Line Cartage, Inc.,* No. 99 C 8268, 2000 WL 1154072, at *4 (N.D.Ill.2000)."The IWPCA [does] not create ... entitlement to overtime wages. In fact, the Seventh Circuit has stated that the IWPCA merely requires 'that the employer honor his contract."*Lopez v. Smurfit-Stone Container Corp.,* No. 02 C 7347, 2003 WL 297533, at *3 (N.D.Ill.2003) (citing *National Metalcrafters v. McNeil,* 784 F.2d 817, 824 (7th Cir.1986)).

Another court from this district has dealt with this issue. *See Mathias v. Addison Fire Protection Dist. No. 1,* 43 F.Supp.2d 916 (N.D.Ill.1999). In *Mathias,* the plaintiffs filed FLSA and IWPCA claims seeking overtime pay allegedly due them. *Id.* The employer paid plaintiffs one wage for their work as firefighters, and a lower wage when working as fire inspectors. Plaintiffs sought to increase the rate of pay for fire inspectors. *Id.* A collective bargaining agreement ("CBA"), however, controlled the rate of pay for each position, and the plaintiffs understood that they would receive a lower rate of pay for their hours logged as fire inspectors. *Id.* at 920.Ruling that the CBA was definitive, the court dismissed the FLSA claim and then turned to the IWPCA claim. *Id.*"The IWPCA mandates that employers pay their employees agreed upon wages and benefits within certain time periods ."*Id.* at 926 (citing 820 ILCS §§

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                 Page 5
Not Reported in F.Supp.2d, 2005 WL 1528255 (N.D.Ill.)
**2005 WL 1528255 (N.D.Ill.)**

115/2-5)."The IWPCA does not, however, address the rate at which an employer must pay its employees, either during regular or overtime hours.... The success of Plaintiff's IWPCA claim appears tied to the success of their claim under the FLSA."*Id.* Because the CBA controlled, the plaintiffs could not successfully argue that they were due higher overtime wages based on a contract. Therefore, the court dismissed the IWPCA claim with prejudice. *Id.*

**\*4** In another similar overtime case, *Pautlitz v. City of Boston,* No. 89 C 8855, 1991 WL 33658 (N.D.Ill.1991), the plaintiffs argued that their employee handbook was a contract. *Id.* at \*2. After the court found that the handbook was not a contract, the plaintiffs argued that "even in the absence of a contract, they [were] entitled to the overtime claimed because of a 'policy' to pay such overtime."*Id.* at \*3. The court rejected that argument and dismissed the count with prejudice because the plaintiffs could not state a claim for relief based on contract theory, and because they did not allege an "agreement." *Id.*

The facts in this case parallel those in *Mathias* and *Pautlitz.*Palmer has not alleged the existence of any agreement, contract, or CBA stating that GDLP promised to pay Palmer overtime. Instead of alleging that an agreement requirement GDLP to pay Palmer overtime, Palmer alleges that the FLSA and IMWL bound GDLP to pay Palmer overtime. The respective statute of limitations for those two acts-two and three years, or three years for both if the FLSA violation was willful-however, have expired. Palmer cannot use the IWPCA claim to extend her statute of limitations to five years. Attempting to circumvent these

statute of limitations problems, Palmer argues that if she proves that GDLP owes her for overtime, then the IWPCA will become applicable, citing to *O'Brien v. Encotech Construction,* No. 00 CV 1133, 2004 WL 609798 (N.D.Ill.2004).*O'Brien* does not support the proposition of basing an IWPCA claim on the FLSA and IMWL's requirements to pay overtime because it involved a contractual dispute over a CBA. Unlike *O'Brien,* Palmer has not suggested that any agreement exists that requires GDLP to pay overtime. Hence, the correct route for Palmer to obtain earned pay, including potential overtime pay, is through timely FLSA and IMWL claims. Because GDLP did not breach any contractual obligation to pay overtime, no IWPCA claim exists.

For the above reasons, the Court grants GDLP's motion to dismiss the IWPCA claim with prejudice.

CONCLUSION

Pursuant to Rule 12(f), the Court strikes the statutory penalty remedy sought under Count III. Pursuant to Rule 12(b)(6), the Court dismisses Count IV of Palmer's Complaint.

N.D.Ill.,2005.
Palmer v. Great Dane Trailers
Not Reported in F.Supp.2d, 2005 WL 1528255 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.