**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| **PHILLIP HALL,** ) | **Case No. 08 C 50116** |
| ) | **(consolidated with 09 C 50146)** |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Magistrate Judge** |
| ) | **P. Michael Mahoney** |
| ) | |
| **STERLING PARK DISTRICT,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

Plaintiff, Phillip Hall, filed two different lawsuits against Defendant, Sterling Park

District, that were consolidated by the court.  The first suit, initiated on June 24, 2008, contains

four counts alleging violations of the Fair Labor Standards Act, 29 USC § 207, the Illinois

Minimum Wage Law, 820 ILCS § 105/3-4, and the Illinois Wage Payment Collection Act, 802

ILCS § 115/2, and seeks back pay for overtime worked and compensation for unused vacation

time.  Plaintiff subsequently filed a two-count complaint on July 7, 2009 that seeks damages and

equitable relief to redress alleged violations of the Age Discrimination in Employment Act, 29

U.S.C. § 621 *et seq.* ("ADEA").  The court consolidated the cases in their entirety on October 7,

2009.  Defendant has now filed a motion for summary judgment as to all counts in both of

Plaintiff's suits.

**II. BACKGROUND**

Plaintiff began his employment at the Sterling Park District ("the Park District") on or

1

around May 1, 1994 when he was hired as the Director of Golf Operations at the Emerald Hill Golf and Learning Center.  The Park District had recently acquired Emerald Hill and hired Plaintiff as its first Director.   He was 41 years old when he started the job.  He continued to work at full-time capacity until he was terminated on or about April 30, 2006, at 53 years old.

The Park District is governed by a publicly elected five-member Board of Commissioners ("the Board").  The operations of the Park District are assigned to an Executive Director, a position filled by Larry Schuldt ("Schuldt") during the entire period of Plaintiff's employment.  Under the Executive Director are three director-level department heads, including the Director of Golf Operations, the Director of Parks and Planning, and the Director of Recreation.  As the Director of Golf Operations, Plaintiff's duties included oversight of the 18-hole Emerald Hill Golf Course and its affiliated clubhouse, golf shop, restaurant, and banquet facilities.  Plaintiff had a staff that included up to four full-time employees and more than 30 total employees during the peak season.

Plaintiff entered into an initial employment agreement (hereinafter referred to as Plaintiff's "contract") beginning on May 1, 1994 and running for a period of three years.  The contract contained an amendment stating that it would automatically renew for subsequent three year terms unless either party notifies the other within 90 days of the end of the stated term that the contract would not be renewed.  Plaintiff's contract automatically renewed on three occasions, allowing him to work continuously under contract through April 30, 2006.

Plaintiff's initial job was to manage the Park District's efforts to improve the Emerald Hill Golf Course, which was in extremely poor condition.  In addition to the maintenance of the golf course grounds, Plaintiff had the duties of managing the clubhouse and the food and

beverage operations. Plaintiff described his primary duty as course maintenance, which required manual labor. He also had the responsibility for making recommendations about hiring, disciplinary, and salary decisions as to part-time employees at Emerald Hill. Plaintiff managed a budget of over $600,000 and made recommendations about the yearly budget to Schuldt and the Board. As one of three department heads within the Park District, Plaintiff would attend various management-related meetings and monthly Board Meetings.

Plaintiff described working over 40 hours per week during the peak season each year, which runs from May and October, including working about three weekends per month. Plaintiff rarely worked a full 40 hour week during the non-peak season, although he did occasionally work overtime during this season as well. While at work, Plaintiff estimates that between 75% and 80% of his time was spent performing manual labor and other non-management duties. Of the 20% to 25% of the time he spent performing "management work," he described much of this work as routine data entry or paperwork. Plaintiff requested additional funds for labor on numerous occasions, but because his requests were denied, he had to assume many of the tasks required to maintain the appearance and condition of the golf course.

Beginning in 2005, Schuldt began evaluating the operations at Emerald Hill with an eye toward streamlining and restructuring operations. As a part of the evaluation, Schuldt asked Plaintiff to make cost-saving recommendations. Plaintiff provided Schuldt two documents analyzing recommendations for restructuring the full-time positions of Food and Beverage Manager and Golf Professional. In August, 2005, Plaintiff alleges that Schuldt unilaterally chose to terminate the Food and Beverage Manager against Plaintiff's recommendation. With six weeks remaining in the golf season, Schuldt then ordered Plaintiff to terminate the Golf

Professional. A younger worker in his twenties, who was under the supervision of Plaintiff, was assigned the duties of the vacated positions.

Then, in November, 2005, Schuldt apparently decided not to renew Plaintiff's employment agreement for an additional three year term. There was uncertainty about the direction the Park District was going to take with regard to Emerald Hill. Revenues were declining and rounds of golf were down. Schuldt described concerns about Plaintiff's job performance, and specifically believed Plaintiff relied too heavily on poorly performing subordinates in the areas of food and beverage management and golf operations. Schuldt also discovered in 2005 that $12,000 in inventory was missing from the clubhouse, and had concerns about Plaintiff's "lackadaisical" response. Finally, Schuldt believed that Plaintiff had not accomplished four of the eight goals he was expected to complete in 2005. Schuldt believed that taking away the security of a contract would motivate Plaintiff. Schuldt informed Plaintiff of this decision during his annual performance evaluation on November 18, 2005, at which time he informed Plaintiff that he would be retained as an at-will employee and would receive a $1,000 a year (approximately 1%) raise. Other workers received 3% raises, as Plaintiff had received in past years, but Plaintiff was informed that he received 1% based on Schuldt's view that he performed well in only one of the three areas of his job.

Plaintiff disputes that the purpose of the November 18, 2005 meeting was to conduct his annual performance evaluation, as he was not provided with a written evaluation on standardized forms, as had been the policy and practice of the District. Plaintiff also disputes Schuldt's given reasons for the non-renewal of his contract. Namely, Plaintiff stated that Schuldt was aware of Plaintiff's reliance on subordinates based on the amount of time he needed to spend on the

4

physical maintenance of the golf course. Plaintiff points out that despite Schuldt's decision to terminate two full-time staff members, the clubhouse restaurant and the golf shop were both running smoothly and profitably and the course was "in the best shape ever." Plaintiff believes he completed six of his eight listed goals for 2005, and the two that were incomplete had been assigned to the previously terminated Golf Professional. As to the $12,000 in missing inventory, Plaintiff again disputes the characterization that his response was lackadaisical, and describes how he was not allowed to participate in the investigation. In short, Plaintiff disputed the content of his evaluation and came to believe that the November 18, 2005 meeting signaled the beginning of the end of his employment with the Park District.

On December 19, 2005, Plaintiff sought a meeting with the Board to discuss his concerns, and was instead instructed to file a written grievance. Plaintiff filed a written grievance on December 23, 2005, indicating his objections to his evaluation and decreased raise. On January 10, 2006, a member of the Board sent Plaintiff a letter denying his grievance, and affirming the decisions to give him a $1,000 raise and to eliminate his contract. At a January 16, 2006 executive meeting, the Board decided to eliminate the Director of Golf Operations and Assistant Golf Course Superintendent positions and to create the Golf Course Superintendent and Golf Operations Manager positions. This resulted in the elimination of Plaintiff's job, as well as the job of Aaron Heaton ("Heaton"), a 23-year-old employee.

Plaintiff was informed of the Board's decision in a letter from Schuldt on January 31, 2006. He was offered the opportunity to apply for the newly-created Golf Course Superintendent job. Plaintiff did apply for the position, but was not granted an interview. Heaton was ultimately selected to fill the position without having submitted an application or

being interviewed.  Another 22-year-old employee, C.J. Wade ("Wade") was chosen for the

position of Golf Operations Manager.  Plaintiff was officially terminated in a letter dated March

23, 2006.  The termination letter alluded to Plaintiff's performance, attitude, and inability to

maintain respectful communications with his supervisor.

### III. DISCUSSION

### A. Statement of the Law

A court may only grant summary judgment "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c); *see also Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).   In

evaluating such a motion, the court's function is not to weigh the evidence and determine the

truth of the matter, but to determine whether there is a genuine issue for trial.  *Id.* at 490.  The

court must draw all reasonable inferences in the light most favorable to the party opposing the

motion.  *Id.*  If the moving party bears the burden of persuasion at trial, that party must support

its motion with credible evidence to show that, even in the absence of an adequate response by

the nonmovant, it is entitled to judgment as a matter of law.  *Saab Cars USA, Inc. v. United

States*, 434 F.3d 1359, 1368 (Fed. Cir. 2006); *Arnett v. Myers*, 281 F.3d 552, 562 (6th Cir. 2002);

*see also Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting) (The

moving party "must support its motion with credible evidence . . . that would entitle it to a

directed verdict if not controverted at trial.").  Moreover, a  party who bears the burden of proof

on a particular issue may not rest on its pleadings, but must affirmatively demonstrate that there

is a genuine issue of material fact by identifying with reasonable particularity the evidence upon

which the party relies.  *Hemsworth*, 476 F.3d at 489–90.

## B.  Fair Labor Standards Act Claims

Plaintiff claims he was mis-categorized as an exempt employee for the purposes of the Fair Labor Standards Act, 29 U.S.C. § 207, et seq. ("FLSA").  He claims he primarily performed work that was non-exempt in nature, and is owed overtime compensation pursuant to the FLSA for all hours in excess of forty hours per week.

The FLSA exempts employees employed in a bona fide executive, administrative, or professional capacity from the overtime and minimum wage requirements contained in the law.  Federal regulations define an executive employee to be an employee who is:

> (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).  That Plaintiff was compensated above the rate of $455 per week does not appear to be in factual dispute.[1]  It is also clear that Plaintiff was responsible for directing the work of a number of other employees, including up to 30 employees during the peak season.

---

[1]Plaintiff's salary in 2006 was $69,828, or $1,342.84 per week.  Plaintiff argues his "effective hourly pay rate" should be calculated in light of the number of hours worked, and presents an alternative hourly rate of $22.39 based on an average of 60-hour weeks.  Even were the court to accept this distinction, extrapolating this hourly rate to a 40-hour work-week still results in a weekly rate of $895.60, an amount far exceeding the base rate in the regulations.

Along the same lines, Plaintiff could recommend hiring, firing, disciplinary, and salary decisions and Plaintiff's recommendations were usually followed by the District.

The question at issue, then, is whether Plaintiff's primary duty was management of the golf facility. Primary duty is defined as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700. This determination must be made on a case-by-case basis considering all of the facts in a particular case, and placing "major emphasis" on the character of the employee's job as a whole. *Id.* The regulations list a number of factors that a court may consider, including, but not limited to: (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.* The regulations in effect during the time Plaintiff was working for Defendant contained the above factors, and contained the additional consideration of the frequency with which the employee exercises discretionary power. 29 C.F.R. § 541.103 (2003). Though time spent performing exempt work is a useful consideration, there is no requirement that an employee spend over 50 percent of his time performing exempt work. *Id.*

Plaintiff urges the court to find that his primary duty was the physical maintenance of the golf course, which included a great deal of manual labor. Plaintiff estimates that he spent 75-80 percent of his time performing non-exempt work. He characterized this non-exempt work as, among other things, cutting grass, changing cups, applying chemical treatments to the course, maintaining and operating machinery, building maintenance, clearing trees, raking sand traps, grading cart paths, breaking down tables, watering flowers, setting up the events tent, fixing

8

leaky toilets, operating the concessions, driving a tractor to seed other park district facilities, applying herbicides throughout the park district, and performing basic data entry and clerical work. The court does not question that Plaintiff performed all of these tasks with varying degrees of frequency, especially during the peak golf season. However, such evidence is not determinative that Plaintiff was a non-exempt employee. Plaintiff's description of the management functions he performed as "inconsequential" and "ancillary" are self-serving conclusions. Why would the Park District hire and continue to employ a Director of Golf Operations at nearly $70,000 per year with expectations that such an individual would primarily perform manual labor alongside seasonal and lower-paid employees?

The totality of the circumstances indicate that Plaintiff was appropriately categorized as an exempt employee, despite his time spent performing manual labor. Plaintiff testified that he did the initial interviewing and made hiring recommendations for the laborers, food and beverage operations workers, and the equipment operators for the golf course. He also supervised the golf pro, the food and beverage manager, and the assistant superintendent, who in turn supervised the laborers. Plaintiff explained that at times, he was responsible for supervising the food and beverage operations for the entire park district. Plaintiff was involved in budgeting, inventory, marketing, staffing, groundskeeping, maintenance, and decisionmaking as to the Emerald Hill facility. Though he disputes that he was in "sole charge" of the golf course, the established facts of this case reveal that Plaintiff had some level of responsibility for the overall day-to-day operation of the entire Emerald Hill Golf facility. Plaintiff also attempts to paint Schuldt as the highest ranking Park District official at the golf course, but does not point to any evidence other than Schuldt's title as Executive Director of the Sterling Park District. The

9

evidence shows that Plaintiff was in charge of Emerald Hill.

As of 2006, Plaintiff was paid a yearly salary that exceeded the salary of any other employee at the golf course by more than $30,000, and it was Plaintiff's testimony that he was distinguished from certain subordinates in that he was a "GCSAA-certified Golf Course Superintendent." Because of budget cuts, Plaintiff alleges that his manual labor workload increased in the last five or six years of his employment. Plaintiff's showing that he shouldered some of the burden created by a shortage of support staff does not render him a non-exempt employee. *See Demos v. City of Indianapolis*, 302 F.3d 698, 706 n.10, (7th Cir. 2002). Rather, the evidence, including deposition testimony from Heaton, indicates that Plaintiff continued to manage operations and employees while physically performing other work. *See, e.g., Masilionis v. Falley's, Inc.*, 904 F.Supp. 1224, 1230 (D. Kan. 1995). Plaintiff's contention that his primary duty was the day-to-day physical maintenance of the golf course is further belied by his argument relating to his ADEA claim that Defendant wrongly represented that he was performing poorly in other areas. Specifically, Plaintiff filed a written grievance asserting that the clubhouse restaurant and the pro shop were operating profitably and that he had "approximately 26 employees that work for me" that helped to transform the golf course. The existence of this dispute indicates that it was both the expectation of Plaintiff and Defendant that Plaintiff was ultimately responsible for management in these areas.

In sum, undisputed facts show that Plaintiff was in a position of relative importance, was regularly involved in budgetary and personnel decisions, did not have a direct supervisor on-site at Emerald Hill, and was salaried at a rate significantly higher than his subordinates. Although Plaintiff has created factual disputes as to certain matters, he has not raised genuine issues as to

10

the material facts that would allow a reasonable fact-finder to determine that Plaintiff was a non-exempt employee. Defendant's motion for summary judgment is granted as to Counts I and II of Plaintiff's complaint filed on June 24, 2008.

The Illinois Minimum Wage Law contains an identical exemption for an employee employed in a bona fide executive capacity, and defines the exemption based on the FLSA. The above analysis applies in the same manner to Plaintiff's IMWL claim. Defendant's motion for summary judgment is granted as to Count III of the June 24, 2008 complaint.

### C. Illinois Wage Payment Collection Act Claims

Plaintiff seeks unpaid overtime wages and compensation for unused vacation time under the The Illinois Wage Payment Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.* The IWPCA does not establish a right to overtime pay or vacation pay, but rather allows for a cause of action based on compensation wrongfully withheld pursuant to "an employment contract or agreement." 820 ILCS 115/4-5; *Andrews v. Kowa Printing Corp.*, 814 N.E.2d 198, 205 (Ill. App. 2004), *aff'd*, 838 N.E.2d 894 (Ill. 2005). In other words, the IWPCA provides a cause of action where an employer did not honor a contract or agreement with an employee. *See, e.g., National Metalcrafters v. McNeil*, 784 F.2d 817, 824 (7th Cir. 1986). The IWPCA also requires employers to compensate employees for the monetary equivalent of earned but unused vacation time at the time of their separation from employment. 820 ILCS 115/5. Defendant argues that Plaintiff's employment agreement classified him as a salaried employee, and that the Park District's Vacation Policy did not allow employees to accrue vacation time in excess of 45 days.

This issue was first addressed by the District Court in an order denying Defendant's motion to dismissed the IWPCA claim pursuant to Fed. R. Civ. P. 12(b)(6). (Mem. Op. & Order,

Dec. 10, 2008, Dkt. No. 31.) In the opinion, Judge Reinhard found that Plaintiff's allegations, when liberally construed in Plaintiff's favor, satisfied the requirements of notice pleading. The District Court took notice of language in the Personnel Policy Manual granting overtime wages only to non-exempt employees and acknowledged that the manual was not an employment contract, but found that Plaintiff's allegations allow for inquiry into "the way the employer-employee relationship has played out over the course of the relationship." (Mem. Op., Dkt. No. 31, p. 2.) Now at summary judgment, the parties have completed discovery and had the opportunity to support their respective positions on how the employer-employee relationship played out as to the IWPCA claims.

Plaintiff claims that he is owed compensation for unused vacation time exceeding 45 days. Plaintiff attempts to show that he was working under a purported oral agreement that superceded the terms in the District's Vacation Policy. Plaintiff's theory results in him being owed compensation beyond the 43.5 days the Park District apparently believed he was owed for at the time he was terminated. What Plaintiff appears to be arguing is that the District violated an oral agreement at the end of each year when it reduced his vacation time back to 45 days. Plaintiff continued to believe that his days were accumulating, and that at some point this issue would be remedied in line with the assurances Plaintiff received from Schuldt.

The court will examine the evidence to determine whether a dispute exists as to the material facts surrounding Plaintiff's claim of a modified agreement. Plaintiff points to two main pieces of evidence to support his claim that he had an expectation that he would be paid for his excess vacation days: (1) he claims Schuldt told him during a number of conversations about Plaintiff's excess vacation time that there was "nothing to worry about" as long as Schuldt was

12

the Executive Director; and (2) Plaintiff claims that Schuldt referenced a financial audit of the

Park District that listed employees' accrued unused vacation time as a liability that the District

would eventually owe. Schuldt agrees that he discussed the issue of excess unused vacation time

with Plaintiff, but did not recall telling Plaintiff that he would not have to worry about losing

accrued vacation time. Plaintiff admitted during his deposition that he did not know whether the

financial audit referenced employee accrued vacation time in excess of 45 days.

Defendants point to language in Plaintiff's Employment Agreement stating that it

"represents the entire agreement of the parties with respect to the subject matter hereof, and it

may not be altered or amended orally but only by agreement in writing." However, the

Employment Agreement contains no description of Plaintiff's vacation benefits other than a

general provision stating that entitled Plaintiff to "all of the regular benefits afforded to the

employees of the District as in effect from time to time." In turn, the District's Personnel Policy

Manual contained a Vacation Policy, which stated the following:

> Employees are recommended to take vacations annually; however, unused vacations
> may be accumulated to a maximum of forty-five (45) days. Any unused vacation
> days in excess of the forty-five day maximum will be forfeited. Vacation days are
> considered unused on December 31 of the year in which they are earned.

(Def.'s Rule 56.1 Stat. of Facts, Ex. 20.) The Policy Manual also provided a mechanism for

Plaintiff to challenge his vacation time, had he wished to do so, stating:

> Vacation time available will be shown on the employee's pay-check stub.
> Employees who feel there is a discrepancy in the calculation of their vacation pay or
> eligibility may request a review of that calculation by the Administrative Office.

(Def.'s Rule 56.1 Stat. of Facts, Ex. 20.) There is no evidence that Plaintiff ever availed himself

of this particular process, though he did approach Schuldt with questions on the matter. Plaintiff

13

testified at his deposition that, aside from the "nothing to worry about" comment, Schuldt never told Plaintiff that he would be compensated for excess unused time or that he should disregard the information in the manual.

In a November 2004 email to Schuldt, Plaintiff noted that he had "accumulated 102.15 days of vacation" plus 70 hours of weekend "comp. time" and asked if there was any way he could be compensated for excess unused vacation or whether he actually had to take the days off – in which case he would need to take 69 days off "to get back to even." Neither party recalled any response to the email. Though it is clear Plaintiff experienced some worry or confusion regarding his vacation time, the contents of this email could cut both ways. On one hand, it does not make clear that there was an agreement that Plaintiff would be compensated for all of his excess days. On the other hand, Plaintiff's calculations about his vacation time indicate that he was working under the impression that he was accumulating vacation time beyond the 45 day limit. The same could be said for Plaintiff's apparent journal note that as of November 2005 he had "accumulated over 90 vacation days that [Plaintiff] can never use or be paid for." The fact that Plaintiff believed he had 90 excess days indicates that he thought he was accruing days beyond the 45-day limit. Defendant would argue that Plaintiff knew the written policy would prohibit him from being compensated for this time.

Plaintiff's Employment Agreement leaves some ambiguity as to vacation benefits. The Personnel Policy Manual contains clear language as to the 45-day cap, but states that it "does not create a promise or an express or implied contract by the Park District." The language of these documents does not foreclose a finding that an oral agreement existed, and that Plaintiff was working with an understanding that he was not subject to the 45-day cap. The court finds there

14

to be disputes as to the material facts that led the parties to their beliefs about how Plaintiff should have been compensated for his unused vacation time. These issues of fact relate directly to Plaintiff's IWPCA claims and should be determined by a finder of fact at trial. Therefore, Defendant's motion for summary judgment is denied as to Count IV of the June 24, 2008 complaint as it relates to Plaintiff's claims for unpaid vacation time.

### D. Age Discrimination Complaint

#### 1. Contents of the Executive Meetings of the Board of Commissioners

The parties have filed a number of motions regarding disputed transcripts[2] from certain executive meetings of the District's Board of Commissioners. Plaintiff has filed a motion for leave to file the transcripts unsealed and unredacted as "Group Exhibit D" to its response to Defendant's Motion for Summary Judgment. Defendant opposes Plaintiff's motion, and filed a motion to strike certain portions of Plaintiff's Response materials in part because they reference the previously unfiled Group Exhibit D. The court ordered Plaintiff to submit the materials for an *in camera* inspection, and will address these discovery and evidentiary issues prior to deciding Defendant's motion for summary judgment as to Plaintiff's ADEA claims.

As an initial matter, the court must determine whether the transcripts will be admitted into the record as an exhibit, as Plaintiff requests. Defendant objects for a number of reasons, including that the transcripts lack foundation or authentication, and that they are protected from disclosure by the Illinois Open Meetings Act and/or the Federal Deliberative Process Privilege.

---

[2]The court recognizes that the disputed documents are not official transcripts. They are notes reflecting the audio recordings of the executive meetings as typed-out by employees of Plaintiff's counsel. Though mindful of the distinction, the court herein will refer to the notes as "transcripts" for the sake of brevity.

As to Defendant's objection over foundation, the court need not determine whether the information is in a form that would be admissible at trial.  The court may review facts that would be admissible at trial if in a form permitted by the Federal Rules of Evidence, even if the form produced at summary judgment would not be admissible.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 327 (1986); *Wragg v. Village of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010).  Though the evidence need not be in an admissible form, the court must make a determination that the content of the information would be admissible.  *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 761 (7th Cir. 2008) (citing *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002)).  The information submitted by Plaintiff is sufficient to apprise the court of the content from the executive board meetings that Plaintiff contends is relevant to this case.

The question that remains is whether disclosure of the content proposed to be filed by Plaintiff would violate the Illinois Open Meetings Act or the Deliberative Process Privilege.  The Illinois Open Meetings Act provides that, absent the governmental entity's consent, "the verbatim record of a meeting closed to the public shall not be open for public inspection or subject to discovery in any administrative or judicial proceeding other than one brought to enforce this Act."  5 *Ill. Comp. Stat.* 120/2.06(e).  Where the principle claim arises under federal law, the proceedings in this court are governed by the principles of the federal common law. *Fed. R. Evid.* 501(a); *Memorial Hosp. for McHenry County v. Hon. Milton I. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981).  However, "[a] strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be done at no substantial cost to federal substantive and procedural policy."  *Sronkoski v. Schaumburg Sch. Dist., No. 54*, 08-C721, 2009 WL 1940779, 2009 U.S. Dist. LEXIS 57803, at *11 (N.D. Ill. July

16

1, 2009) (*quoting Memorial Hosp.*, 664 F.2d at 1061). The Seventh Circuit has indicated that courts should "weigh the need for truth against the importance of the relationship or policy sought to be furthered by the privilege, and the likelihood that recognition of the privilege will in fact protect that relationship in the factual setting of the case." *Memorial Hosp.*, 664 F.2d at 1062–61.

In this case, the court found it appropriate to review the transcripts, *in camera*, to allow for an informed balancing of the interests of the parties. *See, e.g. Sandholm v. Dixon Public School Dist.*, Case No. 09 C 50119, 2010 WL 899032, at *1 (N.D. Ill. Mar. 10, 2010) (Mahoney, M.J.). On review of the transcripts, the court found there to be information that may aid in uncovering the facts allegedly relied upon by Defendant in its decision to terminate Plaintiff and that the interests served by the open meeting privilege are overcome by the need for probative evidence at this stage of litigation. *See Kodish v. Oakbrook Terrace Fire Protection Dist. et al.*, 235 F.R.D. 447, 452 (N.D. Ill. 2006); *see also, Sronkoski*, 2009 U.S. Dist. LEXIS 57803, at *13–14. Put in a different context, if a school board got together in a closed meeting and, for example, discussed terminating teachers as part of a mini-RIF, and one of the board members made a statement to the effect of "we should make sure to get rid of the black teacher and restructure to replace her with a white teacher," it is difficult to argue that such information would not be admissible. Here, the materials put forth by Plaintiff contain purported references to Plaintiff's age, the ages of Plaintiff's potential replacements, and information as to the reasons behind Plaintiff's termination. The court finds that the importance of the information outweighs the policies behind the Illinois Open Meetings Act.

The court reaches the same conclusion as to the Deliberative Process Privilege. The

17

privilege proscribes to protect "frank discussion of legal and policy matters [that are] essential to the decision-making process of a governmental agency." *United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993). If the privilege is found to apply, the court may still order disclosure if the plaintiff demonstrates a "particularized need" that outweighs the defendant's need for confidentiality. *Sandholm*, 2010 WL 899032 at *1. Though Defendant emphasizes the need to protect the ability of deliberative bodies to have frank discussions of legal and policy matters, the court refers to the above hypothetical as an example of situation where, as here, limitations should be placed on the ability to keep discussions confidential where the discussion itself may be the heart of the discriminatory activity.

For the foregoing reasons, Plaintiff's motion to file "Exhibit D" unredacted and unsealed is granted, in part. Plaintiff may file only those portions of the transcripts that contain content that is relied upon by Plaintiff in his opposition to Defendant's motion for summary judgment.

Defendant's motion to strike is likewise denied. The court has received relevant information through Rule 56.1 statements about which both parties have objected. As to Defendant's concerns about an inability to respond to particular statements in Plaintiff's Local Rule 56.1(b)(3)(B) responses, this is unlikely to prejudice Defendant. In reviewing the record as a whole, the court has construed the facts in a light most favorable to Plaintiff. Defendant's ability to object to certain characterizations in Plaintiff's answers would not affect the court's analysis. Plaintiff has mitigated Defendant's other concerns by supplementing its submissions with a notice of errata, corrected exhibits, and the above-discussed motion for leave to file meeting transcripts. The court believes it has all of the factual tools to reach a reasoned decision, and will consider the appropriate information as submitted by the parties in considering

18

Plaintiff's ADEA claims.

    2.      Age Discrimination Claim

Plaintiff filed his ADEA claims in a separate complaint on July 7, 2009. The ADEA makes it unlawful for any employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §621(a)(1). To establish a claim under the ADEA, Plaintiff must prove that age was the "but-for" cause of the decision not to renew his contract or hire him into a new position. *Gross v. FBL Fin Serv., Inc.*, __ U.S. __, 129 S.Ct. 2343, 2350 (2009). "[I]t's not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for his age, the adverse action would not have occurred." *Martino v. MCI Communications Serv., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009) (emphasis in original). Plaintiff must show that "age was the *determinative* factor." *Lindsey v. Walgreen Co.*, 615 F.3d 873, 876 (7th Cir. 2010) (emphasis in original).

There are two ways to approach proving a discrimination claim under the ADEA, and Plaintiff has attempted both. Under the direct method, Plaintiff must present evidence that could be interpreted as an acknowledgment of discriminatory intent or could establish a decisionmaker's discriminatory motive through a chain of inferences. *See Mach v. Will Co. Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009); *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). More commonly used at the summary judgment stage, the indirect approach requires Plaintiff to show that (1) he was over 40 years old; (2) he was meeting the legitimate job expectations of his employer; (3) he suffered an adverse employment action; and (4) similarly situated, younger employees were treated more favorably or brought in to perform the same work Plaintiff had

19

been performing. *Martino v. MCI Commun. Servs., Inc.*, 574 F.3d 447, 452 (7th Cir. 2009);

*Duncan v. Fleetwood Motor Homes of Indiana, Inc.*, 518 F.3d 486 (7th Cir. 2008) (citations

omitted). Where there appears to be no factual dispute that Plaintiff has alleged a *prima facie*

case under the indirect method, the burden then shifts to Defendant to show that there was a

legitimate nondiscriminatory reason for its employment decision. *Duncan*, 518 F.3d at 491. The

methods of proving discrimination under each approach will often overlap where, as here,

Plaintiff weaves together circumstantial evidence to create an inference that Defendant's motive

was, in fact, discriminatory. *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900,

902 (7th Cir. 2006) (analyzing the difference between the direct and indirect methods and direct

versus circumstantial evidence). The court will consider the evidence offered by Plaintiff in the

context of both the direct and indirect methods of proof.

Under the direct method, the question for the court at summary judgment is whether

issues of material fact exist regarding evidence that "points directly to a discriminatory reason

for the employer's action." *Atanus*, 530 F.3d at 671. The focus is not whether the evidence

presented is "direct" or "circumstantial" in nature, but rather, does the evidence "point directly"

to a discriminatory motive. *Id.* If Plaintiff produces such evidence, Defendant's summary

judgment motion must fail. *Id.* Here, Plaintiff does not appear to have evidence of a direct

admission of discrimination by Defendant, and instead attempts to produce a "convincing

mosaic" of circumstantial evidence that would allow a trier of fact to find discrimination by

Defendant. *Id.*; *Troupe v. May Department Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). This

evidence may include "suspicious timing, ambiguous statements oral or written, behavior toward

or comments directed at other employees in the protected group, and other bits and pieces from

20

which an inference of discriminatory intent might be drawn." *Troupe*, 20 F.3d at 736.  Plaintiff

may also attempt to show that similarly situated younger employees were treated better by

Defendant, or that Defendant's justifications for the adverse employment actions taken by

Plaintiff were pretextual.[3]  *Id.*

Plaintiff presents a confluent description of evidence pointing toward a finding of

discriminatory motive, including written and oral statements, suspiciously timed

decisionmaking, and inconsistencies in Defendant's reasoning for its actions.  Plaintiff points out

that he had been receiving yearly evaluations between 1994 and 2005, and on three occasions

received contract extensions, without any negative reviews of his work.  Based on various

ratings systems used throughout his evaluations, Plaintiff was described as "above average,"

"exceptional," "outstanding," "very good," and was given an "Overall Performance Description"

in 2003 of "Highly Effective Performance, Exceeds Standard."  A review of Plaintiff's

evaluations from 1995 to 2003 reveals no instances where he was marked as "below average,"

"below standard," or "improvement necessary" in any category.  In 2005, the clubhouse

restaurant and the golf shop were both operating at a profit, and the golf course was, by

Schuldt's description, in its "best shape ever," despite the Park District's decision to terminate

two of Plaintiff's full-time subordinates.  Plaintiff also describes how the following comments

were made by Park District officials with regard to the ages of Plaintiff or his potential

replacements:

> (1) at staff meetings in 2003 and 2004, Schuldt described Plaintiff as "the oldest"
> employee in terms of age rather than years of service, the "closest one [to being a

---

[3]These latter two types of circumstantial evidence overlap with what Plaintiff must show under the indirect method, and apply equally to both methods.

senior citizen]," "the elder statesman," and asked how "an old fellow like you" hit a good drive;

(2) at the meeting where Plaintiff was informed of the decision not to renew his contract, Plaintiff mentioned not wanting to be doing certain types of labor at age 65 and Schuldt responded "[w]ell, we have to be careful because you old farts have age laws";

(3) during the December 15, 2005 Board meeting, Schuldt described Plaintiff's potential replacements as "a couple of young people" in Wade and Heaton;

(4) during the January 10, 2006 Board meeting, Schuldt described Plaintiff as "with no contract, 55, at-will"; and

(5) when speaking about Wade at a March 20, 2006 meeting, Schuldt described Wade as "almost like a kid with the stuff I gave him to do" and stated that "I think [Heaton] will be the same way."

Plaintiff notes that these comments were made around the time or after he turned 50 years old. The parties agree that Plaintiff was invited to, and did apply for the newly created Golf Course Superintendent position, but was not granted an interview. Heaton, a substantially younger employee with less experience than Plaintiff, was given the job without having to apply or interview. Wade, another younger employee, was similarly hired into the other newly created position.

Defendant paints a different picture of the events leading to Plaintiff's separation from employment. Defendant asserts that Plaintiff was terminated, and then not re-considered for a new position, based on his performance and other non-discriminatory restructuring plans. Defendant describes a situation where Plaintiff's job performance did not meet Defendant's expectations in the areas of food and beverage management and clubhouse / golf shop

22

management. Specifically, Defendant has described how Plaintiff was initially brought in to, and did, improve the physical conditions of the course, but once the course was consistently improved, Defendant made clear it was looking for better leadership in the areas of food and beverage management and supervision of the clubhouse and golf shop. Defendant claims the legitimate nondiscriminatory reason for not renewing Plaintiff's contract was to motivate him to perform better. Defendant also asserted a need to maintain flexibility in the face of decreasing revenue. Once Plaintiff learned that his contract would not be renewed, Defendant alleges Plaintiff's performance and motivation worsened, his relationship with Schuldt and the Board deteriorated, and he became increasingly insubordinate or absent in the months leading up to the decision to terminate him. Defendant points to evidence of Plaintiff's written complaint to the Board, a demeaning attitude taken toward the Board by Plaintiff and his wife during a meeting, and a large number of vacation days taken by Plaintiff in late 2005 and early 2006. Finally, Defendant claims that younger employees were not treated more favorably. Plaintiff was given an opportunity to apply for the newly created position as a part of the restructuring. While admitting that some of Plaintiff's tasks were taken on by Heaton, Defendant claims that Heaton was fully qualified and could be employed for a salary $29,000 lower than Plaintiff's salary, and $15,000 lower than the salary that would have been offered to Plaintiff for the newly created position.

Defendant characterizes the comments alleged by Plaintiff as "stray remarks" which do not lead to an inference of age-based animus. As to the comment about Plaintiff being "with no contract, 55, at will," Defendant explains that the '55' was in reference to the potential salary of the newly created position, and not to Plaintiff's age. Defendant would point to portions of

Plaintiff's evaluations where it was suggested that he improve his management of the food and beverage and clubhouse areas, or to his 2004 and 2005 evaluations when he was given specific goals to complete. As for the reasons why Plaintiff was not granted an interview, Defendant asserts that Plaintiff had not completed the goals in his evaluations, and that his performance, attitude, and relationship with his supervisor had become progressively worse.

The court finds the competing factual assertions to be material and relevant to Plaintiff's claims. Taken together, the evidence Plaintiff has put forward could be found by a jury to point directly to a discriminatory motive by Defendant. Defendant disputes most of Plaintiff's claims, resulting in genuine issues of material fact that are better suited for consideration at trial.

In addition, Plaintiff frames an argument under the indirect method. Three out of the four components of a *prima facie* case for age discrimination appear beyond dispute: (1) Plaintiff was over 40 years of age when he was terminated; (2) Plaintiff has alleged adverse employment actions in that he was terminated and subsequently not reconsidered for a newly created position; and (3) substantially younger employees were brought in to take on the duties vacated by Plaintiff's termination. The parties are at odds over the fourth factor – whether Plaintiff was performing to reasonable job expectations. When viewing the facts in a light most favorable to Plaintiff, the court finds that Plaintiff has alleged sufficient facts to support the proposition that he was performing up to the reasonable job expectations of Defendant.

The burden then shifts to Defendant to put forward a legitimate nondiscriminatory reason why it terminated Plaintiff, and did not interview or re-hire him for a newly created position. Here, the analysis overlaps significantly with the court's discussion under the direct method. As described, *supra*, Defendant presents a number of nondiscriminatory factors in support of its

decisions regarding Plaintiff. Plaintiff disputes the reasons put forward by Defendant and the facts supporting them. Consistent with the analysis under the direct method, the court finds there to be genuine issues of material fact relating to Plaintiff's claim that Defendant's asserted reasons for firing him were pretextual.

Therefore, Defendant's motion for summary judgment is denied as to Count I of the July 7, 2009 complaint.

3. Retaliation Claim

Plaintiff's retaliation claim is closely related to his discrimination claim. After Plaintiff was informed that his contract would not be renewed, he requested an opportunity to speak with the Board. The Board instead instructed him to file a written grievance. Plaintiff composed a grievance, and eventually testified during a deposition that he believed the grievance contained a complaint about age discrimination. His grievance also explicitly stated that he "[felt] confident that the District will not discriminate or retaliate against me for bringing these issues to light." As noted herein, shortly after the Board received Plaintiff's letter, it was discussing options to replace him during executive meetings. After sending the letter, and speaking to the Board, Plaintiff was informed that he would be terminated at the expiration of his contract and was not granted an interview for the newly created position.

Many of the issues of material fact with regard to Plaintiff's discrimination claim are inextricably linked with Plaintiff's retaliation claim. Though there is evidence which, if accepted, shows that the Board and Schuldt did not retaliate against Plaintiff, there are genuine issues of material fact that are key to Plaintiff's claims and have to be determined by a trier of fact. *See Sylvester*, 453 F.3d at 904 (finding "there is no rich mosaic of circumstantial evidence

25

of retaliation in this case, but there is enough (though maybe barely enough) to preclude summary judgment"). Therefore, Defendant's motion for summary judgment is denied as to Count II of the July 7, 2009 complaint.

## IV. CONCLUSION

The court grants Defendant's motion for summary judgment as to Counts I, II, and III of Plaintiff's June 24, 2008 complaint relating to violations of the FLSA and IMWL. The court grants Defendant's motion for summary judgment as to Count IV of the June 24, 2008 complaint as it relates to Plaintiff's claims for unpaid overtime under the IWPCA, but denies Defendant's motion as it relates to Plaintiff's claims for uncompensated accrued vacation time under the IWPCA. Defendant's motion for summary judgment is denied as to Counts I and II of Plaintiff's July 7, 2009 complaint alleging violations of the ADEA. Plaintiff's motion for leave to file Group Exhibit D unsealed and unredacted is granted, in part. Defendant's motion to strike is denied.

ENTER:

_____
P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE:        May 4, 2011